1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
3  Post Montgomery Center
   One Montgomery Street, Suite 1800
4  San Francisco, CA  94104
   Telephone:  415/288-4545
5  415/288-4534 (fax)
   shawnw@rgrdlaw.com
6
7  *Local Counsel*

8  LABATON SUCHAROW LLP
   CHRISTOPHER J. KELLER
9  MICHAEL W. STOCKER (179083)
   RACHEL A. AVAN
10 140 Broadway
   New York, New York  10005
11 Telephone: (212) 907-0700
12 212/818-0477 (fax)
   ckeller@labaton.com
13 mstocker@labaton.com
   ravan@labaton.com
14
15 *Counsel for Plaintiff*
   *Norfolk County Retirement System*
16
                      UNITED STATES DISTRICT COURT
17
                     NORTHERN DISTRICT OF CALIFORNIA
18
   NORFOLK COUNTY RETIREMENT        )  Case No.
19 SYSTEM, Individually and on Behalf of All )
   Others Similarly Situated,        )  CLASS ACTION
20                                    )
                          Plaintiff,  )  COMPLAINT FOR VIOLATIONS OF THE
21                                    )  FEDERAL SECURITIES LAWS
            vs.                       )
22                                    )
   SOLAZYME, INC., JONATHAN S.       )
23 WOLFSON, TYLER W. PAINTER, DAVID  )
   C. COLE, JERRY FIDDLER, MICHAEL V. )
24 ARBIGE, IAN T. CLARK, PETER KOVACS, )
   JAMES R. CRAIGIE, GOLDMAN, SACHS & )
25 CO., and MORGAN STANLEY & CO. LLC, )
                                      )
26                        Defendants. )
   _____ )  DEMAND FOR JURY TRIAL
27
28

CLASS ACTION COMPLAINT FOR VIOLATIONS FO THE FEDERAL SECURITIES LAWS

1    Plaintiff Norfolk County Retirement System ("Norfolk County" or "Plaintiff") by and

2    through its undersigned counsel, alleges the following individually and on behalf of a class of all

3    persons and entities similarly situated.  All allegations are made upon information and belief, except

4    as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's

5    allegations are based upon the investigation of Plaintiff's counsel, which included a review of U.S.

6    Securities and Exchange Commission ("SEC") filings by Solazyme, Inc. ("Solazyme" or the

7    "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories

8    about the Company, press releases and other public statements issued by the Company, and media

9    reports about the Company.  Plaintiff believes that substantial additional evidentiary support will

10   exist for the allegations set forth herein after a reasonable opportunity for discovery.

11   **NATURE OF THE ACTION**

12       1.    This is a federal securities class action brought pursuant to the Securities Exchange

13   Act of 1934 (the "Exchange Act") on behalf of all persons or entities who, between February 27,

14   2014 and November 5, 2014, inclusive (the "Class Period"), purchased or otherwise acquired the

15   securities of Solazyme (the "Class").  The Exchange Act claims allege that certain Defendants (as

16   defined herein) engaged in a fraudulent scheme to artificially inflate the prices of Solazyme

17   securities during the Class Period.

18       2.    This action is also brought pursuant to the Securities Act of 1933 (the "Securities

19   Act") on behalf of all persons or entities who purchased or otherwise acquired Solazyme securities

20   pursuant and/or traceable to either of two registered public offerings during the Class Period.  On or

21   about March 27, 2014, Solazyme executed a public notes offering (the "Notes Offering") through

22   which Solazyme sold approximately $149.5 million in convertible notes (including the full exercise

23   of an underwriters' option) paying five percent interest and scheduled to mature in 2019 (the

24   "Notes").  That same day, Solazyme also conducted a separate public secondary offering of common

25   stock (the "Stock Offering," and together with the Notes Offering, the "Offerings"), pursuant to

26   which the Company sold 5.75 million shares of stock (including the full exercise of an underwriters'

27   option) at $11.00 per share for aggregate gross proceeds of approximately $63.25 million.

28

3.     Pursuant to the Securities Act, certain Defendants are strictly liable for the material misstatements in the Offering Documents (as defined herein) issued in connection with the Offerings, and these claims specifically exclude any allegations of knowledge or scienter.  The Securities Act claims are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of Defendants—*i.e.*, the Securities Act claims do not allege, arise from, or sound in, fraud.  Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims.

4.     The Exchange Act and Securities Act claims asserted herein arise from a series of false statements of material fact and omissions of material adverse information, made by Defendants in Solazyme's Offering Documents and throughout the Class Period, about the construction progress, development, and production capacity associated with the Company's renewable oils production facility located in Moema, Brazil (the "Moema Facility").  The ultimate disclosure of the truth about the construction delays and diminished production capacity of the Moema Facility caused a precipitous decline in the market value of Solazyme's securities, resulting in significant losses and damages to the Plaintiff and the Class.

## FACTUAL OVERVIEW AND SUMMARY OF ALLEGATIONS

5.     Solazyme is a bioproducts company that uses algae-based fermentation to produce renewable oils for a range of personal and industrial uses.  Through proprietary technology, the Company purports to utilize microalgae in an industrial fermentation process to transform plant-based sugars into sustainable, high-performance products.  The Company maintains manufacturing facilities in California, Illinois, Iowa, and Brazil.

6.     In 2012, the Company executed a joint venture agreement with one of the largest sugarcane processing companies in Brazil to construct and operate the Moema Facility.  The Moema Facility, initially targeted for completion around the end of 2013, would transform sugarcane into oil products with a projected production capacity of 100,000 metric tons ("MT") of oil per year (or "nameplate capacity").

7.     During the subsequent periods prior to and during the Class Period, Solazyme offered periodic positive assessments of the Company's progress toward nameplate capacity at the Moema

CLASS ACTION COMPLAINT FOR VIOLATIONS FO THE FEDERAL SECURITIES LAWS -         - 2

1  Facility, including the extent of construction completion, the availability of required utility services,

2  and the scalability of the Company's fermentation process to be implemented at the Moema Facility.

