**LABATON SUCHAROW LLP**
Joel H. Bernstein (*pro hac vice*)
Mark S. Arisohn (*pro hac vice*)
Corban S. Rhodes (*pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jbernstein@labaton.com
marisohn@labaton.com
crhodes@labaton.com

*Co-Lead Counsel for Plaintiffs and the Putative Class*

**GLANCY PRONGAY & MURRAY LLP**
Ex Kano S. Sams II (Bar No. 192936)
1925 Century Park East
Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-432-1495
esams@glancylaw.com

*Co-Lead Counsel for Plaintiffs and the Putative Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Shawn A. Williams (Bar No. 213113)
Willow E. Radcliffe (Bar No. 200087)
Matthew S. Melamed (Bar No. 260272)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
mmelamed@rgrdlaw.com

*Liaison Counsel for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

NORFOLK COUNTY RETIREMENT SYSTEM, JOHN MEDLIN, JOHN HUSSAIN, LEONARDO FERNANDEZ, JAMES ACKELS and NANCY ACKELS, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

SOLAZYME, INC., JONATHAN S. WOLFSON, TYLER W. PAINTER, DAVID C. COLE, JERRY FIDDLER, MICHAEL V. ARBIGE, IAN T. CLARK, PETER KOVACS, JAMES R. CRAIGIE, GOLDMAN, SACHS & CO., and MORGAN STANLEY & CO. LLC,

Defendants.

Case No.: 15 Civ. 2938 (HSG)

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

Page


SUMMARY OF THE ACTION ........ 1

NATURE OF THE CLAIMS ........ 3

JURISDICTION AND VENUE ........ 5

PARTIES ........ 5

1. Plaintiffs ........ 5

2. Defendants ........ 7

a. The Company ........ 7

b. The Individual Defendants ........ 7

c. The Officer and Director Defendants ........ 7

d. The Underwriter Defendants ........ 8

SUBSTANTIVE ALLEGATIONS ........ 8

A. Background ........ 8

B. Exchange Act Allegations ........ 11

1. February 2014 Misrepresentations ........ 11

2. March 2014 Misrepresentations ........ 14

3. May – June 2014 Misrepresentations ........ 15

4. July – August 2014 Misrepresentations ........ 18

5. The Truth About the Production Capacity at Moema Facility Was Hidden from Investors ........ 21

6. The Truth About the Moema Facility Is Partially Revealed to the Public ........ 28

7. The Market Reacts to Solazyme's Revelations ........ 29

8. Additional Scienter Allegations ........ 31

9. Presumption of Reliance ........ 32

10. Additional Loss Causation Allegations ........ 33

11. Inapplicability of Statutory Safe Harbor and Bespeaks Caution Doctrine ........ 34

C. Securities Act Allegations ........ 35

CLASS ACTION ALLEGATIONS .......... 42

ADDITIONAL CONTROL PERSON ALLEGATIONS .......... 43

CAUSES OF ACTION AGAINST THE EXCHANGE ACT DEFENDANTS .......... 44

COUNT I For Violation of Section 10(b) of the Exchange Act and SEC Rule l0b-5 Against the Exchange Act Defendants .......... 44

COUNT II For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants and the Company .......... 45

CAUSES OF ACTION AGAINST THE SECURITIES ACT DEFENDANTS .......... 46

COUNT III For Violations of Section 11 of the Securities Act Against the Securities Act Defendants .......... 46

COUNT IV For Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants .......... 47

COUNT V For Violations of Section 15 of the Securities Act Against the Officer and Director Defendants .......... 48

PRAYER FOR RELIEF .......... 50

JURY DEMAND .......... 51

This is a securities class action for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"). Plaintiffs Norfolk County Retirement System ("Norfolk County"), John Medlin, John Hussain, Leonardo Fernandez, James Ackels and Nancy Ackels (together, "Plaintiffs") by and through their undersigned counsel, allege the following individually and on behalf of a class of all persons and entities similarly situated. All allegations are made upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' allegations are based upon the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Solazyme, Inc. ("Solazyme" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. Solazyme is a publicly-traded corporation founded in 2003 that manufactures, markets and distributes specialty oil products for a variety of uses. For most of its existence, Solazyme operated only in small-scale laboratories funded by federal grants. In 2011, however, the Company went public and announced its aspirations to commercialize its operations on a much grander scale. The key to Solazyme's planned expansion was the construction of a new flagship manufacturing facility in Moema, Brazil (the "Moema Facility") that was announced in March 2012. The project was part of a joint venture with a leading international agribusiness and food company, Bunge Limited, and was designed to launch Solazyme as a significant player in the industry.

2. Although the Moema Facility was initially targeted for completion at the end of 2013, by 2014 the facility had not produced a drop of commercially-salable oil. Despite Solazyme's claims that the Moema Facility was a state-of-the-art manufacturing plant designed to produce 100,000 metric tons of high quality oil products annually, the Moema Facility was

actually capable of producing only a meager amount of a reddish sludge-like substance that no customer would accept.

3. As a result, Solazyme, with the help of Goldman, Sachs & Co. and Morgan Stanley & Co. LLC, raised more than $200 million from investors, through a combination of stock and bond offerings, in an attempt to keep the Moema Facility dream alive.

4. In order to raise capital and keep investors interested, however, Solazyme hid the true state of affairs at its Moema Facility. Rather than reveal the persistent problems plaguing its technology, Solazyme instead assured investors that the plant was proceeding according to its schedule to become a major operation that would produce 100,000 metric tons of oil annually.

5. Solazyme management consistently concealed systemic problems at the Moema Facility, downplaying setbacks as short-term, easy-fix issues such as power and steam access and installation delays. Repeatedly, the market analysts covering Solazyme directly asked the Company's executives if the production problems it was experiencing were limited to these short-term, fixable glitches, or whether there were deeper issues. And each time, Solazyme's management lied and said that "the delays ha[d] nothing to do with process," and that once the "hiccup[s]" were resolved, the plant would be hitting its production targets.

6. Solazyme also misrepresented to investors that commercial production began in May of 2014, and that the Company had begun shipping oil produced at the Moema Facility to its customers during the Class Period. A well-informed confidential witness that worked on the Solazyme joint venture in Brazil throughout the Class Period has confirmed that no commercially salable oil produced at the Moema Facility was ever shipped to customers during the Class Period (as defined below). Instead, Solazyme imported oil into Brazil that was actually produced at the Company's much smaller facility in Iowa in an attempt to satisfy customer orders that were supposed to be filled with oil produced at the Moema Facility.

7. Solazyme continued to defraud investors with the illusion of progress at the Moema Facility until November 5, 2014, when the Company abruptly announced that it was "mak[ing] some adjustments in [its] manufacturing and commercialization strategies." Specifically, the Company announced for the first time that it "no longer plan[ned] to produce a

[100,000 metric ton] capacity" plant as originally planned, and would instead "narrow [] production focus to smaller volumes of higher value products." These statements were also false, intentionally leaving out the fact that the Company actually abandoned its plans for the Moema Facility because those plans did not work, never worked, and in fact the Company never knew they would work.

8. Market analysts, who had relied on the Company's statements that commercial-scale production was already underway and that oil was already being shipped to customers from the Moema Facility, immediately seized on the "very significant change in [Solazyme's] strategy," and for the first time understood that the true nature of the problems at the Moema Facility were far more serious than the Company had previously let on. The Company's stock and bond values plummeted on the revelation, and the investors that had artificially propped-up Solazyme by investing $200 million in the failing project were crushed during the sell-off that ensued. The Company's stock price declined by more than 58%, from $7.49 to $3.14 per share, following the next trading session on November 6, 2014. Similarly, the market price of Solazyme's convertible notes declined by $235.00 per note from the prior reported trade on November 4, 2014, or 30.32%, to close at $540.00 per note following the next session in which the Notes traded on November 7, 2014.

9. As a result of Defendants' materially false and/or misleading statements and omissions: (1) Solazyme's Notes and common stock were offered to the public at artificially-inflated prices; and (2) Solazyme's securities traded at artificially-inflated prices during the Class Period. However, as the truth about the construction delays, diminished production capacity of the Moema Facility, and Solazyme's process difficulties became known to investors, the artificial inflation evaporated, and the prices of Solazyme's securities fell, with the price of the Company's notes and common stock declining by 52.64% and 78.64% from their respective Class Period highs. These price declines caused significant losses and damages to Plaintiffs and other members of the Class.

## NATURE OF THE CLAIMS

10. Plaintiffs assert claims under both the Exchange Act and the Securities Act as a

result of Defendants' many misrepresentations to investors concerning the Moema Facility.

11. The Exchange Act claims are brought on behalf of all persons or entities who, between February 27, 2014 and November 5, 2014, inclusive (the "Class Period"), purchased or otherwise acquired the securities of Solazyme (the "Class"). The Exchange Act claims allege that certain Defendants (as defined herein) engaged in a fraudulent scheme to artificially inflate the prices of Solazyme securities during the Class Period by misrepresenting the true state of affairs concerning the centerpiece of the Company's manufacturing capabilities, the Moema Facility.

12. The Securities Act claims are brought on behalf of all persons or entities who purchased or otherwise acquired Solazyme securities pursuant and/or traceable to either of two registered public offerings during the Class Period. On or about March 27, 2014, Solazyme executed a public notes offering (the "Notes Offering") through which Solazyme sold approximately $149.5 million in convertible notes (including the full exercise of an underwriters' option) paying five percent interest and scheduled to mature in 2019 (the "Notes"). That same day, Solazyme also conducted a separate public secondary offering of common stock (the "Stock Offering," and together with the Notes Offering, the "Offerings"), pursuant to which the Company sold 5.75 million shares of stock (including the full exercise of an underwriters' option) at $11.00 per share for aggregate gross proceeds of approximately $63.25 million.

13. The Securities Act Defendants (as defined below) are strictly liable under the Securities Act for the material misstatements in the Offering Documents (as defined herein) issued in connection with the Offerings, and these claims specifically exclude any allegations of knowledge or scienter. The Securities Act claims are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of the Securities Act Defendants—*i.e.*, the Securities Act claims do not allege, arise from, or sound in, fraud. Plaintiffs specifically disclaim any allegation of fraud, scienter, or recklessness in these non-fraud claims.