3      8.    The true facts were as follows:

4          (a)    Solazyme's Moema Facility was experiencing difficulties due to insufficient

5  access to electricity and steam utility services;

6          (b)    the Moema Facility's design and construction relating to the internal transfer

7  of materials and recovery of end products caused it to suffer from problems not present at the

8  Company's other facilities;

9          (c)    the Moema Facility could not scale its production in a cost-effective manner;

10 and

11         (d)    as a result of the foregoing, Solazyme lacked a reasonable basis for its

12 projections relating to the Moema Facility's progress and the Company's outlook.

13     9.    On May 5, 2014, after the markets had closed, Solazyme reported operational results

14 for the first quarter of 2014.  During the related conference call, co-founder and Chief Executive

15 Officer Jonathan S. Wolfson ("Wolfson") stated that, rather than being "online" with "everything

16 functioning as expected," as Defendants had previously claimed, the Moema Facility was instead

17 "experiencing intermittent power and steam availability," and consequently had failed to produce its

18 first commercial product.

19     10.    Then, on July 30, 2014, after the markets had closed, Solazyme announced

20 operational results for the second quarter of 2014.  During the related conference call, Wolfson

21 stated that the Moema Facility's utility problems had yet to be resolved, merely claiming that the

22 Company had "made great progress addressing the utility issues."

23     11.    Finally, after the close of the markets on November 5, 2014, Solazyme acknowledged

24 significant and wide-ranging construction delays at the Moema Facility.  On that day, the Company

25 revealed for the first time that it would "narrow [its] production focus to smaller volumes of higher

26 value products at both Moema and Clinton/Galva" and would be "prioritizing cash management and

27 product margin over a rapid capacity ramp."

28

12.     In reaction to the disclosure that the Company's Moema Facility was suffering from significant construction delays and would therefore abandon high volume production, the prices of Solazyme securities fell dramatically.  For example, the Company's stock price declined $4.35 per share, or 58.08 percent, to close at $3.14 per share following the next trading session on November 6, 2014.  Similarly, the market price of Solazyme's Notes declined by $235.00 per Note from the prior reported trade on November 4, 2014, or 30.32 percent, to close at $540.00 per Note following the next session in which the Notes traded on November 7, 2014.

13.     As a result of Defendants' materially false and/or misleading statements and omissions: (1) Solazyme's Notes and common stock were offered to the public at artificially inflated prices; and (2) Solazyme's securities traded at artificially inflated prices during the Class Period. However, as the truth about the construction delays and diminished production capacity of the Moema Facility became known to investors, the artificial inflation came out, and the prices of Solazyme's securities fell, with the price of the Company's Notes and common stock declining by 52.64 percent and 78.64 percent from their respective Class Period highs.  These price declines caused significant losses and damages to Plaintiff and other members of the Class.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*, and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Solazyme maintains its principal executive offices in this District.  Further, many of the acts that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

1    17.    In connection with the acts and conduct alleged in this complaint, Defendants,

2    directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

3    limited to, the mails, interstate wire and telephone communications, and the facilities of the national

4    securities markets.

5    **CLASS ACTION ALLEGATIONS**

6    18.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

7    of Civil Procedure on behalf of all persons and entities that purchased or otherwise acquired

8    Solazyme securities during the Class Period, including securities sold in the Offerings.  Excluded

9    from the Class are Defendants and their families, directors and officers of Solazyme and their

10   families, and affiliates.

11   19.    The members of the Class are so numerous that joinder of all members is

12   impracticable.  The disposition of their claims in a class action will provide substantial benefits to

13   the parties and the Court.  As of April 30, 2015, Solazyme had 80,068,179 shares of common stock

14   outstanding, owned by thousands of persons.

15   20.    There is a well-defined community of interest in the questions of law and fact

16   involved in this action.  Questions of law and fact common to the members of the Class that

17   predominate over questions that may affect individual Class members include:

18           (a)    whether the Securities Act was violated by Defendants;

19           (b)    whether the Exchange Act was violated by Defendants;

20           (c)    whether Defendants omitted and/or misrepresented material facts;

21           (d)    whether Defendants' statements omitted material facts necessary in order to

22   make the statements made, in light of the circumstances under which they were made, not

23   misleading;

24           (e)    whether Defendants knew or recklessly disregarded that their statements were

25   false and misleading;

26           (f)    whether the prices of the Company's securities were artificially inflated; and

27           (g)    the extent of damage sustained by Class members and the appropriate measure

28   of damages.

21.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

22.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

23.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## RELEVANT BACKGROUND

24.     Solazyme is a bioproducts company that produces oils from renewable sources.  The Company's technology focuses on the use of algae as part of a fermentation process that transforms plant materials into oils for use in a range of products, including skincare and food goods and industrial applications.

25.     In May 2011, Solazyme entered into an agreement with Bunge Global Innovation, LLC, a unit of the agribusiness company Bunge Limited ("Bunge"), to jointly develop microbe-derived oils from Brazilian sugarcane feedstock.  In 2012, the Company entered into a joint venture agreement with Bunge to build, own, and operate the Moema Facility adjacent to Bunge's sugarcane mill in Moema, Brazil.  Under the joint venture agreement, Bunge agreed to provide feedstock as well as utility services to the Moema Facility.  The Moema Facility was originally projected to be completed around the end of 2013.

26.     During the subsequent periods prior to and during the Class Period, Solazyme offered periodic positive assessments of the Company's progress regarding the Moema Facility.   For example, as part of his comments relating to the Company's announcement of operating results for the second quarter of 2013 on August 7, 2013, Chief Financial Officer Tyler W. Painter ("Painter") stated (with added emphasis):

> Our second quarter results ***keep us on track*** to achieve our full year objectives.  Our operating and capital expenditures remain within our expectations.  As we near the commencement of production at Moema and Clinton, our commercialization path is supported by a strong capital structure and a supportive group of partners.

CLASS ACTION COMPLAINT FOR VIOLATIONS FO THE FEDERAL SECURITIES LAWS -          - 6 -

1

**SECURITIES ACT CLAIMS**

2    **A.    Parties**

3        **1.    Plaintiff**

4        27.    Plaintiff Norfolk County, headquartered in Canton, Massachusetts, is a defined-

5    benefit retirement system.  As set forth in the attached certification, Norfolk County purchased

6    Solazyme securities at artificially inflated prices pursuant or traceable to the Offering Documents

7    and has been damaged thereby.