14. The Exchange Act and Securities Act claims asserted herein arise from a series of

false statements of material fact and omissions of material adverse information, made by Defendants in Solazyme's Offering Documents and throughout the Class Period, about the construction progress, development, and production capacity associated with the Moema Facility. The ultimate disclosure of the truth about the diminished production capabilities and construction delays at the Moema Facility caused a precipitous decline in the market value of Solazyme's securities, resulting in significant losses and damages to the Plaintiffs and the Class.

## JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*, and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17. Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Solazyme maintains its principal executive offices in this District. Further, many of the acts that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

18. In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

## PARTIES

### 1. Plaintiffs

19. Plaintiff Norfolk County, headquartered in Canton, Massachusetts, is a defined-benefit retirement system. Plaintiff Norfolk County purchased Solazyme securities during the Class Period, as set forth in the certification previously filed with the Court, and suffered

damages as a result of the federal securities law violations alleged herein. As detailed in its Certification previously filed with the Court on August 24, 2015, Norfolk County purchased common stock of Solazyme at artificially inflated prices, including Solazyme common stock traceable to Solazyme's March 27, 2014 stock offering sold pursuant to a materially false and misleading Registration Statement and Stock Prospectus (as defined below), and has been damaged thereby. By Order dated October 8, 2015, the Court appointed Norfolk County as a Lead Plaintiff in this action.

20. Plaintiff John Medlin is a citizen of Georgia. Plaintiff Medlin purchased Solazyme securities during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein. By Order dated October 8, 2015, the Court appointed John Medlin as a Lead Plaintiff in this action.

21. Plaintiff John Hussain is a citizen of Minnesota. Plaintiff Hussian purchased Solazyme securities during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein. By Order dated October 8, 2015, the Court appointed John Hussain as a Lead Plaintiff in this action.

22. Plaintiff Nancy Ackels is a citizen of Arizona. Plaintiff Nancy Ackels purchased Solazyme securities during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein. By Order dated October 8, 2015, the Court appointed Nancy Ackels as a Lead Plaintiff in this action.

23. Plaintiff James Ackels is a citizen of Arizona. Plaintiff James Ackels purchased Solazyme securities during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.

24. Plaintiff Leonardo Fernandez is a citizen of Florida. Plaintiff Fernandez purchased Solazyme securities during the Class Period, as set forth in the certification

previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein. By Order dated October 8, 2015, the Court appointed Leonardo Fernandez as a Lead Plaintiff in this action.

**2. Defendants**

**a. The Company**

25. Defendant Solazyme is a corporation organized under the laws of the State of Delaware and maintains its principal executive offices at 225 Gateway Boulevard, South San Francisco, California. The Company's common stock is listed on the NASDAQ Global Select Market (the "NASDAQ") and trades under the ticker symbol "SZYM."

**b. The Individual Defendants**

26. Defendant Jonathan S. Wolfson is a co-founder and the CEO of the Company, and a member of the Company's Board of Directors. During the Class Period, CEO Wolfson certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.

27. Defendant Tyler W. Painter is the CFO of the Company. Since July 1, 2014, Defendant Painter has also served as the Company's Chief Operating Officer. During the Class Period, CFO Painter certified the Company's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.

28. Together Defendants Wolfson and Painter are collectively referred to herein as the "Individual Defendants." Together with Defendant Solazyme, the Individual Defendants are collectively referred to herein as the "Exchange Act Defendants."

**c. The Officer and Director Defendants**

29. Defendant David C. Cole was the President of the Company and a member of the Company's Board of Directors at all relevant times prior to October 8, 2014. President Cole signed the Company's registration statements in connection with the Offerings.

30. Defendant Jerry Fiddler is the Chairman of the Company's Board of Directors. Chairman Fiddler signed the Company's registration statements in connection with the Offerings.

31. Defendant Michael V. Arbige is a member of the Company's Board of Directors, and signed the Company's registration statements in connection with the Offerings.

32. Defendant Ian T. Clark is a member of the Company's Board of Directors, and signed the Company's registration statements in connection with the Offerings.

33. Defendant Peter Kovacs is a member of the Company's Board of Directors, and signed the Company's registration statements in connection with the Offerings.

34. Defendant James R. Craigie is a member of the Company's Board of Directors, and signed the Company's registration statements in connection with the Offerings.

35. Together, Defendants Wolfson, Painter, Cole, Fiddler, Arbige, Clark, Kovacs, and Craigie are referred to as the "Officer and Director Defendants."

#### d. <u>The Underwriter Defendants</u>

36. Defendant Goldman, Sachs & Co. ("Goldman") acted as an underwriter of the Offerings and as a representative of the underwriters for the Offerings. Goldman maintains its principal place of business at 200 West Street, New York, New York.

37. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as an underwriter of the Stock Offering and as a representative of the underwriters for the Stock Offering. Morgan Stanley maintains its principal place of business at 1585 Broadway, New York, New York.

38. Together Defendants Goldman and Morgan Stanley are referred to as the "Underwriter Defendants." The Company, the Officer and Director Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

## <u>SUBSTANTIVE ALLEGATIONS</u>

### A. <u>Background</u>

39. Solazyme is bioengineering company founded in 2003 that creates oil products through a fermentation process that utilizes algae to produce oils for a variety of potential applications.

40. Solazyme's production technique begins by introducing sugar "feedstock" into tanks (also called "fermenters") together with microalgae. The algae then converts the sugar

through a naturally occurring biochemical reaction into a substance colloquially referred to as "cake," that is essentially a mixture of oil and other lipids together with other bioproducts. The cake must then be processed in a press in order to extract the oil from the mixture, which must then be further refined to turn it into commercially usable oil. The process of converting the sugar into the cake is sometimes referred to as the "fermentation process" or the "upstream process," while the process of extracting and refining the oil is sometimes referred to as the "downstream process."

41. Throughout most of its existence, Solazyme focused solely on research and development of algae-based oil production techniques in a laboratory setting, and did not make any efforts at commercial-scale production. Solazyme funded its research efforts through federal grants and by partnering with energy companies as well as the U.S. Department of Defense to conduct research on the potential for generating fuel using this process. Sales were *de minimis* and generally limited to testing applications in connection with these partnerships, and Solazyme did not typically distribute its products commercially in the marketplace.

42. In or around 2010, however, the Company began to shift its focus and expand its ambitions towards broader commercialization of its algae-based oil production method. In that year, Solazyme launched a line of dietary supplements, which was the Company's first commercial product for retail consumption. But the Company's production capacity remained very limited, with only a laboratory in Peoria for research and development purposes capable only of a 2,000 metric ton annual production capacity. The limited capacity of the Peoria laboratory did not allow for Solazyme to sell products on a commercial scale.

43. In order to achieve greater commercialization of its products, Solazyme went public in May of 2011 with an initial public offering ("IPO") on the NASDAQ exchange. The offering priced on May 27, 2011, and Solazyme issued approximately 11 million shares at a price of $18 per share, raising nearly $200 million in investment capital.

44. From the beginning of Solazyme's status as a public company, the focus from the investment community has always acutely centered on the Company's production capacity. Just prior to Solazyme's IPO, Greentech Media reported that "according to proponents," one of

Solazyme's potential advantages over competitors was that "algae can produce more oil per acre than other forms of biomass."

45. Around the same time as the IPO, Solazyme also announced several partnerships with large agribusinesses to develop products and build new facilities capable of producing oil on a large commercial scale. This included a project in which Solazyme partnered with Archer Daniels Midland Co. ("ADM") to build a small facility in Iowa, referred to as the "Clinton/Galva facility," that when fully ramped-up was expected to have an annual production capacity of 20,000 metric tons.

46. More significantly, Solazyme also announced that it was partnering with Bunge Global Innovation, LLC, a unit of the international agribusiness and food company Bunge Limited ("Bunge"), to jointly develop microbe-derived oils from Brazilian sugarcane feedstock. In May of 2011, Solazyme and Bunge entered into a Joint Development Agreement ("JDA") to develop oils that could be sold commercially. In August 2011, Solazyme and Bunge announced that they had entered into a Joint Venture Framework Agreement ("JVFA") setting forth the preliminary terms of a joint venture to build a new facility to produce commercial grade oil with an annual production capacity of 100,000 metric tons of oil – the Moema Facility.

47. The JDA and JVFA laid the groundwork that culminated in an April 2012 Joint Venture Agreement ("JVA") between Solazyme and Bunge to build, own, and operate the Moema Facility, which would be located adjacent to an existing Bunge's sugarcane mill in Moema, Brazil. The joint venture at Moema operated under the name Solazyme Bunge Produtos Renováveis Ltda. ("Solazyme-Bunge"). Under the JVA, Bunge agreed to provide sugarcane feedstock as well as power and steam services to the Moema Facility. The Company's June 26, 2012 press release announcing the plant's ground breaking stated that "Construction started on schedule and the plant is targeted to be operational in the fourth quarter of 2013."

## B. Exchange Act Allegations

### 1. February 2014 Misrepresentations

48. Solazyme met neither its stated goals of completing the Moema Facility, nor of starting production at that facility, during 2013. In fact, as of February 27, 2014, the first day of the Class Period, the Moema Facility was still under construction. Nevertheless, Solazyme sought to reassure the markets with strong statements about the progress at Moema.

49. After the markets closed on February 26, 2014, Solazyme issued a press release announcing results for the fourth quarter and full year of 2013 and hosted a conference call for investors and analysts to discuss the same. CEO Wolfson began the conference call by recognizing that Solazyme "did not accomplish everything we set out to do in 2013, including not hitting our revenue targets, and pushing out the Moema production time line."