8        **2.    Securities Act Defendants**

9            **a.    The Company**

10       28.    Defendant Solazyme is a corporation organized under the laws of the State of

11   Delaware and maintains its principal executive offices at 225 Gateway Boulevard, South San

12   Francisco, California.  The Company's common stock is listed on the NASDAQ Global Select

13   Market (the "NASDAQ") and trades under the ticker symbol "SZYM."

14           **b.    The Officer and Director Defendants**

15       29.    Defendant Wolfson is the co-founder and Chief Executive Officer ("CEO") of the

16   Company, and a member of the Company's Board of Directors.  CEO Wolfson signed the

17   Company's registration statements in connection with the Offerings.

18       30.    Defendant Painter is the Chief Financial Officer ("CFO") of the Company.  Since

19   July 1, 2014, Defendant Painter has also served as the Company's Chief Operating Officer.  CFO

20   Painter signed the Company's registration statements in connection with the Offerings.

21       31.    Defendant David C. Cole ("Cole") was the President of the Company and a member

22   of the Company's Board of Directors at all relevant times prior to October 8, 2014.  President Cole

23   signed the Company's registration statements in connection with the Offerings.

24       32.    Defendant Jerry Fiddler ("Fiddler") is the Chairman of the Company's Board of

25   Directors.  Chairman Fiddler signed the Company's registration statements in connection with the

26   Offerings.

27       33.    Defendant Michael V. Arbige is a member of the Company's Board of Directors, and

28   signed the Company's registration statements in connection with the Offerings.

34.     Defendant Ian T. Clark is a member of the Company's Board of Directors, and signed the Company's registration statements in connection with the Offerings.

35.     Defendant Peter Kovacs is a member of the Company's Board of Directors, and signed the Company's registration statements in connection with the Offerings.

36.     Defendant James R. Craigie is a member of the Company's Board of Directors, and signed the Company's registration statements in connection with the Offerings.

37.     The Defendants listed in paragraphs 29 to 36 are referred to as the "Officer and Director Defendants."

### c.     The Underwriter Defendants

38.     Defendant Goldman, Sachs & Co. ("Goldman") acted as an underwriter of the Offerings and as a representative of the underwriters for the Offerings.  Goldman maintains its principal place of business at 200 West Street, New York, New York.

39.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as an underwriter of the Stock Offering and as a representative of the underwriters for the Stock Offering.  Morgan Stanley maintains its principal place of business at 1585 Broadway, New York, New York.

40.     The Defendants listed in paragraphs 38 to 39 are referred to as the "Underwriter Defendants."  The Company, the Officer and Director Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

**B.     Claims Against the Securities Act Defendants**

41.     On February 13, 2014, Solazyme filed an automatic shelf registration statement on Form S-3ASR with the SEC for the public offering of stock, debt, and other securities from time to time thereafter.  This registration statement was signed by the Officer and Director Defendants and became effective automatically upon filing.

42.     The following month, on March 14, 2014, the Company filed its Annual Report for 2013 on Form 10-K with the SEC (the "2013 10-K").  Solazyme's 2013 10-K discussed, among other things, the construction progress, development, and production capacity associated with the Moema Facility.  For example, the Company stated in part:

Our ***process is compatible with commercial-scale, widely-available fermentation and oil recovery equipment.*** We operate our lab and pilot fermentation and recovery equipment as scaled-down versions of our large commercial engineering designs, such as those used to supply large quantities of oil for our algae-derived fuel delivered for testing and certification programs with the U.S. Department of Defense. This allows us to more easily scale up to larger fermentation vessels. We have scaled up our technology platform and have successfully operated at lab (5-15 liter), pilot (600-1,000 liter), demonstration (75,000 liter) and commercial (approximately 120,000–500,000 liter and above) fermenter scale. ***The commercial scale achieved at ADM's Clinton Facility is comparable to the fermentation equipment at the Solazyme Bunge Renewable Oils facility in Brazil.***

\*       \*       \*

***[T]he commissioning of the facility at Moema is underway. As such, we are now expanding into large-scale, high-volume commercial production*** and sales of intermediate and ingredient products across food, industrial, fuel and personal care markets.

\*       \*       \*

The Solazyme Bunge JV is currently constructing a production facility adjacent to Bunge's Moema sugarcane mill in Brazil, and commissioning is underway. ***We are targeting the production of commercially saleable product by the end of the first quarter of 2014,*** though such production could move into the second quarter. ***The production facility is expected to have a name plate capacity of 100,000 [metric tons] of oil per year.***

(All emphases are added unless otherwise noted.)

43.     On March 25, 2014, Solazyme filed a Form S-3ASR registration statement in contemplation of the Company's public offering of Notes and common stock (as modified, the "Registration Statement"). The Registration Statement incorporated by reference the Company's 2013 10-K, was signed by the Officer and Director Defendants, and became effective automatically upon filing.

44.     The following day, on March 26, 2014, the Company filed a Form S-3MEF registration statement modifying the Registration Statement to register an additional $12.75 million in aggregate maximum principal amount of Notes and stock. This Form S-3MEF was also signed by the Officer and Director Defendants.

45.     On March 27, 2014, Solazyme filed complete prospectuses in connection with the Notes Offering (the "Notes Prospectus") and the Stock Offering (the "Stock Prospectus," and together with the Registration Statement and Notes Prospectus, the "Offering Documents") with the SEC pursuant to SEC Rule 424(b)(5).

46.     As set forth in the Notes Prospectus, Solazyme registered $149.5 million in Notes to be offered to the public at $1,000 per $1,000 of par value.  As set forth in the Stock Prospectus, Solazyme registered 5.75 million shares of common stock to be offered to the public at $11.00 per share.

47.     The Offering Documents included descriptions of the Company and its facilities, including the status and progress of the Moema Facility.  For example, the Offering Documents reiterated the Company's prior positive statements related to the construction progress, development, and production capacity for the Moema Facility:

> We have been working for years to bring large-scale manufacturing of our products online.  In advance of this, we initiated our commercialization efforts several years ago by launching low-volume, high-margin branded skin and personal care products and nutritional supplement ingredients that could be produced on an economically attractive basis via tolled manufacturing.  Our large-scale Clinton/Galva Facilities are now online, and the ***commissioning of the facility at Moema is underway. As such, we are now expanding into large-scale, high-volume commercial production*** of certain products and sales of intermediate and ingredient products across food, industrial, fuel and personal care markets.  While the margins on these products are somewhat lower than those launched initially, the volumes are dramatically larger and present excellent market opportunities.