50. In his prepared remarks during the call, however, the primary theme that CEO Wolfson repeated over and over was the near-completion of the flagship Moema Facility. These statements were materially false and misleading:

> ***On the production side, we … neared completion of the 100,000 metric ton Moema plant***.
>
> * * *
>
> We're making ***strong and steady progress at Moema***. We're currently ***deep into the commissioning process***. To really understand the progress, it's useful to break out the major unit operations in the facility. ***The plant requires infrastructure, including utilities such as steam and power***, and additional capabilities like cleaning and sterilization systems.[1]
>
> * * *
>
> ***Infrastructure and upstream which together comprise a substantial percentage of the plant, are both currently online and everything is functioning as expected***.
>
> * * *

[1] The "commissioning" of the plant, as that term is used throughout this Consolidated Complaint with respect to the Moema Facility, refers to the process of assuring that all systems and components of a facility are designed, installed and tested according to the operational requirements of the owner. The main objective of commissioning is to effectively conduct the orderly turnover of a unit from the constructor to the owner, demonstrating the facility's operability in terms of performance, reliability, safety and information traceability.

> [W]e are carefully staging production ramp-up with a planned ***12 to 18-month time line to reach nameplate capacity at both Clinton and Moema***. . . . ***The clock will start soon at Moema with initial fermentation operations just getting under way***.
>
> * * *
>
> We believe that the progress at Moema and its current schedule leaves us ***in good shape to bring full production online this spring***, and with the anticipated 12 to 18-month scale-up process, this puts us ***on track to reach full nameplate capacity in the back half of 2015***, as we suggested on the last call.
>
> * * *
>
> ***At Moema, commissioning is well underway, a significant [portion] of the plant is already online, and we're getting close to producing our first commercially saleable product***.

51. The February 26 press release similarly quoted Wolfson as falsely stating that Solazyme was "***deep into commissioning in Brazil as we complete the first-of-its-kind 100,000 MT Solazyme Bunge Renewable Oils (SB Oils) facility at Moema***."

52. Other Solazyme executives also repeated Wolfson's false claims regarding the Moema ramp up process, including CFO Painter, who stated during the conference call in response to an analyst's question that "***the plant was designed at Moema to be a 100,000 metric ton nameplate*** … what we have said is ***over 12 to 18 months, that in that window we'll hit*** what is ***100%*** of what the plant was designed to run at." Painter also falsely encouraged analysts to think of the 12 – 18 month range as "***conservative***," and agreed that Solazyme "***could actually achieve [the] 12 month target***."

53. In addition to the constant refrain that commencement of commercial production was imminent, Solazyme management also repeatedly emphasized the large scale of production capacity that the Moema Facility would have once completed, at the 100,000 metric ton level and even beyond. Wolfson explained that Solazyme was "***focusing on larger product opportunities generally in excess of 100,000 metric tons per year.*** . . . [W]hile we're focused on successfully ramping Clinton/Galva and Moema, we're also very hard at work on projects for ***significant capacity expansion***."

54. Solazyme also announced significant progress on the sales side, especially with respect to its "anchor customer," Unilever, one of the world's largest food and personal care products companies, whose multinational brands include Dove and Ben & Jerry's. In 2013, Solazyme signed a deal to provide Unilever with ***3 million gallons*** of its algae-based oil products. Wolfson explained to investors on February 26, 2014 that "the supply agreement we entered into last fall included a requirement for the completion of product validation trials run by Unilever," and then falsely told investors "that ***those validation trials have now been successfully completed***."[2]

55. Market analysts reacted positively to these February 26, 2014 statements. A Jefferies' equity research update issued later that same day was titled "Pivot to Commercial Production On Track," and stated that "Moema remains on track for initial commissioning in March and production in March or April, and regulatory approvals appear to be on track as well. Solazyme continues to target nameplate capacity in 12-18 months." As a result, Jefferies placed a Buy rating on shares of Solazyme.

56. Cowan & Co.'s research update issued the following day similarly gave Solazyme an "Outperform" rating, reporting that "Moema Has Completed Most Phases of Startup" and "Production Volume Should Ramp Significantly" in the second half of 2014.

57. Credit Suisse's research note issued on February 27, 2014 was titled "Moema Commissioning Nears," and Morgan Stanley reported on the same day that it was "more positive" after the call, because, among other things, the fact that "Moema JV [was] likely on-stream in the next 30-60 days," and because "Moema has 5x the nameplate capacity as Clinton/Galva."

---

[2] The relationship between Solazyme and Unilever was also important to market analysts. For example, a September 25, 2013 report by Cowen & Co. titled "Unilever Supply Agreement Suggest Bunge Startup on Track" stated that with "initial validation quantities to ship in Q4:13"….the "issue is whether SZYM will be able to make sufficient quantities at reasonable cost, or whether it will stumble on the final step to full commercialization, as other biomaterials companies have. We believe today's announcement [of the Unilever supply agreement] strong suggests that SZYM is close to proving that it can."

2. **March 2014 Misrepresentations**

58. On March 14, 2014, Solazyme filed its 2013 10-K with the SEC, which discussed, among other things, the construction progress, development, and production capacity associated with the Moema Facility. For example, the Company stated in part:

> ***Our process is compatible with commercial-scale, widely-available fermentation and oil recovery equipment***. We operate our lab and pilot fermentation and recovery equipment as scaled-down versions of our large commercial engineering designs, such as those used to supply large quantities of oil for our algae-derived fuel delivered for testing and certification programs with the U.S. Department of Defense. This allows us to more easily scale up to larger fermentation vessels. We have scaled up our technology platform and have successfully operated at lab (5-15 liter), pilot (600-1,000 liter), demonstration (75,000 liter) and commercial (approximately 120,000—500,000 liter and above) fermenter scale. ***The commercial scale achieved at ADM's Clinton Facility is comparable to the fermentation equipment at the Solazyme Bunge Renewable Oils facility in Brazil***.
>
> * * *
>
> ***[T]he commissioning of the facility at Moema is underway. As such, we are now expanding into large-scale, high-volume commercial production*** and sales of intermediate and ingredient products across food, industrial, fuel and personal care markets.
>
> * * *
>
> The Solazyme Bunge JV is currently constructing a production facility adjacent to Bunge's Moema sugarcane mill in Brazil, and commissioning is underway. ***We are targeting the production of commercially saleable product by the end of the first quarter of 2014***, though such production could move into the second quarter. ***The production facility is expected to have a name plate capacity of 100,000 [metric tons] of oil per year***.

59. The Company's 2013 10-K also included a certification signed by CEO Wolfson and CFO Painter, incorporated therein as Exhibit 31.1, falsely certifying, *inter alia*, that to their knowledge "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***."

60. Market analysts reacted favorably to the statements Solazyme made in March 2014 concerning the progress at the Moema Facility. For example, on March 27, 2014, Jefferies

maintained its Buy rating, stating "[o]ver the next few quarters we expect Solazyme to evolve from a demonstration story to an operating company." Cowen & Co. similarly noted in its April 1, 2014 update that "[p]roduction is imminent at the 100K MT Moema plant."

**3. <u>May – June 2014 Misrepresentations</u>**

61. After the close of the trading session on May 5, 2014, Solazyme issued a press release announcing results of operations for the first quarter of 2014.[3] In connection with this announcement, CEO Wolfson commented in part:

> While we haven't yet announced our first commercial product out of Moema, much of that plant is operational, including full-scale fermenters. We expect to manufacture commercial product at the Moema facility in the second quarter.

62. That same day, Solazyme hosted a conference call for investors and analysts to discuss the Company's results. As part of his prepared remarks, CEO Wolfson attributed the delay in commercial production to "***intermittent power and steam availability*** resulting from the start up of a new cogen facility at the adjoining Moema sugar mill."

63. However, Wolfson repeatedly and falsely represented that this was the sole reason for the delay, stating "***[s]team and power aside, we are progressing closer to completion of the plant***."

64. In fact, Wolfson was confronted directly on this question by multiple analysts during the question and answer portion of the call, and his responses directly misled investors. For example, one exchange with a Goldman Sachs analyst went as follows:

> **Analyst**: when you mentioned that much of Moema is operational here, ***I just want to make sure that there's not anything process related here that's been part of the delay. It's all been mechanical issues?***
>
> **Wolfson**: "It's been making sure that we can get the ***construction completed*** to the point where we can commission and start up. … ***It hasn't been anything other than construction to commissioning***."

[3] On May 8, 2014, Solazyme filed its quarterly report on Form 10-Q for the first quarter of 2014 with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. This Form 10-Q also included certifications substantially similar to those described in paragraph 59.

> **Analyst**: … ***anything with respect to your technology*** specifically? Then I guess I'm focused more on just the tail end of ramping up here, and getting commercial product out the door."
>
> **Wolfson**: Yes, so ***the answer is no, not at all.*** In fact, unlike maybe other technologies that are bringing up the first of their kind commercial plan, Solazyme is actually running a very large scale [of] our technology today at Clinton/Galva. We've already produced four completely distinct and unique products and sold them, and are shipping every day. ***The delays have nothing to do with the process***."

65. Another exchange with an analyst from Raymond James & Associates ("RJA") went as follows:

> **RJA Analyst**: ***Had it not been for the disrupted power supply from the cogen plant at the sugar mill, would you have made the original timetable for starting up Moema***?
>
> **Wolfson**: we believe that had we had consistent power and steam, we would've produced first commercial product by now. ***Absolutely, yes***."

66. Similarly, Defendant Wolfson addressed additional questions from analysts specific to Solazyme's downstream oil recovery process, and Wolfson again falsely reassured investors in response to these questions that everything was under control and there were no significant problems with the oil extraction or refinement process:

> **Analyst:** Hi, guys. Jonathan, a first question on, ***you commented that the back end separation at Moema was taking a little bit longer than expected. I always thought your separation process was really pretty simple***, just dry out the fermentation [broth], and press out the oils. You can you provide any more color on what it was that was more complicated than you thought?
>
> **CEO Wolfson:** ***I wouldn't say it was more complicated.*** I would just say that if you break that down into multiple parts, the unit operations to get to the Encapso product, ***they're all operable and really have been operable since later March***. The part that just happens to be taking longer and to be specific, Rob, ***it has to do with just getting some conveyance equipment installed***, is the final oil extraction units. ***I wouldn't say it has anything to do with complexity***.