The Offering Documents also stated that Bunge had agreed to provide utility services to the Moema Facility.

48.     However, the descriptions of the construction progress, development, and production capacity associated with the Company's Moema Facility were materially false and misleading because they failed to disclose that the Moema Facility was experiencing construction delays due to insufficient access to electricity and steam utility services, and that these challenges would prohibit the Moema Facility from scaling its capacity production as projected.  As a result, the Company's Offering Documents were deficient and misleading at all relevant times.  The misstated and omitted facts would have been material to a reasonable person reviewing the Offering Documents.

49.     The Securities Act Defendants owed Plaintiff and the Class a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

50.     The Securities Act Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Offering Documents and did not possess reasonable grounds for believing that the Offering Documents did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

51.     On May 5, 2014, after the markets had closed, Solazyme hosted a conference call to discuss the Company's operational results for the first quarter of 2014.  During the call, CEO Wolfson stated that the Moema Facility had encountered significant utility disruptions, and, provided with only "*intermittent power and steam availability*," the Moema Facility had failed to produce its first commercial product.

52.     On July 30, 2014, after the markets had closed, Solazyme hosted a conference call to discuss operational results for the second quarter of 2014.  During the call, CEO Wolfson stated that the Moema Facility's utility problems had yet to be resolved, noting only that the Company had "made great progress addressing the utility issues."

53.     The full truth regarding the false and misleading nature of the Offering Documents was disclosed when, after the close of the markets on November 5, 2014, Solazyme hosted a conference call to discuss operational results for the third quarter of 2014.  During the call investors learned that "[p]ower and steam consistency *continues to be an issue*," and that "all of the plant's key unit operations, including those on the downstream side are working, but *not all of the downstream is working yet efficiently, continuously or on an integrated basis*."  Critically, investors learned that Solazyme would "narrow [its] production focus to smaller volumes of higher value products at both Moema and Clinton/Galva" and would be "prioritizing cash management and product margin *over a rapid capacity ramp*."  As a result, the Company "*no longer plan[ned] to produce a nameplate capacity within 12 to 18 months*."

54.     In reaction to these disclosures, Solazyme's stock price declined $4.35 per share, or 58.08 percent, to close at $3.14 per share following the next trading session on November 6, 2014. Similarly, the market price of Solazyme's Notes declined by $235.00 per Note from the prior

1   reported trade on November 4, 2014, or 30.32 percent, to close at $540.00 per Note following the

2   next session in which the Notes traded on November 7, 2014.

3        55.   Plaintiff and members of the Class purchased the Notes pursuant or traceable to the

4   Notes Offering and/or purchased Solazyme stock pursuant to the Stock Offering, and were damaged

5   thereby.

6        56.   Plaintiff and other members of the Class did not know, nor in the exercise of

7   reasonable diligence could they have known, of the untrue statements of material facts or omissions

8   of material facts in the Offering Documents when they purchased or acquired Solazyme securities

9   pursuant or traceable to the Offerings.

10  **C.   Counts Against Securities Act Defendants Related to the Offerings**

11
12  **COUNT I**

13  **For Violations of Section 11 of the Securities Act**
    **Against the Securities Act Defendants**

14       57.   Plaintiff repeats and realleges paragraphs 1 to 56, as if fully set forth herein, except

15  that for purposes of this Count I, Plaintiff expressly excludes and disclaims any allegation that could

16  be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely

17  on claims of strict liability and/or negligence under the Securities Act.

18       58.   This Count is brought against the Securities Act Defendants on behalf of all those

19  who purchased or otherwise acquired the Company's Notes and/or common stock issued pursuant or

20  traceable to the Offerings.  The Offering Documents for the Offerings were false and misleading,

21  contained untrue statements of material facts, omitted to state facts necessary to make the statements

22  made not misleading, and failed adequately to disclose material facts, as described above.

23       59.   The Securities Act Defendants are strictly liable for the misstatements and omissions

24  and for the damages that Plaintiff and the other members of the Class have sustained thereby.  The

25  Securities Act Defendants are responsible for the contents and dissemination of the Offering

26  Documents, and did not conduct a reasonable investigation or possess reasonable grounds for the

27  belief that the statements contained in the Offering Documents were true and without omissions of

28  any material facts and were not misleading.

CLASS ACTION COMPLAINT FOR VIOLATIONS FO THE FEDERAL SECURITIES LAWS -     - 12

60.     The Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reasons of the conduct herein alleged, each of the Securities Act Defendants violated and/or controlled a person who violated, Section 11 of the Securities Act.

61.     Less than one year has elapsed between the time the facts upon which this Count is based were or could reasonably have been discovered and the time this claim was brought.  Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act
### Against the Underwriter Defendants

62.     Plaintiff repeats and realleges paragraphs 1 to 61, as if fully set forth herein, except that for purposes of this Count II, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.  This Count is brought against the Underwriter Defendants on behalf of all those who purchased or otherwise acquired the Company's Notes and/or common stock issued pursuant or traceable to the Offerings.

63.     The Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of: (1) the Company's Notes offered pursuant to the Notes Offering; and/or (2) the Company's common stock offered pursuant to the Stock Offering.  The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Underwriter Defendants' actions of solicitation included participating in the preparation and dissemination of the false and misleading Offering Documents.

64.     The Underwriter Defendants owed to the purchasers of the Company's Notes and/or common stock, including Plaintiff and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such

statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

65.   Plaintiff and the other members of the Class purchased the Company's Notes and/or the Company's common stock from the Underwriter Defendants pursuant to the defective Offering Documents.  Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the false nature of the statements and omissions contained in the Offering Documents.

66.   By reason of the conduct alleged herein, the Underwriter Defendants violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and the other members of the Class who hold the Company's Notes and/or common stock purchased pursuant to the Offerings have the right to rescind and recover the consideration paid for their Notes and/or common stock.