67. Finally, Wolfson repeatedly stated that the power and steam issues, which were, according to Solazyme, the sole cause of the delays, were temporary and easily remedied:

> **Analyst:** Hi. I just had a couple of quick questions, one on Moema. You said some of the delays related to a new cogen facility, and you do not expect[ that] to be a long-term issue. …

> ***Would there be maybe some intermediate term risk related to that, that maybe this ramp takes a bit longer?*** Thanks.
>
> **CEO Wolfson:** Bunge's been a phenomenal partner to Solazyme, and I should say, is a phenomenal partner to Solazyme. ***I wouldn't read much into this*** other than the intermittency of steam and power, it's been something that has been really a recent issue. What I would say about Bunge is that they're operating many facilities, including many cogen facilities very successfully all around the world. ***I think between Solazyme and Bunge, we don't have concerns about the reliability of steam and power in the longer term***.

68. Wolfson's prepared remarks contained these same false statements that "***we don't see reliable availability of power and steam as a long-term issue....*** [W]e still see production of our first commercial products at Moema happening this quarter and ***limited, if any, impact on the ultimate scale-up timeline of Moema***. This kind of unexpected ***hiccup*** is why we've clearly defined the first phase of plant start-up to be about establishing consistent commercial operations."

69. Solazyme's strategy of deflecting concerns over the mounting delays at the Moema Facility by blaming them on utility problems worked. Analysts remained upbeat on the progress at Moema, citing management's explanations.

70. For example, Morgan Stanley's research update on May 6, 2014 was titled "Moema COD Close at Hand; Long-term Value Still Intact,"[4] stating that "[a]lthough Moema did not reach COD in April as expected, the delay was due to power supply issues from a nearby co-gen plant rather than fundamental technology or process problems."

71. Credit Suisse's May 6, 2014 update, titled "Significant Commercialization Progress Albeit Slight Delay in Brazil," was similarly positive, and cited management's power and steam access justification to support its conclusion that "the delay is relatively minor and par for the course with plant startups." Jefferies also concluded on May 7, 2014, after Solazyme management's explanations, that the Company was "on track," and maintained its Buy rating.

---

[4] "COD" in this context stands for "Cash On Delivery," which is industry short-hand for the shipment of commercial products.

72. On May 29, 2014, Solazyme issued a press release in which the Company falsely represented that it had "***successfully produced its first commercially saleable products on full-scale production lines***" at the Moema Facility, and stating that "***production [was] underway***," which was described as "an ***important milestone*** for this joint venture."

73. Analysts reacted to this announcement, including a special company update issued by analysts at Morgan Stanley on May 30, 2014 titled "Moema COD Significantly Derisks Story," which explained that "[t]he company announced Thursday that the Moema facility is operational, having manufactured oils" and other products. Based on the Company's announcement that production was underway, the analyst concluded:

> ***An operational Moema facility allows the market to refocus on Solazyme's valuable technology platform and robust strong growth prospects*** rather than handicapping the startup of the Brazilian plant. ***We expect the Clinton and Moema facilities to reach nearly 25% of their 120k MT total capacity by the end of 2014***.

74. Additionally, Solazyme held investor meetings in June of 2014 that were attended and reported on by market analysts. At these meetings, CEO Wolfson continued to mislead investors by pushing the narrative that there were no significant issues at the plant, that the power and steam issues were largely resolved, and that commercialization was proceeding according to schedule, while deliberately concealing that no salable oil had been produced.

75. For example, Cowen & Co. issued an update on June 19, 2014 titled "Meetings with CEO Point to Progress on Production and Customer Base," which stated that "[s]tartup issues with power and steam at Moema appear largely if not 100% resolved." Solazyme apparently told the analysts that the power and steam issues had been resolved and that the plant was now generating "more power than the mill and SZYM JV plant [*i.e.*, the Moema Facility] consume," so much so that Solazyme was selling its excess power back to the grid.

**4. <u>July – August 2014 Misrepresentations</u>**

76. All through the summer of 2014, Solazyme continued to falsely represent to investors that everything was on track at the Moema Facility, which it continued to boast as a large scale manufacturing facility. In fact, Solazyme by this point was often focusing investors

even ***beyond*** the 100,000 metric ton nameplate capacity, and pointing to "***significant expansion potential***" for the plant.

77. On July 30, 2014, Solazyme hosted a conference call for investors and analysts to discuss the Company's results of operations for the second quarter of 2014. As part of his prepared remarks, CEO Wolfson referred to the Moema Facility variously as a "***large-scale manufacturing facilit[y]***" or "***100,000 metric ton Moema facility***."

78. On the same call, Wolfson continued on, stating in part:

> [W]e've made substantial progress commissioning the plant and are ***in the final stages. All equipment through the finishing process is now installed and commissioning is nearing completion***.

79. CFO Painter similarly misled investors by claiming that "***[w]e continue to expect the ramp to nameplate at both facilities to be a 12- to 18-month process*** that starts slowly and accelerates in the later stages."

80. Significantly, during a question-and-answer session that followed, Defendant Wolfson falsely told investors that Solazyme had "produced both oil and Encapso using full-scale production lines ***and we've shipped initial volumes of commercial products***" from the Moema Facility, and that the Company had "***made great progress addressing the utility issues***."

81. Further, President Cole misled investors by claiming that:

> ***All unit operations at this point are installed; feedstock prep, seed fermentation, production tanks, sterilizers, downstream drying and packaging. They're all on line***. … ***we expect to commission the balance of our capacity beyond the three tanks we have now in the next several weeks***."

82. Indeed, Cole provided a picture of the progress that was so optimistic that he focused on the Moema Facility's ability to expand ***beyond*** the ramp-up to achieve even greater than 100,000 metric ton annual production numbers. He falsely represented that "we are now operating three commercial facilities, two of which are ***large-scale facilities with significant expansion potential***," referring to Moema and Clinton/Galva.

83. During the same July 30, 2014 conference call, Defendant Cole then elaborated on the Moema Facility's expansion:

> We have an upstream team that's working very actively with several parties to look at our ***plant expansion***. We're not only looking at new plants and new geographies, ***we're also looking at possibly expanding with -- in the relationships we currently have, including the Bunge relationship within the previously-announced expansion framework that takes us up to 300,000 tons*** ....

84. Solazyme continued to make similar false statements to analysts and investors at two investment conferences held on August 11-12, 2014. CFO Painter boasted of the Moema Facility that it was a “100,000 metric ton purpose built plant in Sao Paolo state in Brazil, this was with our partner, Bunge … again, ***it is [a] 100,000 metric ton plant*** at their largest sugar mill in Brazil which is [at] Moema.”

85. Painter continued to insist during these conferences that the Moema Facility was operating according to its originally conceived schedule:

> What we have talked about is that for each of these facilities our production ramp is a 12- to 18-month cycle. So as we are bringing in, finalizing the commissioning of the plant, ***the introduction of commercial production at the plant starts that 12- to 18-month cycle.*** … [I]n the third phase, we reach toward what we call nameplate capacity. ***So that means you are running at a run rate of producing 100,000 metric tons a year when you hit that nameplate capacity***.

86. Solazyme's SVP of Corporate Development also attended the investor conference and told investors “We just began commercial production out of [the Moema] facility. It's based in Sao Paulo state and ***that's for 100,000 metric tons of production volume***.”

87. Once again analyst reactions to the statements Solazyme made in July and August of 2014 concerning the progress at the Moema Facility were overwhelmingly positive. Morgan Stanley's research update on July 31, 2014 stated that “[t]he production ramp is underway and apparently on track” and maintained its “Overweight” (Buy) rating as a result.

88. Credit Suisse reported the same day that “[t]he company continues to make commercial progress with Moema coming online in Q2 and now ramping up,” noting that “Solazyme has started initial runs & shipments from the 100k MT Moema facility.” Based on the Company's representations, Cowen & Co. also reported on July 31, 2014 that its “Base Case” scenario was that “Moema reaches nameplate by mid-15, ramps to 300K MT by Y.E.

2016," and issued a follow-up update on August 12, 2014 after the investor conference that it believed there was an "attractive entry point into Solazyme at current levels, ahead of an inflection as full-scale productions begins to ramp up."

### 5. **The Truth About the Production Capacity at Moema Facility Was Hidden from Investors**

89. The statements made by the Exchange Act Defendants were false and misleading. The Exchange Act Defendants took active steps to hide the truth from Solazyme's investors. For the entirety of the Class Period, the true state of the Moema Facility was dramatically worse than the Company represented it to be, as described in detail by several confidential witnesses who are each former employees of Solazyme or Solazyme-Bunge that worked on the Moema Facility joint venture project in Brazil during Class Period.

90. Confidential witness number 1 ("CW1") was employed as a Controller for Solazyme-Bunge in Sao Paolo, Brazil for the entire duration of 2014, including the Class Period. As a Controller, CW1's responsibilities included maintaining an inventory of oil produced at the Moema Facility and overseeing the accounting records concerning the value of that inventory. As part of CW1's job, CW1 received regular updates on the progress of the ramp up of the Moema Facility, including descriptions of the nature and extent of the production problems as they were occurring at the Moema Facility during the Class Period. CW1 was therefore in a position to have, and does in fact have, first-hand knowledge concerning the production process issues at the Moema Facility during the Class Period.

91. According to CW1, the intermittent power and steam access was only one of the issues that contributed to the delays and low production output at the Moema Facility. Other problems with the production process also contributed significantly to the delays and other problems at the facility. CW1 states that the other significant issue that caused delays at the Moema Facility during the Class Period was the poor quality of the oil being produced that rendered it unsalable. For example, the extracted oil had a predominantly black or red color, and was of a thinner viscosity than expected. This was unacceptable to Solazyme's customers, chiefly its largest customer, Unilever, which required the oil to be clear and have a thicker

viscosity. In an attempt to meet Unilever's specifications, Solazyme tried sending the raw oil produced at the Moema Facility to a third party company in Brazil called Triangulo for further refinement.