67.   Plaintiff, individually and representatively, hereby offers to tender to the Underwriter Defendants the Company's Notes and/or common stock that Plaintiff and the other members of the Class continue to own, on behalf of all members of the Class who continue to own such Notes and/or common stock, in return for the consideration paid for those Notes and/or shares, together with interest thereon.  Plaintiff, individually and representatively on behalf of Class members who have sold their Company Notes and/or shares are entitled to and hereby claims rescission damages.

68.   Less than one year has elapsed between the time the facts upon which this Count is based were or could reasonably have been discovered and the time this claim was brought.  Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

**COUNT III**

**For Violations of Section 15 of the Securities Act**
**Against the Officer and Director Defendants**

69.   Plaintiff repeats and realleges paragraphs 1 to 68, as if fully set forth herein, except that for purposes of this Count III, Plaintiff expressly excludes and disclaims any allegation that

1  could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based

2  solely on claims of strict liability and/or negligence under the Securities Act.

3      70.    This Claim is brought against the Officer and Director Defendants pursuant to Section

4  15 of the Securities Act on behalf of all those who purchased or otherwise acquired the Company's

5  Notes and/or common stock issued pursuant or traceable to the Offerings.

6      71.    As set forth in Count I herein, the Company is liable pursuant to Section 11 of the

7  Securities Act.  Each of the Officer and Director Defendants was a control person of the Company

8  with respect to the Offerings by virtue of such individual's position as a senior executive officer

9  and/or director of the Company and had direct and/or indirect business and/or personal relationships

10  with other directors, officers, and/or major shareholders of the Company.  By reason of their

11  positions within the Company and/or positions on the board of directors of the Company, the Officer

12  and Director Defendants had the requisite power to directly or indirectly control or influence the

13  specific corporate policies that resulted in the unlawful acts and conduct alleged in Count I.

14      72.    Each of the Officer and Director Defendants was a culpable participant in the

15  violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed

16  the Offering Documents and having otherwise participated in the process that allowed the Offerings

17  to be executed.  The Officer and Director Defendants, by virtue of their managerial and/or board

18  positions with the Company, controlled the Company, as well as the contents of the Offering

19  Documents, at the time of the Offerings.  Each of the Officer and Director Defendants was provided

20  with or had unlimited access to copies of the Offering Documents, and had the ability to either

21  prevent their issuance or cause them to be corrected.

22      73.    As a result, the Officer and Director Defendants are liable pursuant to Section 15 of

23  the Securities Act for the primary violations of Section 11 of the Securities Act by the Company.

24      74.    By virtue of the foregoing, Plaintiff and other members of the Class who purchased or

25  otherwise acquired the Company's Notes and/or common stock pursuant or traceable to the

26  Offerings are entitled to damages against the Officer and Director Defendants.

27      75.    Less than one year has elapsed between the time Plaintiff discovered or reasonably

28  could have discovered the facts upon which this Count is based and the time this claim was brought.

1  Less than three years have elapsed between the time that the securities upon which this Count is

2  brought were bona fide offered to the public and the time this action was commenced.

3  **EXCHANGE ACT CLAIMS**

4  **A.      Parties**

5          **1.        Plaintiff**

6          76.    Plaintiff Norfolk County, headquartered in Canton, Massachusetts, is a defined

7  benefit retirement system.  As set forth in the attached certification, Norfolk County purchased

8  Solazyme securities at artificially inflated prices during the Class Period and has been damaged

9  thereby.

10         **2.        Exchange Act Defendants**

11                **a.        The Company**

12         77.    Defendant Solazyme is a corporation organized under the laws of the State of

13  Delaware and maintains its principal executive offices at 225 Gateway Boulevard, South San

14  Francisco, California.  The Company's common stock is listed on the NASDAQ and trades under the

15  ticker symbol "SZYM."

16                **b.        The Individual Defendants**

17         78.    Defendant Wolfson is a co-founder and the CEO of the Company, and a member of

18  the Company's Board of Directors.  During the Class Period, CEO Wolfson certified the Company's

19  periodic financial reports filed with the SEC and spoke with investors and securities analysts

20  regarding the Company on a regular basis.

21         79.    Defendant Painter is the CFO of the Company.  Since July 1, 2014, Defendant Painter

22  has also served as the Company's Chief Operating Officer.  During the Class Period, CFO Painter

23  certified the Company's periodic financial reports filed with the SEC and spoke with investors and

24  securities analysts regarding the Company on a regular basis.

25         80.    The defendants described in paragraphs 78 to 79 are collectively referred to herein as

26  the "Individual Defendants."  Together with Defendant Solazyme, the Individual Defendants are

27  collectively referred to herein as the "Exchange Act Defendants."

28

**B.     Substantive Allegations**

    **1.     False and Misleading Statements**

81.     After the markets closed on February 26, 2014, Solazyme issued a press release announcing results for the fourth quarter and full year of 2013.  Commenting on these results, CEO Wolfson stated in part:

> In the first half of 2014, we are focused on successfully executing Solazyme's entry into broad commercial operations.  We have begun shipping multiple products from the Clinton/Galva, Iowa facilities and are ***deep into commissioning in Brazil*** as we complete the first-of-its-kind 100,000 MT Solazyme Bunge Renewable Oils (SB Oils) facility at Moema.  In these early days we are focused on generating consistent and reliable production for our partners, ahead of accelerating our production ramp later this year.

82.     That same day, Solazyme hosted a conference call for investors and analysts to discuss the Company's results.  As part of his prepared remarks, CEO Wolfson stated in part:

> We're making ***strong and steady progress at Moema***.  We're currently ***deep into the commissioning process***.  To really understand the progress, it's useful to break out the major unit operations in the facility.  ***The plant requires infrastructure, including utilities such as steam and power***, and additional capabilities like cleaning and sterilization systems.
>
>               *       *       *
>
> ***Infrastructure and upstream which together comprise a substantial percentage of the plant, are both currently online and everything is functioning as expected***.
>
>               *       *       *
>
> We ***believe*** that the progress at Moema and its current schedule leaves us ***in good shape to bring full production online this spring***, and with the anticipated 12 to 18-month scale-up process, this puts us ***on track to reach full nameplate capacity in the back half of 2015***, as we suggested on the last call.