92. Moreover, production volumes of even this discolored and thin oil were extremely low as a result of other fundamental problems with its extraction process at the Moema Facility. For example, according to CW1, the "cake" that was produced during the fermentation stage was constantly clogging the press that was used to extract the oil, and as a result, the cake would start burning inside the press. As a result, the machines would have to be shut down and cleaned, which greatly slowed down the process, in addition to losing the existing batch of oil that was being processed. The process was operating on brand new machines, so this was not a problem involving broken machinery that needed to be, or could be, fixed. CW1's account is corroborated by the Company's own belated admission on November 5, 2014 that it had not achieved "consistent processing."

93. Therefore, according to CW1, if the power and steam issues had not occurred, the Moema Facility still would not have been on schedule with its ramp up to commercial production levels because the Company was so far behind its production targets that the amount of oil production that would have been gained by resolving the utility issue, while material, would not by itself have been sufficient to make up the difference. CW1 also stated that the intermittent power and steam outages were not resolved during the summer of 2014, and, in fact, persisted throughout the entire Class Period and beyond.

94. Finally, CW1 stated that Solazyme's management team in the United States, including CEO Wolfson and CFO Painter, were kept regularly apprised of the state of the progress at the Moema Facility, including with respect to the nature and extent of the problems with the manufacturing process, the power and steam issues, the oil quality and the production capacity. CW1 stated that such updates were provided during weekly conference calls in which CW1 often participated, and which also included CFO Painter and sometimes CEO Wolfson. CW1 also stated that Solazyme-Bunge CFO Erico Lopes, and Solazyme-Bunge Managing Director Walfredo Linhares spoke regularly with Defendant Painter by phone in addition to the

weekly conference calls to provide further updates. CW1 also stated that some of Solazyme's management team, including Wolfson and Painter, traveled to Brazil during the Class Period to visit the Moema Facilities and discuss the problems with the production process and the associated delays.

95. CW1's account was corroborated by another confidential witness ("CW2"), who also provided further details about the problems with the Company's production process at its Moema Facility. CW2 was employed by Solazyme-Bunge as a Senior Administrator working in the Sao Paolo office during the entire Class Period. In that position, CW2 was responsible for all financial and administrative reporting systems with respect to the Moema Facility. This included all information stored in Solazyme-Bunge's systems concerning product inventory (*i.e.* oil production), customer orders, sales of oil, and vendor relations. CW2 was therefore in a position to have, and does in fact have, first-hand knowledge concerning the lack of production capabilities at the Moema Facility during the Class Period.

96. According to CW2, no oil produced at the Moema Facility was ever sold to customers during the Class Period. Instead, in an attempt to satisfy existing orders from customers expecting oil from Moema, primarily Unilever, Solazyme imported oil to Brazil that was produced at Solazyme's ***Clinton/Galva facility***. CW2 knows this because CW2 oversaw the process of clearing the Clinton/Galva oil through customs into Brazil for this purpose.

97. CW2 explained that the attempted substitution of oil from Clinton/Galva was rejected by Unilever because it was not actually produced at the Moema Facility. The reason was simple – these initial volumes were supposed to be used by Unilever for testing purposes to establish the reliability of the oil produced at the Moema Facility for use in Unilever's products. Substitute imported oil that was not actually produced at the Moema Facility was therefore useless to Unilever for this purpose. CW2 states that no customer orders were ever filled during the Class Period using oil produced at the Moema Facility. CW2 would have known if the Company had sold any oil produced at the Moema Facility because CW2 maintained and had full access to the information systems into which all customer order and sale information was entered.

98. In fact, according to CW2, commercial oil production never truly got underway at the Moema Facility during the Class Period. Instead, the Company's efforts during the Class Period were focused on troubleshooting and trying to fix problems with the production process, and that was inconsistent with commercial production operations. CW2 states that he was aware of the power and steam problems because they were regularly discussed in the Solazyme-Bunge office, but that these utility problems did not have a significant effect on the oil production output because commercial production was not ongoing to begin with during the Class Period. Moreover, CW2 states that consistent power and steam access continued to be an issue during the entire Class Period and beyond. CW2's account is corroborated not only by CW1, but also by Solazyme's subsequent admission on November 5, 2014 that "[p]ower and steam consistency continues to be an issue."

99. CW2 also confirmed that at the end of 2014 Solazyme attempted to cure its deficient oil by sending it to Triangulo for refinement. This was necessary because, according to CW2, the Moema Facility lacked the ability to refine or purify the oil in order to meet customer specifications. CW2 further explained, however, that only small quantities of oil were sent to Triangulo as a test, and that the attempt was a failure and the oil that was sent to Triangulo for purification was not sold to Solazyme's customers.

100. Finally, CW2 confirmed that Solazyme's management, including Defendants Wolfson and Painter, were kept fully apprised of the status of the Moema Facility and its inability to produce commercial-grade oil because the progress at the Moema Facility was very important to the overall success of the Company. CW2 stated that Wolfson would visit the Moema Facility approximately 3 times per year during the relevant period, and that the Solazyme-Bunge's CEO Hildo Henz and CFO Erico Lopes would travel to the United States to meet with the Individual Defendants in order to provide them with updates concerning the progress of the Moema Facility. CW2 also stated that Henz and Lopes had frequent conference calls with Solazyme's management to discuss the problems at the Moema Facility.

101. A third confidential witness ("CW3") provided further detail and corroboration concerning the true state of affairs at the Moema Facility. CW3 is a chemical engineer who

worked as a production supervisor at the Moema Facility during the Class Period, from the spring of 2014 through mid-autumn of 2014. CW3's primary responsibility at the Moema Facility was to supervise the production of algae with respect to oil production under Solazyme's supply agreement with Unilever.

102. CW3 stated that during the entire time CW3 was employed at the Moema Facility, the production line experienced delays in production and was never able to meet production startup goals. According to CW3, the production delays and shortfalls were primarily due to faults in the production process itself. CW3 stated that although there were delays due to lack of electricity, these issues were generally resolved fairly quickly and without a major impact on production. Rather, most of the operational delays resulted from maintenance having to be performed on clogged valves and fermentation tanks. When asked to describe the mechanical issues, CW3 stated that the design of the machinery used was very inefficient and was frequently clogging due to blockages caused by the density of the algae cake produced. CW3 stated that there was also a problem with the process that related to a toxic red chemical present in the sugar that was used during the fermentation process. CW3 stated that Solazyme executives were constantly at the Moema Facility during CW3's employment in order to address the delays and to attempt to increase production levels.

103. Finally, a fourth confidential witness ("CW4") also corroborates the accounts of the other confidential witnesses concerning the true state of production at the Moema Facility. CW4 was employed by Solazyme as a production line supervisor at the Moema Facility from March 2014 through the end of the Class Period and beyond. According to CW4 there were numerous issues and problems arising because the process was flawed. CW4 stated that the process worked only for small batches, but when they tried to increase production many problems developed. Some of these problems were because of the type of sugar being used, according to CW4, while others resulted from the density of the cake that occurred when they tried to increase the volume. CW4 stated that the power outages had some negative effect on production capacity, but that the power problems were generally resolved very quickly, and in any event they were minor compared to the production issues. CW4 stated that Solazyme

executives and engineers were a constant presence at the Moema Facility because they were trying to solve the production problems, but they were never able to resolve the issues during the time he was employed by the Company.

104. The accounts provided by these confidential witnesses, who were all directly involved in the operations of the Moema Facility during the Class Period, flatly contradict the representations made by the Company to investors, including:

i. **Solazyme represented to investors** in July of 2014 that the Company had "shipped initial volumes of commercial products" from the Moema Facility, including "both oil and Encapso."

- **In reality**, the Company ***never sold any oil produced at the Moema Facility*** during the Class Period. Instead, Solazyme attempted to satisfy its contractual obligations to its largest customer, Unilever, by substituting oil produced at the Clinton/Galva facility in lieu of oil produced at the Moema Facility.

ii. **Solazyme represented to investors** that "***validation trials have now been successfully completed***" with respect to its Unilever agreement.

- **In reality**, Unilever rejected Solazyme's attempt to substitute its Clinton/Galva oil instead of Moema Facility oil for testing purposes, and therefore those tests were, at best, ongoing and subject to the further approval of Unilever.

iii. **Solazyme represented to investors** that but for the power and steam issues, the Company would be on track with its production targets at the Moema Facility.

- **In reality**, the other issues at the Moema Facility were such that the entire process was fundamentally flawed. The machinery being used to process raw materials was not producing oil in a state which could be sold commercially in a large scale. The failure to correct those primary issues substantially contributed to the delays, and were in fact more significant in impeding progress than the power and steam access. Simply stated, all

the power and steam in the world would not have solved the problem existing because the machinery was not doing what it was supposed to do.

iv. **Solazyme represented to investors** that the utility issues were largely resolved during the summer of 2014.

- **In reality**, the utility issues were not resolved, and in fact were never resolved during the Class Period, and in any event, the utility problems were not Solazyme's only material production issue. Its main impediment to having a facility that operated as promised was that its factory was incapable – even when it had power – of making commercially salable oil.

v. **Solazyme represented to investors** that the Moema Facility "delays have nothing to do with the process."

- **In reality**, the oil production process at the Moema Facility was plagued with problems such as oil discoloration, low viscosity and cake burning issues, and the Company was not making significant progress in resolving these problems.

vi. **Solazyme represented to investors** repeatedly that it was on track with its 12-18 month ramp up schedule.

- **In reality**, Solazyme was far behind schedule because of its inability to get its production process to work, even when the plant had power—a fact the Exchange Act Defendants deliberately concealed from investors.

vii. **Solazyme represented to investors** that the Moema Facility would have a 100,000 metric ton per year production capacity when completed.

- **In reality**, there was no reasonable basis to believe that the plant could ever produce 100,000 metric tons of oil after all of the equipment had been commissioned and was never able to produce any commercially significant amount of salable oil.

viii. **Solazyme represented to investors** that the technology it developed in

laboratory type settings in the United States were capable of scaling into a high-volume commercial operation at the Moema Facility.

- **In reality**, Solazyme could not scale its production methods and never had a realistic prospect of replicating its laboratory methods on a commercial scale in a cost-effective manner.

105. In short, the Exchange Act Defendants misrepresented the state of affairs at the Moema Facility as it actually existed during the Class Period at the time each of the misrepresentations were made, and further lacked a reasonable basis for its projections relating to the Moema Facility's progress and the Company's outlook.