83.     On March 14, 2014, Solazyme filed its 2013 10-K with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.  Solazyme's 2013 10-K discussed, among other things, the construction progress, development, and production capacity associated with the Moema Facility.  For example, the Company stated in part:

> Our process is compatible with commercial-scale, widely-available fermentation and oil recovery equipment.  We operate our lab and pilot fermentation and recovery equipment as scaled-down versions of our large commercial engineering designs, such as those used to supply large quantities of oil for our algae-derived fuel delivered for testing and certification programs with the U.S. Department of Defense. This allows us to more easily scale up to larger fermentation vessels.  We have scaled up our technology platform and have successfully operated at lab (5-15 liter), pilot

(600-1,000 liter), demonstration (75,000 liter) and commercial (approximately 120,000—500,000 liter and above) fermenter scale. *The commercial scale achieved at ADM's Clinton Facility is comparable to the fermentation equipment at the Solazyme Bunge Renewable Oils facility in Brazil.*

\*    \*    \*

*[T]he commissioning of the facility at Moema is underway. As such, we are now expanding into large-scale, high-volume commercial production* and sales of intermediate and ingredient products across food, industrial, fuel and personal care markets.

\*    \*    \*

The Solazyme Bunge JV is currently constructing a production facility adjacent to Bunge's Moema sugarcane mill in Brazil, and commissioning is underway. *We are targeting the production of commercially saleable product by the end of the first quarter of 2014,* though such production could move into the second quarter. *The production facility is expected to have a name plate capacity of 100,000 [metric tonnes] of oil per year.*

84.   The Company's 2013 10-K also included a certification signed by CEO Wolfson, incorporated therein as Exhibit 31.1, which stated:

I, Jonathan S. Wolfson, certify that:

1.   I have reviewed this Annual Report on Form 10-K of Solazyme, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others

within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

The Company's 2013 10-K further included a substantially similar certification signed by CFO Painter as Exhibit 31.2

85.    On March 25 and 26, 2014, Solazyme filed the Registration Statement with the SEC and on March 27, 2014, Solazyme filed its Notes Prospectus and its Stock Prospectus with the SEC. The Offering Documents discussed the construction progress, development, and production capacity for the Moema Facility, including those described in paragraph 47 above.

86.     On April 1, 2014, Solazyme announced the successful closing of the Offerings, in which the full underwriters' over-allotment options for both the Notes Offering and Stock Offering were exercised.

87.     After the close of the trading session on May 5, 2014, Solazyme issued a press release announcing results of operations for the first quarter of 2014.  In connection with this announcement, CEO Wolfson commented in part:

> While we haven't yet announced our first commercial product out of Moema, much of that plant is operational, including full-scale fermenters.  We expect to manufacture commercial product at the Moema facility in the second quarter.

88.     That same day, Solazyme hosted a conference call for investors and analysts to discuss the Company's results.  As part of his prepared remarks, CEO Wolfson stated in part:

> Commissioning is continuing at the Moema facility, Production equipment, fermentation through Encapso downstream is commissioned and operable, as is fermentation including the 625,000-liter fermenters, and in fact we've successfully inoculated fermentations in the 625,000-liter fermenters multiple times.  However, *our facility has been experiencing intermittent power and steam availability* resulting from the start up of a new cogen facility at the adjoining Moema sugar mill.
>
> *            *            *
>
> Steam and power aside, we are progressing closer to completion of the plant.  Key upstream functions our online, and we're making good progress on completing work on oil recovery.  Recovery capability through finished Encapso product is now operational, and we're commissioning the oil extraction units that lead to finished oils.  Completion of this final stage of oil recovery has taken longer than anticipated, but *we're targeting completion and operation of the full oil recovery processes this quarter.  As these processes come fully online, we'll be following the same path as you've seen us follow at Clinton/Galva in terms of a focus on establishing consistent operations.*

89.     During a question-and-answer session that followed, CEO Wolfson engaged in the following exchanges:

> **Analyst**:  Hi, guys.  Jonathan, a first question on, *you commented that the back end separation at Moema was taking a little bit longer than expected.  I always thought your separation process was really pretty simple*, just dry out the fermentation [broth], and press out the oils.  You can you provide any more color on what it was that was more complicated than you thought?
>
> **CEO Wolfson**:  *I wouldn't say it was more complicated*.  I would just say that if you break that down into multiple parts, the unit operations to get to the

Encapso product, ***they're all operable and really have been operable since later March***.

\*　　\*　　\*

**Analyst**:  Hi.  I just had a couple of quick questions, one on Moema.  You said some of the delays related to a new cogen facility, and you do not expected to be a long-term issue.  I'm just wondering if you could give us some more color on that.  What is Bunge prioritizing?  Are they prioritizing the JV or the sugar mill?  ***Would there be maybe some intermediate term risk related to that, that maybe this ramp takes a bit longer***?  Thanks.

**CEO Wolfson**:  Bunge's been a phenomenal partner to Solazyme, and I should say, is a phenomenal partner to Solazyme.  ***I wouldn't read much into this*** other than the intermittency of steam and power, it's been something that has been really a recent issue.  What I would say about Bunge is that they're operating many facilities, including many cogen facilities very successfully all around the world.  ***I think between Solazyme and Bunge, we don't have concerns about the reliability of steam and power in the longer term***.

90.    On May 8, 2014, Solazyme filed its quarterly report on Form 10-Q for the first quarter of 2014 with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release.  This Form 10-Q also included certifications substantially similar to those described in paragraph 84.

91.    On July 30, 2014, after the close of the trading session, Solazyme issued a press release announcing results of operations for the second quarter of 2014.  In connection with this announcement, CEO Wolfson commented in part:

Solazyme made important progress in the second quarter on its commercialization path. . . .  [W]e have begun production and shipment from the Solazyme Bunge Renewable Oils plant in Brazil. . . .  We have more work ahead as we progress on our production ramps and continue to build our commercial pipeline, but I believe we have the products, the plants, the capital and the team to execute moving forward.