**6. The Truth About the Moema Facility Is Partially Revealed to the Public**

106. After the close of the trading session on November 5, 2014, Solazyme made a dramatic announcement in its earnings press release and in a subsequent conference call with investors and analysts that same day. Specifically the Company announced for the first time during the investor call:

> ***[Solazyme will] narrow our production focus to smaller volumes*** of higher value products at both Moema and Clinton/Galva. We will be prioritizing cash management and product margin over a rapid capacity ramp. ***We therefore, no longer plan to produce a nameplate capacity within 12 to 18 months.*** This decision will cause us to deprioritize near term production in some product areas where we're seeing significant and growing demand, but are not yet economically attractive given early cost structure and commodity pricing trends.

107. The Company explained the decision by stating, among other things, that "***[o]perational challenges at Moema are causing a slower than anticipated descent down the manufacturing cost curve***."

108. Solazyme's Chief Technology Officer then disclosed a substantial list of the problems impeding progress at the Moema Facility:

> ***Power and steam consistency continues to be an issue***. The fix[es] implemented over the spring and summer have led to improvements resulting in periods of reliability. So these have continued to be interest bearers with setbacks as well. To be clear, ***the work that has been done up to now, including a significant focus on backup systems is a partial fix***.

* * *

> ***[T]here is continued work to do on the downstream operations to allow them to run continuously and then in integrated fashion***. Specifically, we are focusing on some correctable ***issues with the conveyance system***.

109. Next, despite previously and emphatically having told investors that "the delays have nothing to do with process," the Company did an about-face on the November 5th call, and stated that it was "also ***working to achieve consistent processing with the process***, the timing of which is taking longer than we expected." Finally, the Company further disclosed that "***not all of the downstream is working yet efficiently, continuously or on an integrated basis***."

110. On October 9, 2014, less than a month prior to these revelations, Solazyme issued a press release concerning the forthcoming release of the Company's third quarter 2014 financial results and notifying investors about the upcoming November 5 call, but failed to disclose any information about the problems at the Moema Facility.

### 7. <u>The Market Reacts to Solazyme's Revelations</u>

111. In reaction to these disclosures of the truth concerning Solazyme's inability to produce oil on a large commercial basis at the Moema Facility, Solazyme's stock price declined $4.35 per share, or 58.08 percent, to close at $3.14 per share following the next trading session on November 6, 2014. Similarly, the market price of Solazyme's Notes declined by $235.00 per Note from the prior reported trade on November 4, 2014, or 30.32 percent, to close at $540.00 per Note following the next session in which the Notes traded on November 7, 2014.

112. The Exchange Act Defendants' false statements and omissions during the Class Period, as set forth in ¶¶ 48-88, caused the Company's securities to trade at artificially inflated prices during the Class Period. However, as the conditions described above were revealed to the market, the prices of the Company's securities fell significantly. For example, Solazyme's stock price fell by $11.56 per share—or 78.64%—from its Class Period-high closing price of $14.70 per share on March 12, 2014. Similarly, the market price of Solazyme's Notes declined by $600.30 per Note—or 52.64%—from their Class Period-high closing price of $1,140.30 on June 27, 2014.

113. As shown above, the artificially-inflated market value of the Company's securities during the Class Period was the direct result of Defendants' misrepresentations concerning the progress at the Moema Facility because those statements were closely followed by industry analysts who perceived the Moema Facility to be the cornerstone of Solazyme's perceived commercial success.

114. Similarly, the dramatic crash in the value of Solazyme's securities that immediately followed the Company's November 5, 2014 revelations concerning the inability of the Moema Facility to achieve large-scale commercial capacity was a direct result of the market's acceptance of the reality that had been hidden from investors during the Class Period.

115. For example, just prior to the November 5 announcement, investment column The Motley Fool "suggested management use the third-quarter earnings conference call as an ***opportunity to begin rebuilding investor trust by being honest about the seemingly obvious issues***." Shortly after the November 5 revelations the column's assessment was that "***management seized the opportunity, but there won't be much celebrating after investors digest and interpret the sobering admissions made during the call***." The column ended with the following conclusion:

> ***I would feel very uncomfortable buying Solazyme shares until the company can demonstrate or disclose more information that removes any doubt that fermentation processes, the core technology, are potentially the/a culprit for the swift change in commercialization strategy***.

116. Other analysts expressed similar views. The day after the November 5, 2014 investor call, Morgan Stanley issued an update stating that it was "reviewing our long-term view of the company ***in light of new disclosure of delays and incremental costs associated with ramping the company's commercial facilities***." The update further stated:

> Management disclosed that the two major commercial facilities (particularly the Brazilian Moema facility) are experiencing significant delays and higher unit costs than expected. Although some of the issues are attributable to lower than expected power reliability, ***others relate to more fundamental challenges integrating downstream production steps***. ***The company had provided an update less than a month ago (on October 9th) that did not include disclosure about potential delays in the production ramp, so we believe that the announcement was largely unexpected by the market***.

117. Morgan Stanley concluded that "[a]s a result of the new disclosure, we are in the process of reviewing our long-term assumptions relating to growth and earnings power of the business, as well as our OW rating and valuation on the stock." Days later following their review, on November 10, 2014 Morgan Stanley downgraded Solazyme's stock, stating that "***Newly disclosed delays in the ramps of both Moema and Clinton / Galva facilities highlight risks associated with the company's growth and force us to reduce our long-term forecasts considerably***." Morgan Stanley also noted:

> Management announced Wednesday that they are experiencing delays bringing online their Bunge and Clinton / Galva facilities. ***Although the company says that the core fermentation process seems to be working***, they are running into ***problems integrating the downstream finishing steps of the production process***. Management has identified some possible improvements, but ***the measures do not fully solve more fundamental problems leading to higher than expected production costs***, in our view. ***Management has not yet identified a full fix for the problem***, let alone characterized the cost or timing of resolving the problem.

118. In other words, analysts saw right through the Company's attempt to frame its 180 degree U-turn as a strategic "adjustment," and saw the Company's statements for what they were, namely, an admission that the problems at the Moema Facility were far worse than the Company had previously disclosed, and that in fact, the Moema Facility was not in its current trajectory ever going to be, a 100,000 metric ton facility. This fact was already well known at Solazyme throughout the Class Period, but on November 5, 2014, the market learned this for the first time as well, and reacted as one would expect on such news.

**8. <u>Additional Scienter Allegations</u>**

119. As alleged herein, the Exchange Act Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

120. Moreover, as described in paragraphs 94, 100 and 102-103 above, the Exchange Act Defendants, including the Individual Defendants Wolfson and Painter, had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time because of their direct involvement with and oversight of the Moema Facility project. The Moema Facility was the central cornerstone of the Company's ambitions to become a large-scale commercial manufacturer and distributor of oil products. Discussion concerning the progress at the Moema Facility dominated the calls that Wolfson and Painter held each quarter with investors during the Class Period.

121. In order to keep apprised of the developments at the Moema Facility, Defendants Wolfson and Painter maintained close contact with Solazyme-Bunge CEO Hildo Henz, Solazyme-Bunge CFO Erico Lopes, Solazyme-Bunge Managing Director Walfredo Linhares, and other Solazyme and Solazyme-Bunge employees in Brazil who were directly overseeing the operations of the Moema Facility. Wolfson and Painter participated in weekly conference calls to discuss the utility issues, the production process failures, the construction delays, and all other aspects of the progress of the Moema Facility, and they personally visited the facility and saw first-hand the issues they were concealing from investors. Moreover, Unilever was a key customer and its rejection of substitution oil was known to the Exchange Act Defendants.

**9. <u>Presumption of Reliance</u>**

122. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities traded in efficient markets;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiffs and other members of the Class purchased Solazyme securities between the time the Exchange Act Defendants misrepresented or failed

to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

123. At all relevant times, the markets for Solazyme securities were efficient for the following reasons, among others:

(a) as a regulated issuer, Solazyme filed periodic public reports with the SEC;

(b) Solazyme regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c) Solazyme securities were actively traded in an efficient market, including the NASDAQ, where the Company's common stock trades under the ticker symbol "SZYM."

124. As a result of the foregoing, the markets for Solazyme securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the respective prices of Solazyme securities. Under these circumstances, all purchasers of Solazyme securities during the Class Period suffered similar injury through their purchases of Solazyme securities at artificially inflated prices and the presumption of reliance applies.

125. Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiffs and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**10. <u>Additional Loss Causation Allegations</u>**

126. During the Class Period, as detailed herein, the Exchange Act Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of

conduct that artificially inflated the price of Solazyme's securities, and operated as a fraud or deceit on Class Period purchasers of the Company's securities by misrepresenting the state of the construction progress, development, and production capacity for the Moema Facility and the prospects and outlook for Solazyme, and including misrepresenting the fact that it had sold commercial-grade oil produced at the Moema Facility and telling investors that there were no issues relating to the production process.

127. Later, as the Company's prior false statements, misrepresentations, and fraudulent conduct were disclosed to the market, the prices of Solazyme's securities fell as the prior artificial inflation dissipated from the market prices of the securities. As a result of their purchases of the Company's securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**11. Inapplicability of Statutory Safe Harbor and Bespeaks Caution Doctrine**

128. Neither the Exchange Act Defendants' "Safe Harbor" warnings accompanying their forward-looking statements ("FLS") issued during the Class Period, nor the bespeaks caution doctrine can shield those statements from liability because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Solazyme who knew that the FLS was false.

129. For example, the Company's standard FLS warning given prior to statements made during the quarterly investor/analyst conference calls stated that:

> some of the comments constitute forward-looking statements that reflect management's current views and estimates of future events and economic circumstances, industry conditions, company plans, performance, and financial results. Statements are based on many assumptions and factors, including the completion and ramping up of production facilities, the availability and pricing of raw materials and equipment, operating efficiencies, new product development, market conditions, product sales, access to capital, and actions of governments, partners, and customers. Any changes in such assumptions or factors can produce significantly different results.