The press release also noted:

**Commercial Production Begins at Moema Facility.**  In late May 2014, Solazyme's joint venture with Bunge Global Innovation LLC successfully produced its first commercially saleable products at the Solazyme Bunge Renewable Oils plant in Brazil and has subsequently begun shipping.  Both oil and encapsulated lubricant, Encapso™, products have been manufactured using full-scale production lines that include the 625,000L fermentation tanks.

92.    That same day, Solazyme hosted a conference call for investors and analysts to discuss the Company's results.  As part of his prepared remarks, CEO Wolfson stated in part:

At Moema we've made great progress addressing the utility issues.  We're almost finished with all of the commissioning.

CLASS ACTION COMPLAINT FOR VIOLATIONS FO THE FEDERAL SECURITIES LAWS -          - 21 -

\*      \*      \*

*All equipment through the finishing process is now installed and commissioning is nearing completion*.

93.    During a question-and-answer session that followed, President Cole engaged in the following exchange, in relevant part:

**Analyst:**  I know it's early, Jon, but *any metrics you can provide on the initial ramp in shipments out of Moema* the way you gave us a bit of detail on the ramp out of Clinton/Galva?

**President Cole:**  Hi, Brian.  *All unit operations at this point are installed; feedstock prep, seed fermentation, production tanks, sterilizers, downstream drying and packaging.  They're all on line*.

2.    **The Truth Is Revealed**

94.    After the close of the trading session on November 5, 2014, Solazyme issued a press release announcing the Company's results of operations for the third quarter of 2014.  Among other things, Solazyme reported delays in progress at the Moema Facility, stating in relevant part:

Our Clinton/Galva and Peoria facilities are performing well.  *Progress at Moema is more mixed* with the upstream process operating as expected, while the *downstream process will require continued work to establish consistent, fully integrated operations*.

\*      \*      \*

Key downstream unit operations are functional all the way to oil production, and modest quantities of finished product continue to be produced and shipped. *The further optimization and integration of downstream processes and the improvement of reliable power and steam supply at the facility are areas of significant focus*.

Importantly, Solazyme further disclosed a drastic change in the Company's strategy and outlook for its future, with CEO Wolfson commenting:

Strategically, we're moving to intensify our focus on our high-value specialty portfolio, *a move that will alter the near-term trajectory of our production ramp* but which we believe will ultimately drive greater value for the Company.

CFO Painter further stated:

Our near term focus is on bringing Moema to fully integrated operations and focusing commercial activity around our high-value specialty products. . . . As we execute on these goals, we are emphasizing prudent management of our capital, optimizing our product mix and positioning our manufacturing assets to maximize returns.

95.     On the same day, Solazyme hosted a conference call to discuss its results with analysts and investors.  As part of his prepared remarks, CEO Wolfson stated in part:

> *Operational challenges at Moema are causing a slower than anticipated descent down the manufacturing cost curve*.  This will result in higher longer than expected early cost in production.

*       *       *

> Real-time consideration of these factors has led us to make some adjustments in our manufacturing, and commercialization strategies to drive capital efficiency and commercial success.  Our view is that the destination is largely the same and we think quite possibly even better than it's always been.  But the journey will change a bit.  *Specifically, we'll narrow our production focus to smaller volumes of higher value products at both Moema and Clinton/Galva*.  We will be prioritizing cash management and product margin over a rapid capacity ramp.  *We therefore, no longer plan to produce a nameplate capacity within 12 to 18 months*.

96.     Solazyme's Chief Technology Officer then disclosed a substantial list of problems standing in the way of profitable operations at the Moema Facility:

> *Power and steam consistency continues to be an issue*.  The fix[es] implemented over the spring and summer have led to improvements resulting in periods of reliability.  So these have continued to be interest bearers with setbacks as well.  To be clear, *the work that has been done up to now, including a significant focus on backup systems is a partial fix*.

> The more robust solution involve tying into the electrical grid and current estimates are now that this will be completed in the first half of 2015.  As we've already noted *there is continued work to do on the downstream operations to allow them to run continuously and then in integrated fashion*. Specifically, we are focusing on some correctable *issues with the conveyance system*.  We are also *working to achieve consistent processing with the process*, the timing of which is taking longer than we expected.  As a reminder, all of the plants key unit operations, including those on the downstream side are working, but *not all of the downstream is working yet efficiently, continuously or on an integrated basis*.

*       *       *

> *We're working closely both with teams after JV and our partner Bunge to bring Moema to a fully integrated operations*.

97.     In reaction to these disclosures of the truth about the construction delays and diminished production capacity at the Moema Facility, Solazyme's stock price declined $4.35 per share, or 58.08 percent, to close at $3.14 per share following the next trading session on November 6, 2014.  Similarly, the market price of Solazyme's Notes declined by $235.00 per Note from the prior reported trade on November 4, 2014, or 30.32 percent, to close at $540.00 per Note following the next session in which the Notes traded on November 7, 2014.

CLASS ACTION COMPLAINT FOR VIOLATIONS FO THE FEDERAL SECURITIES LAWS -          - 23

98.     The Exchange Act Defendants' false statements and omissions during the Class Period caused the Company's securities to trade at artificially inflated prices during the Class Period. However, as the conditions described above were revealed to the market, the prices of the Company's securities fell significantly.  For example, Solazyme's stock price fell by $11.56 per share—or 78.64 percent—from its Class Period-high closing price of $14.70 per share on March 12, 2014.  Similarly, the market price of Solazyme's Notes declined by $600.30 per Note—or 52.64 percent—from their Class Period-high closing price of $1,140.30 on June 27, 2014.

99.     The true facts, which were known to, or recklessly disregarded by, the Exchange Act Defendants and concealed from Solazyme's investors and the public during the Class Period, were as follows:

(a)     Solazyme's Moema Facility was experiencing difficulties due to insufficient access to electricity and steam utility services;

(b)     the Moema Facility's design and construction relating to the internal transfer of materials and recovery of end products caused it to suffer from problems not present at the Company's other facilities;

(c)     the Moema Facility could not scale its production in a cost-effective manner; and

(d)     as a result of the foregoing, Solazyme lacked a reasonable basis for its projections relating to the Moema Facility's progress and the Company's outlook.