130. However, none of the historic or present tense statements made by the Exchange Act Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or

relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Exchange Act Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

131. Indeed, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. For example, Solazyme did not caution investors that it had ever sold any oil produced at the Moema Facility during the Class Period, or that Unilever rejected Solazyme's attempt to substitute its Clinton/Galva oil instead of Moema Facility oil for testing purposes or that the factory was incapable of making commercially salable oil.

132. Moreover, to the extent that certain misrepresentations alleged herein could be construed as "forward-looking," these statements lacked a reasonable basis given the information that was known to the Exchange Act Defendants at the time those statements were made. Any warning provided by the Exchange Act Defendants were insufficient to adequately warn investors of the true risks the Company faced.

**C. <u>Securities Act Allegations</u>**

133. On March 25, 2014, Solazyme filed a Form S-3ASR registration statement in contemplation of the Company's public offering of Notes and common stock (as modified, the "Registration Statement"). The Registration Statement incorporated by reference the Company's 2013 10-K, was signed by the Officer and Director Defendants, and became effective automatically upon filing. The following day, on March 26, 2014, the Company filed a Form S-3MEF registration statement modifying the Registration Statement to register an additional $12.75 million in aggregate maximum principal amount of Notes and stock. This Form S-3MEF was also signed by the Officer and Director Defendants.

134. On March 27, 2014, Solazyme filed complete prospectuses in connection with the Notes Offering (the "Notes Prospectus") and the Stock Offering (the "Stock Prospectus," and together with the Registration Statement and Notes Prospectus, the "Offering Documents") with the SEC pursuant to SEC Rule 424(b)(5).

135. As set forth in the Notes Prospectus, Solazyme registered $149.5 million in Notes to be offered to the public at $1,000 per $1,000 of par value. As set forth in the Stock Prospectus, Solazyme registered 5.75 million shares of common stock to be offered to the public at $11.00 per share.

136. On March 25 and 26, 2014, Solazyme filed the Registration Statement with the SEC and on March 27, 2014, Solazyme filed its Notes Prospectus and its Stock Prospectus with the SEC. The March 25 Registration Statement also incorporated by reference the Company's 2013 10-K that was filed on March 14, 2014. The Offering Documents discussed the construction progress, development, and production capacity for the Moema Facility, and made numerous untrue or misleading statements of fact, including that:

a) ***"[T]he commissioning of the facility at Moema is underway. As such, we are now expanding into large-scale, high-volume commercial production***";

b) The Company was "***targeting the production of commercially saleable product by the end of the first quarter of 2014***";

c) "***The production facility is expected to have a name plate capacity of 100,000 [metric tonnes] of oil per year***";

d) Solazyme uses "***standard industrial fermentation and downstream processing equipment that needs little or no modification***" and uses " ***existing industrial equipment to transform plant-based sugars and other types of renewable biomass into tailored oils***."; and

e) "***The commercial scale achieved at ADM's Clinton Facility is comparable to the fermentation equipment at the Solazyme Bunge Renewable Oils facility in Brazil***."

137. However, these descriptions of the construction progress, development, and production capacity associated with the Company's Moema Facility in the Offering Documents were materially false and misleading because they failed to disclose, among other things, that: (i) the Moema Facility was experiencing construction delays due to insufficient access to electricity and steam utility services; (ii) there were additional problems with the production process, including discoloration, viscosity and cake burning; (iii) the Moema Facility could not be operated efficiently using industry standard equipment; and (iv) these challenges would prohibit the Moema Facility from scaling its capacity production as projected. As a result, the

Company's Offering Documents were materially misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the Offering Documents.

138. The falsity of the statements in the Offering Documents was described by four confidential witnesses as follows.

139. CW1 was employed as a Controller for Solazyme-Bunge in Sao Paolo, Brazil for the entire duration of 2014, including the Class Period. As a Controller, CW1's responsibilities included maintaining an inventory of oil produced at the Moema Facility and overseeing the accounting records concerning the value of that inventory. As part of CW1's job, CW1 received regular updates on the progress of the ramp up of the Moema Facility, including descriptions of the nature and extent of the production problems as they were occurring at the Moema Facility during the Class Period. CW1 was therefore in a position to have, and does in fact have, first-hand knowledge concerning the production process issues at the Moema Facility during the Class Period.

140. According to CW1, the intermittent power and steam access was only one of the issues that contributed to the delays and low production output at the Moema Facility. Other problems with the production process also contributed significantly to the delays and other problems at the facility. CW1 states that the other significant issue that caused delays at the Moema Facility during the Class Period was the poor quality of the oil being produced that rendered it unsalable. For example, the extracted oil had a predominantly black or red color, and was of a thinner viscosity than expected. This was unacceptable to Solazyme's customers, chiefly its largest customer, Unilever, which required the oil to be clear and have a thicker viscosity. In an attempt to meet Unilever's specifications, Solazyme tried sending the raw oil produced at the Moema Facility to a third party company in Brazil called Triangulo for further refinement.

141. Moreover, production volumes of even this discolored and thin oil were extremely low as a result of other fundamental problems with its extraction process at the Moema Facility. For example, according to CW1, the "cake" that was produced during the fermentation stage was constantly clogging the press that was used to extract the oil, and as a

result, the cake would start burning inside the press. As a result, the machines would have to be shut down and cleaned, which greatly slowed down the process, in addition to losing the existing batch of oil that was being processed. The process was operating on brand new machines, so this was not a problem involving broken machinery that needed to be, or could be, fixed.

142. Therefore, according to CW1, if the power and steam issues had not occurred, the Moema Facility still would not have been on schedule with its ramp up to commercial production levels because the Company was so far behind its production targets that the amount of oil production that would have been gained by resolving the utility issue, while material, would not by itself have been sufficient to make up the difference. CW1 also stated that the intermittent power and steam outages were not resolved during the summer of 2014, and, in fact, persisted throughout the entire Class Period and beyond.

143. CW1's account was corroborated by CW2, who was employed by Solazyme-Bunge as a Senior Administrator working in the Sao Paolo office during the entire Class Period. In that position, CW2 was responsible for all financial and administrative reporting systems with respect to the Moema Facility. This included all information stored in Solazyme-Bunge's systems concerning product inventory (*i.e.* oil production), customer orders, sales of oil, and vendor relations. CW2 was therefore in a position to have, and does in fact have, first-hand knowledge concerning the lack of production capabilities at the Moema Facility during the Class Period.

144. According to CW2, no oil produced at the Moema Facility was ever sold to customers during the Class Period. Instead, in an attempt to satisfy existing orders from customers expecting oil from Moema, primarily Unilever, Solazyme imported oil to Brazil that was produced at Solazyme's ***Clinton/Galva facility***. CW2 knows this because CW2 oversaw the process of clearing the Clinton/Galva oil through customs into Brazil for this purpose.

145. CW2 explained that the attempted substitution of oil from the Clinton/Galva was rejected by Unilever because it was not actually produced at the Moema Facility. The reason was simple – these initial volumes were supposed to be used by Unilever for testing purposes to

establish the reliability of the oil produced at the Moema Facility for use in Unilever's products. Substitute imported oil that was not actually produced at the Moema Facility was therefore useless to Unilever for this purpose. CW2 states that no customer orders were ever filled during the Class Period using oil produced at the Moema Facility. CW2 would have known if the Company had sold any oil produced at the Moema Facility because CW2 maintained and had full access to the information systems into which all customer order and sale information was entered.

146. In fact, according to CW2, commercial oil production never truly got underway at the Moema Facility during the Class Period. Instead, the Company's efforts during the Class Period were focused on troubleshooting and trying to fix problems with the production process, and that was inconsistent with commercial production operations. CW2 states that he was aware of the power and steam problems because they were regularly discussed in the Solazyme-Bunge office, but that these utility problems did not have a significant effect on the oil production output because commercial production was not ongoing to begin with during the Class Period. Moreover, CW2 states that consistent power and steam access continued to be an issue during the entire Class Period and beyond.

147. CW2 also confirmed that at the end of 2014 Solazyme attempted to cure its deficient oil by sending it to Triangulo for refinement. This was necessary because, according to CW2, the Moema Facility lacked the ability to refine or purify the oil in order to meet customer specifications. CW2 further explained, however, that only small quantities of oil were sent to Triangulo as a test, and that the attempt was a failure and the oil that was sent to Triangulo for purification was not sold to Solazyme's customers.

148. CW3 provided further detail and corroboration concerning the true state of affairs at the Moema Facility. CW3 is a chemical engineer who worked as a production supervisor at the Moema Facility during the Class Period, from the spring of 2014 through mid-autumn of 2014. CW3's primary responsibility at the Moema Facility was to supervise the production of algae with respect to oil production under Solazyme's supply agreement with Unilever.

149. CW3 stated that during the entire time CW3 was employed at the Moema

Facility, the production line experienced delays in production and was never able to meet production startup goals. According to CW3, the production delays and shortfalls were primarily due to faults in the production process itself. CW3 stated that although there were delays due to lack of electricity, these issues were generally resolved fairly quickly and without a major impact on production. Rather, most of the operational delays were as a result of maintenance having to be performed on clogged valves and fermentation tanks. CW3 stated that the design of the machinery used was very inefficient and was frequently clogging due to blockages caused by the density of the algae cake produced. CW3 stated that there was also a problem with the process that related to a toxic red chemical present in the sugar that was used during the fermentation process.

150. Finally, CW4 also corroborates the accounts of the other confidential witnesses concerning the true state of production at the Moema Facility. CW4 was employed by Solazyme as a production line supervisor at the Moema Facility from March 2014 through the end of the Class Period and beyond. According to CW4 there were numerous issues and problems arising because the process was flawed. CW4 stated that the process worked only for small batches, but when they tried to increase production many problems developed. Some of these problems were because of the type of sugar being used, according to CW4, while others resulted from the density of the cake that occurred when they tried to increase the volume. CW4 stated that the power outages had some negative effect on production capacity, but that the power problems were generally resolved very quickly, and in any event they were minor compared to the production issues.