**C.     Loss Causation**

100.     During the Class Period, as detailed herein, the Exchange Act Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Solazyme's securities, and operated as a fraud or deceit on Class Period purchasers of the Company's securities by misrepresenting the state of the construction progress, development, and production capacity for the Moema Facility and the prospects and outlook for Solazyme.

101.     Later, as the Company's prior false statements, misrepresentations, and fraudulent conduct were disclosed to the market, the prices of Solazyme's securities fell as the prior artificial

1  inflation came out of their prices.  As a result of their purchases of the Company's securities during

2  the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages,

3  under the federal securities laws.

4  **D.**     **Inapplicability of Statutory Safe Harbor**

5        102.     The Exchange Act Defendants' verbal "Safe Harbor" warnings accompanying their

6  oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield

7  those statements from liability.

8        103.     The Exchange Act Defendants are also liable for any false or misleading FLS pleaded

9  because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the

10  FLS was authorized and/or approved by an executive officer of Solazyme who knew that the FLS

11  was false.  None of the historic or present tense statements made by the Exchange Act Defendants

12  were assumptions underlying or relating to any plan, projection, or statement of future economic

13  performance, as they were not stated to be such assumptions underlying or relating to any projection

14  or statement of future economic performance when made, nor were any of the projections or

15  forecasts made by the Exchange Act Defendants expressly related to, or stated to be dependent on,

16  those historic or present tense statements when made.

17  **E.**     **Scienter Allegations**

18        104.     During the Class Period, the Exchange Act Defendants had both the motive and

19  opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the

20  statements they made or acted with reckless disregard for the true information known to them at the

21  time for the reasons discussed above.  In so doing, the Exchange Act Defendants committed acts,

22  and practiced and participated in a course of business that operated as a fraud or deceit on purchasers

23  of Solazyme securities during the Class Period.

24  **F.**     **Presumption of Reliance**

25        105.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

26  market doctrine in that, among other things:

27                (a)     the Exchange Act Defendants made public misrepresentations or failed to

28  disclose material facts during the Class Period;

CLASS ACTION COMPLAINT FOR VIOLATIONS FO THE FEDERAL SECURITIES LAWS -          - 25 -

1          (b)      the omissions and misrepresentations were material;

2          (c)      the Company's securities traded in efficient markets;

3          (d)      the misrepresentations alleged would tend to induce a reasonable investor to

4  misjudge the value of the Company's securities; and

5          (e)      Plaintiff and other members of the Class purchased Solazyme securities

6  between the time the Exchange Act Defendants misrepresented or failed to disclose material facts

7  and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

8         106.    At all relevant times, the markets for Solazyme securities were efficient for the

9  following reasons, among others:

10         (a)      as a regulated issuer, Solazyme filed periodic public reports with the SEC;

11         (b)      Solazyme regularly communicated with public investors via established

12  market communication mechanisms, including through regular disseminations of press releases on

13  major news wire services and through other wide-ranging public disclosures, such as

14  communications with the financial press, securities analysts, and other similar reporting services;

15  and

16         (c)      Solazyme securities were actively traded in an efficient market, including the

17  NASDAQ, where the Company's common stock trades under the ticker symbol "SZYM."

18         107.    As a result of the foregoing, the markets for Solazyme securities promptly digested

19  current information regarding the Company from all publicly available sources and reflected such

20  information in the respective prices of Solazyme securities.  Under these circumstances, all

21  purchasers of Solazyme securities during the Class Period suffered similar injury through their

22  purchases of Solazyme securities at artificially inflated prices and the presumption of reliance

23  applies.

24         108.    Further, to the extent that the Exchange Act Defendants concealed or improperly

25  failed to disclose material facts with regard to the Company and its operations, Plaintiff is entitled to

26  a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*,

27  406 U.S. 128, 153 (1972).

28

**G.**     <u>Counts Against the Exchange Act Defendants</u>

<u>COUNT IV</u>

**For Violation of Section 10(b) of the Exchange Act
and Rule l0b-5 Against the Exchange Act Defendants**

109.     Plaintiff repeats, incorporates, and realleges paragraphs 1 through 108 by reference.

110.     During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.     The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

          (a)      employed devices, schemes, and artifices to defraud;

          (b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

          (c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Solazyme securities during the Class Period.

112.     Plaintiff and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Solazyme securities. Plaintiff and other members of the Class would not have purchased Solazyme securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

113.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Solazyme securities during the Class Period.

1

**COUNT V**

2

**For Violation of § 20(a) of the Exchange Act**
**Against the Individual Defendants and the Company**

3

114.   Plaintiff repeats, incorporates, and realleges paragraphs 1 through 113 by reference.

4

5

115.   The Individual Defendants acted as controlling persons of Solazyme within the

6

meaning of Section 20(a) of the Exchange Act.  By virtue of their power to control public statements

7

about Solazyme, the Individual Defendants had the power and ability to control the actions of

8

Solazyme and its employees.  By reason of such conduct, the Individual Defendants are liable

pursuant to Section 20(a) of the Exchange Act.

9

**PRAYER FOR RELIEF**

10

WHEREFORE, Plaintiff prays for judgment as follows:

11

12

A.   Declaring this action to be a proper class action pursuant to Federal Rule of Civil

Procedure 23;

13

14

B.   Awarding Plaintiff and the members of the Class damages and interest;

15

C.   Awarding Plaintiff's reasonable costs, including attorneys' fees; and

16

D.   Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

17

**JURY DEMAND**

18

Plaintiff demands a trial by jury

19

DATED:  June 24, 2015                    ROBBINS GELLER RUDMAN
                                                        & DOWD LLP
20                                                     SHAWN A. WILLIAMS

21

22

23                                                     s/Shawn A. Williams
                                                        SHAWN A. WILLIAMS

24                                                     Post Montgomery Center
                                                        One Montgomery Street, Suite 1800
25                                                     San Francisco, CA  94104
                                                        Telephone:  415/288-4545
26                                                     415/288-4534 (fax)

27                                                     Local counsel

28

CLASS ACTION COMPLAINT FOR VIOLATIONS FO THE FEDERAL SECURITIES LAWS -            - 28 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
MICHAEL W. STOCKER
RACHEL A. AVAN
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
212/818-0477 (fax)

*Counsel for Plaintiff*
*Norfolk County Retirement System*