151. The accounts of the witnesses in paragraphs 139 to 150 above, namely, that (i) commercial production never actually commenced at the Moema Facility during the Class Period, (ii) the Moema Facility was never on track to produce 100,000 metric tons of oil per year, (iii) that the equipment at the Moema Facility was not suited for Solazyme's algae-based oil production methods, and (iv) the Company was never able to scale the production techniques used at the Clinton/Galva facility at the Moema Facility, stand in contrast to the statements in the Offering Documents.

152. The Securities Act Defendants owed Plaintiffs and the Class a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

153. The Securities Act Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Offering Documents and did not possess reasonable grounds for believing that the Offering Documents did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

154. The truth regarding the false and misleading nature of the Offering Documents was disclosed when, after the close of the markets on November 5, 2014, Solazyme hosted a conference call to discuss operational results for the third quarter of 2014. During the call investors learned that the Company "***no longer plan[ned] to produce a nameplate capacity within 12 to 18 months***." The reasons Solazyme gave for this decision included "***[o]perational challenges at Moema are causing a slower than anticipated descent down the manufacturing cost curve***," that "***not all of the downstream is working yet efficiently, continuously or on an integrated basis***," and the fact that "***[p]ower and steam consistency continues to be an issue***."

155. In reaction to these disclosures, Solazyme's stock price declined $4.35 per share, or 58.08%, to close at $3.14 per share following the next trading session on November 6, 2014. Similarly, the market price of Solazyme's Notes declined by $235.00 per Note from the prior reported trade on November 4, 2014, or 30.32 percent, to close at $540.00 per Note following the next session in which the Notes traded on November 7, 2014.

156. Plaintiffs and members of the Class purchased the Notes pursuant or traceable to the Notes Offering and/or purchased Solazyme stock pursuant to the Stock Offering, and were damaged thereby.

157. Plaintiffs and other members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or

omissions of material facts in the Offering Documents when they purchased or acquired Solazyme securities pursuant or traceable to the Offerings.

**<u>CLASS ACTION ALLEGATIONS</u>**

158. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased or otherwise acquired Solazyme securities during the Class Period, including securities sold in the Offerings. Excluded from the Class are Defendants and their families, directors and officers of Solazyme and their families, and affiliates, and were damaged thereby.

159. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of October 30, 2015, Solazyme had 80,539,001 shares of common stock outstanding, owned by thousands of persons.

160. There is a well-defined community of interest in the questions of law and fact involved in this action. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) whether the Securities Act was violated by Defendants;

(b) whether the Exchange Act was violated by Defendants;

(c) whether Defendants omitted and/or misrepresented material facts;

(d) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f) whether the prices of the Company's securities were artificially inflated; and

(g) the extent of damage sustained by Class members and the appropriate measure of damages.

161. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class

sustained damages from Defendants' wrongful conduct.

162. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

163. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## ADDITIONAL CONTROL PERSON ALLEGATIONS

164. By virtue of the Individual Defendants' positions of management and control within the Company as CEO and CFO, they had access to undisclosed adverse information about Solazyme, its operations, financial condition, and internal controls. The Individual Defendants ascertained such information through Solazyme's internal corporate documents, conversations, and connections with each other and with corporate officers, employees, attendance at Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Solazyme's two highest ranking officers. This includes weekly meetings and/or conference calls regarding problems with the manufacturing process, the power and steam issues, the oil quality and production capacity as well as regular visits they made to the Moema Facility personally to inspect the progress and condition of the facility.

165. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and knew, or recklessly disregarded, that there were material misstatements and omissions contained therein. Because of their executive positions with Solazyme, each of the Individual Defendants had access to the adverse undisclosed information about the true production capability at the Moema Facility as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about the Moema Facility, or adopted by the Company, materially false and misleading.

166. The Individual Defendants, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC

filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

167. As executive officers and controlling persons of a publicly-held company whose common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, financial condition, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## **CAUSES OF ACTION AGAINST THE EXCHANGE ACT DEFENDANTS**

### **COUNT I**
### **For Violation of Section 10(b) of the Exchange Act and SEC Rule l0b-5 Against the Exchange Act Defendants**

168. Plaintiffs repeat, incorporate, and reallege paragraphs 48 through 132 by reference.

169. During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

170. The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Solazyme securities during the Class Period.

171. Plaintiffs and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Solazyme securities. Plaintiffs and other members of the Class would not have purchased Solazyme securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

172. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Solazyme securities during the Class Period.

## COUNT II
## For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants and the Company

173. Plaintiffs repeat, incorporate, and reallege paragraphs 48 through 132 by reference.

174. The Individual Defendants acted as controlling persons of Solazyme within the meaning of Section 20(a) of the Exchange Act. By virtue of their power to control public statements about Solazyme, the Individual Defendants had the power and ability to control the actions of Solazyme and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## CAUSES OF ACTION AGAINST THE SECURITIES ACT DEFENDANTS

### COUNT III
### For Violations of Section 11 of the Securities Act Against the Securities Act Defendants

175. Plaintiffs repeat, incorporate and reallege paragraphs 133 through 157, as if fully set forth herein, except that for purposes of this Count III, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

176. This Count is brought against the Securities Act Defendants on behalf of all those who purchased or otherwise acquired the Company's Notes and/or common stock issued pursuant or traceable to the Offerings. The Offering Documents for the Offerings were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements made not misleading, and failed adequately to disclose material facts, as described above.

177. The Securities Act Defendants are strictly liable for the misstatements and omissions and for the damages that Plaintiffs' and the other members of the Class have sustained thereby. The Securities Act Defendants are responsible for the contents and dissemination of the Offering Documents, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

178. The Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts set forth above. By reasons of the conduct herein alleged, each of the Securities Act Defendants violated and/or controlled a person who violated, Section 11 of the Securities Act.

179. Less than one year has elapsed between the time the facts upon which this Count is based were or could reasonably have been discovered and the time this claim was brought.

Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

**COUNT IV**
**For Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants**

180. Plaintiffs repeat, incorporate and reallege paragraphs 133 through 157, as if fully set forth herein, except that for purposes of this Count IV, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act. This Count is brought against the Underwriter Defendants on behalf of all those who purchased or otherwise acquired the Company's Notes and/or common stock issued pursuant or traceable to the Offerings.

181. The Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of: (1) the Company's Notes offered pursuant to the Notes Offering; and/or (2) the Company's common stock offered pursuant to the Stock Offering. The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The Underwriter Defendants' actions of solicitation included participating in the preparation and dissemination of the false and misleading Offering Documents.

182. The Underwriter Defendants owed to the purchasers of the Company's Notes and/or common stock, including Plaintiffs and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

183. Plaintiffs and the other members of the Class purchased the Company's Notes and/or the Company's common stock from the Underwriter Defendants pursuant to the defective Offering Documents. Plaintiffs did not know, nor in the exercise of reasonable

diligence could have known, of the false nature of the statements and omissions contained in the Offering Documents.

184. By reason of the conduct alleged herein, the Underwriter Defendants violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs and the other members of the Class who hold the Company's Notes and/or common stock purchased pursuant to the Offerings have the right to rescind and recover the consideration paid for their Notes and/or common stock.

185. Plaintiffs, individually and representatively, hereby offer to tender to the Underwriter Defendants the Company's Notes and/or common stock that Plaintiffs and the other members of the Class continue to own, on behalf of all members of the Class who continue to own such Notes and/or common stock, in return for the consideration paid for those Notes and/or shares, together with interest thereon. Plaintiffs, individually and representatively on behalf of Class members who have sold their Company Notes and/or shares are entitled to and hereby claims rescission damages.

186. Less than one year has elapsed between the time the facts upon which this Count is based were or could reasonably have been discovered and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

**COUNT V**
**For Violations of Section 15 of the Securities Act**
**Against the Officer and Director Defendants**

187. Plaintiffs repeat, incorporate and reallege paragraphs 133 through 157, as if fully set forth herein, except that for purposes of this Count V, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

188. This Claim is brought against the Officer and Director Defendants pursuant to Section 15 of the Securities Act on behalf of all those who purchased or otherwise acquired the Company's Notes and/or common stock issued pursuant or traceable to the Offerings.

189. As set forth in Count III herein, the Company is liable pursuant to Section 11 of the Securities Act. Each of the Officer and Director Defendants was a control person of the Company with respect to the Offerings by virtue of such individual's position as a senior executive officer and/or director of the Company and had direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company. By reason of their positions within the Company and/or positions on the board of directors of the Company, the Officer and Director Defendants had the requisite power to directly or indirectly control or influence the specific corporate policies that resulted in the unlawful acts and conduct alleged in Count I.

190. Each of the Officer and Director Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Offering Documents and having otherwise participated in the process that allowed the Offerings to be executed. The Officer and Director Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company, as well as the contents of the Offering Documents, at the time of the Offerings. Each of the Officer and Director Defendants was provided with or had unlimited access to copies of the Offering Documents, and had the ability to either prevent their issuance or cause them to be corrected.

191. As a result, the Officer and Director Defendants are liable pursuant to Section 15 of the Securities Act for the primary violations of Section 11 of the Securities Act by the Company.

192. By virtue of the foregoing, Plaintiffs and other members of the Class who purchased or otherwise acquired the Company's Notes and/or common stock pursuant or traceable to the Offerings are entitled to damages against the Officer and Director Defendants.

193. Less than one year has elapsed between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B. Awarding Plaintiffs and the members of the Class damages and interest;

C. Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: December 15, 2015

Respectfully submitted,

_/s/ Joel H. Bernstein_

Joel H. Bernstein (*pro hac vice*)
Mark S. Arisohn (*pro hac vice*)
Corban S. Rhodes (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jbernstein@labaton.com
marisohn@labaton.com
crhodes@labaton.com

*Co-Lead Counsel for Plaintiffs and the Putative Class*

Ex Kano S. Sams II (Bar No. 192936)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East
Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-432-1495
esams@glancylaw.com

*Co-Lead Counsel for Plaintiffs and the Putative Class*

Shawn A. Williams (Bar No. 213113)
Willow E. Radcliffe (Bar No. 200087)
Matthew S. Melamed (Bar No. 260272)
**ROBBINS GELLER RUDMAN & DOWD LLP**
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
mmelamed@rgrdlaw.com

*Liaison Counsel*