**LABATON SUCHAROW LLP**
Joel H. Bernstein (*pro hac vice*)
Mark S. Arisohn (*pro hac vice*)
Corban S. Rhodes (*pro hac vice*)
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jbernstein@labaton.com
marisohn@labaton.com
crhodes@labaton.com

*Co-Lead Counsel for Plaintiffs and the Putative Class*

**ROBBINS GELLER RUDMAN
   & DOWD LLP**
Shawn A. Williams (Bar No. 213113)
Willow E. Radcliffe (Bar No. 200087)
Matthew S. Melamed (Bar No. 260272)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile:  (415) 288-4534
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
mmelamed@rgrdlaw.com

*Liaison Counsel  for Plaintiffs and the Putative Class*

**GLANCY PRONGAY & MURRAY LLP**
Ex Kano S. Sams II (Bar No. 192936)
1925 Century Park East
Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-432-1495
esams@glancylaw.com

*Co-Lead Counsel for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, JOHN MEDLIN, JOHN HUSSAIN, LEONARDO FERNANDEZ, JAMES ACKELS and NANCY ACKELS, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>        vs.<br><br>SOLAZYME, INC. (currently known as TERRAVIA HOLDINGS, INC.), JONATHAN S. WOLFSON, and TYLER W. PAINTER,<br>                              Defendants. | Case No.: 15 Civ. 2938 (HSG)<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

Page

SUMMARY OF THE ACTION ................................................................................................ 1

NATURE OF THE CLAIMS ................................................................................................... 3

JURISDICTION AND VENUE ............................................................................................... 4

PARTIES ................................................................................................................................. 5

       1.    Plaintiffs ................................................................................................ 5

       2.    Defendants ............................................................................................ 6

SUBSTANTIVE ALLEGATIONS .......................................................................................... 7

   A.    Background .......................................................................................................... 7

   B.    Defendants Knowingly Misrepresented the Progress of the Moema Facility,
        the Nature of the Problems and the Outlook for Resolving Those Problems to
        Investors .............................................................................................................. 9

   C.    Multiple Well-Placed Former Solazyme Employees Provide Detailed and
        Corroborating Accounts that Establish Falsity and Scienter ..................................... 11

   D.    Defendants' Material Misrepresentations During the Class Period ........................... 12

       1.    February 2014 ..................................................................................... 12

       2.    March 2014 ......................................................................................... 15

       3.    May 5, 2014 ........................................................................................ 17

       4.    May 29, 2014 ...................................................................................... 22

       5.    July – August 2014 ............................................................................. 23

   E.    The Truth About the Moema Facility Is Partially Revealed to the Public ................. 26

   F.    The Market Reacts to Solazyme's Revelations ....................................................... 27

   G.    Defendants Were Fully Aware of the Condition of the Moema Facility and
        Knowingly Made Each Misrepresentation with Scienter ......................................... 30

   H.    Presumption of Reliance ..................................................................................... 32

   I.    Additional Loss Causation Allegations ................................................................ 33

   J.    Inapplicability of Statutory Safe Harbor and Bespeaks Caution Doctrine ............... 34

CLASS ACTION ALLEGATIONS ................................................................. 35

ADDITIONAL CONTROL PERSON ALLEGATIONS ............................................. 36

CAUSES OF ACTION ............................................................................. 37

PRAYER FOR RELIEF ............................................................................ 39

JURY DEMAND .................................................................................... 40

This is a securities class action for violations of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiffs Norfolk County Retirement System ("Norfolk County"), John Medlin, John Hussain, Leonardo Fernandez, James Ackels and Nancy Ackels (together, "Plaintiffs") by and through their undersigned counsel, allege the following individually and on behalf of a class of all persons and entities similarly situated.  All allegations are made upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' allegations are based upon the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by TerraVia Holdings, Inc., formerly known as Solazyme, Inc. ("Solazyme" or the "Company"),[1] as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.    Solazyme is a publicly-traded corporation founded in 2003 that manufactures, markets and distributes specialty oil products for a variety of uses.  For most of its existence, Solazyme operated only in small-scale laboratories funded by federal grants.  In 2011, however, the Company went public and announced its aspirations to commercialize its operations on a much grander scale.  The key to Solazyme's planned expansion was the construction of a new flagship manufacturing facility in Moema, Brazil (the "Moema Facility") that was announced in March 2012.  The project was part of a joint venture with a leading international agribusiness and food company, Bunge Limited ("Bunge"), and was designed to launch Solazyme as a significant player in the industry.

---

[1] In March 2016 the Company changed its name to TerraVia, and continues to operate under that name.  At all relevant times for purposes of this Amended Complaint, however, the Company was known as Solazyme and Plaintiffs refer to it as such herein.

2. Although the Moema Facility was initially targeted for completion at the end of 2013, by 2014 the facility had not produced a drop of commercially-salable oil. Despite Defendants' claims that the Moema Facility was a state-of-the-art manufacturing plant designed to produce 100,000 metric tons of high-quality oil products annually, the Moema Facility was actually capable of producing only a meager amount of a thin, discolored oil that no customer would accept.

3. Solazyme raised more than $200 million from investors, through a combination of stock and bond offerings, in an attempt to keep the Moema Facility expansion plan alive. In order to raise capital and keep investors interested, however, Defendants hid the true state of affairs at the Company's Moema Facility. Rather than reveal the persistent problems plaguing its technology, Defendants instead assured investors that the plant was proceeding according to its schedule to become a major operation that would produce 100,000 metric tons of oil annually.

4. Defendants, when speaking about the Moema Facility consistently concealed systemic problems at the plant, downplaying setbacks as short-term, easy-fix issues, such as power and steam access and installation delays. Repeatedly, the market analysts covering Solazyme directly asked the Company's executives if the production problems it was experiencing were limited to these short-term, fixable glitches, or whether there were deeper issues. Repeatedly, Defendants lied and said that "the delays ha[d] nothing to do with process," and downplayed the fundamental problems, claiming that once the "hiccup[s]" were resolved, the plant would be hitting its production targets.

5. Defendants also misrepresented to investors that commercial production began in May of 2014, and that the Company had begun shipping oil produced at the Moema Facility to its customers during the Class Period (February 27, 2014 through November 5, 2014, inclusive, as defined below). A well-informed confidential witness that worked on the Solazyme joint venture in Brazil throughout the entire Class Period has confirmed that no commercially salable oil produced at the Moema Facility was ever shipped to customers during the Class Period.

6.      Defendants continued to defraud investors with the illusion of progress at the Moema Facility until November 5, 2014, when the Company abruptly announced that it was "mak[ing] some adjustments in [its] manufacturing and commercialization strategies." Specifically, Defendants announced for the first time that the Company "no longer plan[ned] to produce a [100,000 metric ton] capacity" plant as originally planned, and would instead "narrow [] production focus to smaller volumes of higher value products." In fact, the Company had actually abandoned its plans for the Moema Facility because those plans did not work, and Defendants knew they would never work.

7.      Market analysts – who had relied on Defendants' statements that commercial-scale production was already underway and that oil was already being shipped to customers from the Moema Facility – immediately seized on the "very significant change in [Solazyme's] strategy," and for the first time understood that the true nature of the problems at the Moema Facility were far more serious than Defendants previously represented. The Company's stock price plummeted on the revelation, and Solazyme's investors were crushed during the sell-off that ensued. The Company's stock price declined by more than 58%, from $7.49 to $3.14 per share, during the next trading session on November 6, 2014.

8.      As a result of Defendants' materially false and/or misleading statements and omissions, Solazyme's stock traded at artificially-inflated prices during the Class Period. However, as the truth about the construction delays, diminished production capacity of the Moema Facility and Solazyme's commercialization difficulties became known to investors, the artificial inflation evaporated, and the price of Solazyme's common stock fell by 78.64% from its Class Period high. This price decline caused significant losses and damages to Plaintiffs and other members of the Class.

## NATURE OF THE CLAIMS

9.      Plaintiffs assert claims under the Exchange Act as a result of Defendants' many misrepresentations to investors concerning the Moema Facility.

10.     Plaintiffs' Exchange Act claims are brought on behalf of all persons or entities who, between February 27, 2014 and November 5, 2014, inclusive (the "Class Period"),

purchased or otherwise acquired the common stock of Solazyme and were damaged thereby (the "Class").  Plaintiffs allege that Defendants engaged in a fraudulent scheme to artificially inflate the price of Solazyme's common stock during the Class Period by misrepresenting the true state of affairs concerning the centerpiece of the Company's manufacturing capabilities, the Moema Facility.

11.     The claims asserted herein arise from a series of false statements of material fact and omissions of material adverse information, made by Defendants throughout the Class Period, about the construction progress, development, problems and production capacity associated with the Moema Facility.  The ultimate disclosure of the truth about the diminished production capabilities, problems and construction delays at the Moema Facility caused a precipitous decline in the market value of Solazyme's common stock, resulting in significant losses and damages to the Plaintiffs and the Class.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this District pursuant to § 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Solazyme maintains its principal executive offices in this District.   Further, many of the acts that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

15.     In connection with the acts and conduct alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

# PARTIES

### 1.   Plaintiffs

16.   Plaintiff Norfolk County, headquartered in Canton, Massachusetts, is a defined-benefit retirement system.  Plaintiff Norfolk County purchased Solazyme common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.  By Order dated October 8, 2015, the Court appointed Norfolk County as a Lead Plaintiff in this action.

17.   Plaintiff John Medlin is a citizen of Georgia.  Plaintiff John Medlin purchased Solazyme common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.  By Order dated October 8, 2015, the Court appointed John Medlin as a Lead Plaintiff in this action.

18.   Plaintiff John Hussain is a citizen of Minnesota.  Plaintiff John Hussain purchased Solazyme common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.  By Order dated October 8, 2015, the Court appointed John Hussain as a Lead Plaintiff in this action.

19.   Plaintiff Nancy Ackels is a citizen of Arizona.  Plaintiff Nancy Ackels purchased Solazyme common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.  By Order dated October 8, 2015, the Court appointed Nancy Ackels as a Lead Plaintiff in this action.

20.   Plaintiff James Ackels is a citizen of Arizona.  Plaintiff James Ackels purchased Solazyme common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.

21.   Plaintiff Leonardo Fernandez is a citizen of Florida.   Plaintiff Leonardo Fernandez purchased Solazyme common stock during the Class Period, as set forth in the

1   certification previously filed with the Court, and suffered damages as a result of the federal

2   securities law violations alleged herein.  By Order dated October 8, 2015, the Court appointed

3   Leonardo Fernandez as a Lead Plaintiff in this action.

4         **2.**    **Defendants**

5           **a.**    **The Company**

6         22.    Defendant Solazyme is a corporation organized under the laws of the State of

7   Delaware and maintains its principal executive offices at 225 Gateway Boulevard, South San

8   Francisco, California.  The Company's common stock is listed on the NASDAQ Global Select

9   Market (the "NASDAQ"), and traded during the Class Period under the ticker symbol "SZYM"

10  (now "TVIA").  According to the Company's 2013 and 2014 10-K forms filed with the SEC,

11  Solazyme had 271 full-time employees as of December 31, 2013 and 266 full-time employees

12  as of December 31, 2014.

13          **b.**    **The Individual Defendants**

14        23.    Defendant Jonathan S. Wolfson ("Wolfson") is a co-founder, former Chief

15  Executive Officer ("CEO") of the Company, and a member of the Company's Board of

16  Directors.  During the Class Period, CEO Wolfson certified the Company's periodic financial

17  reports filed with the SEC and spoke with investors and securities analysts regarding the

18  Company on a regular basis.

19        24.    Defendant Tyler W. Painter ("Painter") is the Chief Financial Officer ("CFO") of

20  the Company.  Since July 1, 2014, Defendant Painter has also served as the Company's Chief

21  Operating Officer.  During the Class Period, CFO Painter certified the Company's periodic

22  financial reports filed with the SEC and spoke with investors and securities analysts regarding

23  the Company on a regular basis.

24        25.    Defendants Wolfson and Painter are collectively referred to herein as the

25  "Individual Defendants."  Defendant Solazyme and the Individual Defendants are collectively

26  referred to herein as the "Defendants."

27

28

## SUBSTANTIVE ALLEGATIONS

**A.** **Background**

26. Solazyme is a bioengineering company founded in 2003 that creates oil products through a fermentation process that utilizes algae to produce oils for a variety of potential applications.

27. Solazyme's production technique begins by introducing sugar "feedstock" into tanks (also called "fermenters") together with microalgae. The algae then converts the sugar through a naturally-occurring biochemical reaction into a substance colloquially referred to as "cake," that is essentially a mixture of oil and other lipids together with other bioproducts. The cake must then be processed in a press in order to extract the oil from the mixture, which must then be further refined to turn it into commercially usable oil. The process of converting the sugar into the cake is sometimes referred to as the "fermentation process" or the "upstream process," while the process of extracting and refining the oil is sometimes referred to as the "downstream process."

28. Throughout most of its existence, Solazyme focused solely on research and development of algae-based oil production techniques in a laboratory setting, and did not make any efforts at commercial-scale production. Solazyme funded its research efforts through federal grants and by partnering with energy companies as well as the U.S. Department of Defense to conduct research on the potential for generating fuel using this process. Sales were *de minimis* and generally limited to testing applications in connection with these partnerships, and Solazyme did not typically distribute its products commercially in the marketplace.

29. In or around 2010, however, the Company began to shift its focus and expand its ambitions towards broader commercialization of its algae-based oil production method. In that year, Solazyme launched a line of dietary supplements, which was the Company's first commercial product for retail consumption. But the Company's production capacity remained very limited, with only a laboratory in Peoria, Illinois for research and development purposes capable only of a 2,000 metric-ton annual production capacity. The limited capacity of the Peoria laboratory did not allow Solazyme to sell products on a commercial scale.

30.     In order to achieve greater commercialization of its products, Solazyme went public in May of 2011 with an initial public offering ("IPO") on the NASDAQ exchange.  The offering priced on May 27, 2011, and Solazyme issued approximately 11 million shares of stock at a price of $18 per share, raising nearly $200 million in investment capital.

31.     From the beginning of Solazyme's status as a public company, the market was always acutely centered on the Company's production capacity.  Just prior to Solazyme's IPO, Greentech Media reported that "according to proponents," one of Solazyme's potential advantages over competitors was that "algae can produce more oil per acre than other forms of biomass."

32.     Around the same time as the IPO, Solazyme also announced several partnerships with large agribusinesses to develop products and build new facilities capable of producing oil on a large commercial scale.  This focus included a project in which Solazyme partnered with Archer Daniels Midland Co. ("ADM") to build a small facility in Iowa, referred to as the "Clinton/Galva facility," that when fully ramped-up was expected to have an annual production capacity of 20,000 metric tons.

33.     More significantly, Solazyme also announced that it was partnering with Bunge Global Innovation, LLC, a unit of the international agribusiness and food company Bunge, to jointly develop microbe-derived oils from Brazilian sugarcane feedstock.  In May of 2011, Solazyme and Bunge entered into a Joint Development Agreement ("JDA") to develop oils that could be sold commercially.  In August 2011, Solazyme and Bunge announced that they had entered into a Joint Venture Framework Agreement ("JVFA") setting forth the preliminary terms of a joint venture to build a new facility to produce commercial grade oil with an annual production capacity of 100,000 metric tons of oil – the Moema Facility.

34.     The JDA and JVFA laid the groundwork that culminated in an April 2012 Joint Venture Agreement ("JVA") between Solazyme and Bunge to build, own and operate the Moema Facility, which would be located adjacent to an existing Bunge sugarcane mill in Moema, Brazil.  The joint venture at Moema operated under the name Solazyme Bunge Produtos Renováveis Ltda. ("Solazyme-Bunge").  Under the JVA, Bunge agreed to provide

sugarcane feedstock as well as power and steam services to the Moema Facility. The Company's June 26, 2012 press release announcing the plant's ground breaking stated that "Construction started on schedule and the plant is targeted to be operational in the fourth quarter of 2013."

**B.    Defendants Knowingly Misrepresented the Progress of the Moema Facility, the Nature of the Problems and the Outlook for Resolving Those Problems to Investors**

35.    Solazyme met neither its stated goals of completing the Moema Facility, nor of starting production at that facility, during 2013. Rather, as of February 27, 2014, the first day of the Class Period, the Moema Facility was still very much under construction and encountering serious production problems for which the Company had no viable solution.

36.    Defendants sought to reassure the markets with a series of misrepresentations about the progress at Moema. From February to July of 2014, Defendants, while keenly aware of the utter lack of progress at the Moema Facility and the severity of the problems they faced in bringing the plant online, time and time again: (i) misrepresented that the facility was much farther along than it actually was; (ii) flagrantly mischaracterized the nature of the problems; (iii) withheld crucial information necessary to make their responses to analysts' questions not misleading; and (iv) presented a falsely-optimistic timeline and outlook concerning production capability. The accounts provided by confidential witnesses, who were all involved in the operations of the Moema Facility during the Class Period, and Defendants' own admissions, flatly contradict the representations made by Defendants to investors, including:

   i.    Defendants represented to investors in July of 2014 that the Company had "produced both oil and Encapso using full-scale production lines and we've shipped initial volumes of commercial products" from the Moema Facility.[2]

        o    In reality, the Company never shipped any commercial oil produced at the Moema Facility during the Class Period, and were not actually operating on full-scale production lines.

_____

[2] Encapso is a specialized type of oil produced by Solazyme that is used as a drilling lubricant.

ii.    Defendants represented to investors that but for the power and steam issues, the Company would be on track with its production targets at the Moema Facility.

    o   In reality, other issues aside from power and steam at the Moema Facility were such that the entire process was fundamentally flawed. The machinery being used to process raw materials was not producing commercially salable oil. The failure to correct those primary issues was more significant in impeding progress than the power and steam access.

iii.   Defendants represented to investors that the Moema Facility "delays have nothing to do with the process."

    o   In reality, the oil production process at the Moema Facility was plagued with problems such as oil discoloration, low viscosity and cake burning issues, and the Company was not making significant progress in resolving these problems.

iv.   Defendants represented to investors repeatedly that it was on track with its 12-18 month ramp up schedule.

    o   In reality, Solazyme was far behind schedule because of its inability to get its production process to work, even when the plant had power—a fact Defendants deliberately concealed from investors.

v.    Defendants represented to investors that the Moema Facility would have a 100,000 metric-ton per year production capacity when completed.

    o   In reality, there was no reasonable basis at the time those statements were made to believe that the plant could ever produce 100,000 metric tons of oil after all of the equipment had been commissioned, and was, in fact, never able to produce any commercially significant amount of salable oil.

37.    In short, Defendants misrepresented the state of affairs at the Moema Facility and its impact on Solazyme as it actually existed during the Class Period at the time each of the misrepresentations were made. In addition, Defendants lacked a reasonable basis for the Company's projections relating to the Moema Facility's progress and the Company's outlook.

**C.** **Multiple Well-Placed Former Solazyme Employees Provide Detailed and Corroborating Accounts that Establish Falsity and Scienter**

38.     The employees working for Solazyme and Solazyme-Bunge witnessed a very different state of affairs at the Moema Facility than that which Defendants portrayed to investors during the Class Period.  The detailed accounts of several of these employees directly contradict the impression Defendants gave to the market about the Moema Facility.

39.     Confidential witness number 1 ("CW1") was employed as a Controller for Solazyme-Bunge in Sao Paolo, Brazil for the entire duration of 2014, including the Class Period.  As a Controller, CW1's responsibilities included maintaining an inventory of oil produced at the Moema Facility and overseeing the accounting records concerning the value of that inventory.  As part of CW1's job, CW1 received regular updates on the progress of the ramp up of the Moema Facility, including descriptions of the nature and extent of the production problems as they were occurring at the Moema Facility during the Class Period.  CW1 was therefore in a position to have, and does in fact have, first-hand knowledge concerning the production process issues at the Moema Facility during the Class Period.

40.     CW1's account was corroborated by another confidential witness ("CW2"), who also provided further details about the problems with the Company's production process at its Moema Facility.  CW2 was employed by Solazyme-Bunge as a Senior Administrator working in the Sao Paolo office during the entire Class Period.  In that position, CW2 was responsible for all financial and administrative reporting systems with respect to the Moema Facility.  This responsibility included all information stored in Solazyme-Bunge's systems concerning product inventory (*i.e.* oil production), customer orders, sales of oil, and vendor relations.  CW2 was therefore in a position to have, and does in fact have, first-hand knowledge concerning the lack of production capabilities at the Moema Facility during the Class Period.

41.     Finally, another confidential witness from Solazyme's U.S. operations further confirmed these accounts.  Confidential witness number 3 ("CW3") was employed by Solazyme as a Production Supervisor at the Peoria, Illinois facility for the entirety of 2014, including the entire Class Period.  CW3 has knowledge of the conditions at the Moema Facility during the

Class Period, and of the information which flowed back to Company management in the U.S., through frequent discussions with many colleagues that travelled to Moema to work on the production problems at that facility, and because CW3 participated on regular calls involving both Moema personnel and senior management from Solazyme's headquarters to discuss the manufacturing problems at the Moema Facility.

**D.   Defendants' Material Misrepresentations During the Class Period**

    **1.   February 2014**

        **a.   Defendants' Misrepresentations**

42.    After the markets closed on February 26, 2014, Solazyme issued a press release announcing results for the fourth quarter and full year of 2013 and hosted a conference call for investors and analysts to discuss the same.   CEO Wolfson began the conference call by recognizing that Solazyme "did not accomplish everything we set out to do in 2013, including not hitting our revenue targets, and pushing out the Moema production time line."

43.    In his prepared remarks during the call, however, the primary theme that CEO Wolfson repeated over and over was the near-completion of the flagship Moema Facility.  These statements were materially false and misleading:

> ***On the production side,*** we readied the Clinton/Galva facilities to begin commercial operations on time in January, and ***neared completion of the 100,000 metric ton Moema plant***.[3]

*      *      *

> [W]e are carefully staging production ramp-up with a planned ***12 to 18-month time line to reach nameplate capacity at both Clinton and Moema*** . . . . ***The clock will start soon at Moema with initial fermentation operations just getting under way***.

*      *      *

> We're making ***strong and steady progress at Moema***.   We're currently ***deep into the commissioning process***.[4]

---

[3] Emphasis throughout this Amended Complaint have been added unless otherwise noted.

[4] The "commissioning" of the plant, as that term is used throughout this Amended Complaint with respect to the Moema Facility, refers to the process of assuring that all systems and components of a facility are designed, installed and tested according to the operational requirements of the owner.  The main objective of commissioning is

\*       \*       \*

> *Infrastructure and upstream which together comprise a substantial percentage of the plant, are both currently online and everything is functioning as expected*.

\*       \*       \*

> *We believe that the progress at Moema and its current schedule leaves us in good shape to bring full production online this spring*, and with the anticipated 12 to 18-month scale-up process, this puts us *on track to reach full nameplate capacity in the back half of 2015*, as we suggested on the last call.

\*       \*       \*

> *At Moema, commissioning is well underway, a significant [portion] of the plant is already online, and we're getting close to producing our first commercially salable product*.

44.     The February 26 press release similarly quoted Wolfson as falsely stating that Solazyme was "*deep into commissioning in Brazil as we complete the first-of-its-kind 100,000 MT Solazyme Bunge Renewable Oils (SB Oils) facility at Moema*."

45.     Other Solazyme executives also repeated Wolfson's false claims regarding the Moema ramp up process, including CFO Painter, who stated during the conference call in response to an analyst's question that "*the plant was designed at Moema to be a 100,000 metric ton nameplate* … what we have said is *over 12 to 18 months, that in that window we'll hit* what is *100%* of what the plant was designed to run at."  Painter also falsely encouraged analysts to think of the 12 – 18 month range as "*conservative*," and agreed that Solazyme "*could actually achieve [the] 12 month target*."

> **b.     Knowledgeable Confidential Witnesses Contradict Defendants' Statements**

46.     According to the accounts of confidential witnesses, each of these statements were false and misleading when they were made on February 26, 2014.  CW1, who was working at Solazyme-Bunge at the time these statements were made, stated that the plant was

---

*( . . . continued)*
to effectively conduct the orderly turnover of a unit from the constructor to the owner, demonstrating the facility's operability in terms of performance, reliability, safety and information traceability.

1    not close to achieving commercial viability at *any* point during 2014, including all of February

2    2014.  Moreover, with respect to Solazyme's statements regarding the viability of the Moema

3    Facility's 100,000 MT production capacity, CW1 stated that given the production problems

4    plaguing the Moema Facility during February 2014 and throughout the rest of that year, there

5    was no reasonable basis to conclude that the Moema Facility would achieve nameplate capacity

6    of 100,000 MT in 12 to 18 months.  This information was further confirmed by CW2, who

7    stated that commercial oil production never truly got underway at the Moema Facility during

8    any point in the Class Period.

9            47.     Having spoken on the progress at Moema, including claiming that the Company

10   "neared completion of the 100,000 metric ton Moema plant"; "we're getting close to producing

11   our first commercially salable product"; and that "a significant [portion] of the plant is already

12   online" with encouraging remarks that the plant could be a 100,000 metric ton nameplate in "12

13   month target," Defendants were obligated not to mislead investors regarding the state of affairs

14   at the Moema facility or its impact on Solazyme's business.  In fact, Defendants omitted current

15   adverse information that rendered their statements misleading.  Rather than being close to

16   producing a commercially salable product at Moema, the opposite was true – Moema was not

17   close to achieving commercial viability.  Likewise, the undisclosed production problems at

18   Moema undermined any reasonable conclusion that the plant could be a 100,000 metric ton

19   facility in either 12 or 18 months.

20                    **c.      Defendants' Misrepresentations were Material to the Market**

21           48.     Market analysts reacted positively to these February 26, 2014 statements.  A

22   Jefferies' equity research update issued later that same day titled "Pivot to Commercial

23   Production On Track," stated that "Moema remains on track for initial commissioning in March

24   and production in March or April, and regulatory approvals appear to be on track as well.

25   Solazyme continues to target nameplate capacity in 12-18 months."  As a result, Jefferies placed

26   a Buy rating on shares of Solazyme.

27

28

49.     Cowan & Co.'s research update issued the following day similarly gave Solazyme an "Outperform" rating, reporting that "Moema Has Completed Most Phases of Startup" and "Production Volume Should Ramp Significantly" in the second half of 2014.

50.     Credit Suisse's research note issued on February 27, 2014 was titled "Moema Commissioning Nears," and Morgan Stanley reported on the same day that it was "more positive" after the call, because, among other things, the fact that "Moema JV [was] likely on-stream in the next 30-60 days," and because "Moema has 5x the nameplate capacity as Clinton/Galva."

**2.     March 2014**

**a.     Defendants' Misrepresentations**

51.     On March 14, 2014, Solazyme filed its 2013 Form 10-K with the SEC, which discussed, among other things, the construction progress, development, and production capacity associated with the Moema Facility.  For example, the Company stated in part:

> ***Our process is compatible with commercial-scale, widely-available fermentation and oil recovery equipment***.  We operate our lab and pilot fermentation and recovery equipment as scaled-down versions of our large commercial engineering designs, such as those used to supply large quantities of oil for our algae-derived fuel delivered for testing and certification programs with the U.S. Department of Defense.  This allows us to more easily scale up to larger fermentation vessels.  We have scaled up our technology platform and have successfully operated at lab (5-15 liter), pilot (600-1,000 liter), demonstration (75,000 liter) and commercial (approximately 120,000—500,000 liter and above) fermenter scale.  ***The commercial scale achieved at ADM's Clinton Facility is comparable to the fermentation equipment at the Solazyme Bunge Renewable Oils facility in Brazil***.
>
> *          *          *
>
> Our large-scale Clinton/Galva Facilities are now online, and ***the commissioning of the facility at Moema is underway.  As such, we are now expanding into large-scale, high-volume commercial production*** and sales of intermediate and ingredient products across food, industrial, fuel and personal care markets.
>
> *          *          *
>
> The Solazyme Bunge JV is currently constructing a production facility adjacent to Bunge's Moema sugarcane mill in Brazil, and commissioning is underway.  ***We are targeting the production of commercially salable product by the end of the first quarter of 2014***, though such production could move into the second quarter.

*The production facility is expected to have a name plate capacity of 100,000 [metric tons] of oil per year.*

52.    The Company's 2013 Form 10-K also included a certification signed by CEO Wolfson and CFO Painter, incorporated therein as Exhibits 31.1 and 31.2, falsely certifying, *inter alia*, that to their knowledge "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

### b.    Knowledgeable Confidential Witnesses Contradict Defendants' Statements

53.    CW1, who was working at Solazyme-Bunge at the time the March statements were made, stated that the plant was not close to achieving commercial viability at **any** point during 2014, including all of March 2014.  Thus, when this statement was made on March 14, 2014 – near the end of the first quarter – there was no reasonable basis to believe that the Moema Facility could achieve "production of commercially salable product by the end of the first quarter of 2014," *i.e.* within the next two weeks.  Even by the Company's own false claim to have produced its first commercial product as of May 29, 2014 (*see* ¶¶72-76, below), it took three times longer to achieve than the Company's supposed expectations on March 14, further supporting the fact that the Company lacked a reasonable basis to make the statement at that time.  Moreover, with respect to Solazyme's statements regarding the viability of the Moema Facility's 100,000 metric ton production capacity, CW1 stated that given the production problems plaguing the Moema Facility during March 2014 and throughout the rest of that year, there was no reasonable basis to conclude that the Moema Facility would achieve nameplate capacity of 100,000 metric tons in 12 to 18 months.

54.    CW2 also confirmed that commercial oil production never truly got underway at the Moema Facility at any time during the Class Period.  Instead, the Company's efforts during the Class Period were focused on troubleshooting and trying to fix problems with the production process, which was inconsistent with commercial production operations.

55.     Defendants' representations in Solazyme's Form 10-K misled investors by giving them an impression that progress at Moema was on track consistent with their February 2014 statements.  To this end, Defendants told investors, among other things, that "the commissioning of the facility at Moema is underway" and  this contributed to Solazyme "now expanding into large-scale, high-volume commercial production."  Further, that the Company was "targeting the production of commercially salable product by the end of the first quarter of 2014."  The truth, which was concealed from investors, was that fundamental production problems plagued Moema jeopardizing Solzayme's business.

        **c.**     **Defendants' Misrepresentations were Material to the Market**

56.     Market analysts reacted favorably to the statements Solazyme made in March 2014 concerning the progress at the Moema Facility.  For example, on March 27, 2014, Jefferies maintained its Buy rating, stating "[o]ver the next few quarters we expect Solazyme to evolve from a demonstration story to an operating company."  Cowen & Co. similarly noted in its April 1, 2014 update that "[p]roduction is imminent at the 100K MT Moema plant."

      **3.**     **May 5, 2014**

        **a.**     **Defendants' Misrepresentations**

57.     After the close of the trading session on May 5, 2014, Solazyme issued a press release announcing results of operations for the first quarter of 2014.[5]  In connection with this announcement, CEO Wolfson commented in part:

> While we haven't yet announced our first commercial product out of Moema, much of that plant is operational, including full-scale fermenters.  ***We expect to manufacture commercial product at the Moema facility in the second quarter*** …

58.     That same day, Solazyme hosted a conference call for investors and analysts to discuss the Company's results.  As part of his prepared remarks, CEO Wolfson attributed the delay in commercial production to "***intermittent power and steam availability*** resulting from

---

[5] On May 8, 2014, Solazyme filed its quarterly report on Form 10-Q for the first quarter of 2014 with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. This Form 10-Q also included certifications substantially similar to those described in ¶ 59.

the start up of a new cogen facility at the adjoining Moema sugar mill."  However, Wolfson repeatedly and falsely represented that this was the sole reason for the delay, stating "*[s]team and power aside, we are progressing closer to completion of the plant*."

59.     In fact, Wolfson was confronted directly on this question by multiple analysts during the question and answer portion of the call, and his responses directly misled investors. For example, one exchange with a Goldman Sachs analyst went as follows:

> **Analyst**:     [W]hen you mentioned that much of Moema is operational here, *I just want to make sure that there's not anything process related here that's been part of the delay.  It's all been mechanical issues?*
>
> **Wolfson**: It's been making sure that we can get the ***construction completed*** to the point where we can commission and start up.  … ***It hasn't been anything other than construction to commissioning***.
>
> **Analyst**:     … *anything with respect to your technology* specifically?  Then I guess I'm focused more on just the tail end of ramping up here, and getting commercial product out the door.
>
> **Wolfson**: Yes, so ***the answer is no, not at all.***  In fact, unlike maybe other technologies that are bringing up the first of their kind commercial plan, Solazyme is actually running a very large scale [of] our technology today at Clinton/Galva.  We've already produced four completely distinct and unique products and sold them, and are shipping every day.  ***The delays have nothing to do with the process***.

60.     Another exchange with an analyst from Raymond James & Associates ("RJA") went as follows:

> **Analyst**:  ***Had it not been for the disrupted power supply from the cogen plant at the sugar mill, would you have made the original timetable for starting up Moema***?
>
> **Wolfson**:  we believe that had we had consistent power and steam, we would've produced first commercial product by now. ***Absolutely, yes***."

61.     Similarly, Defendant Wolfson also addressed additional questions from analysts specific to Solazyme's downstream oil recovery process, and Wolfson again falsely reassured investors in response to these questions that everything was under control and there were no significant problems with the oil extraction or refinement process:

> **Analyst**:  Hi, guys.  Jonathan, a first question on, *you commented that the back end separation at Moema was taking a little bit*

*longer than expected.  **I always thought your separation process was really pretty simple***, just dry out the fermentation [broth], and press out the oils…. [C]an you provide any more color on what it was that was more complicated than you thought?

**Wolfson**: ***I wouldn't say it was more complicated.**  I would just say that if you break that down into multiple parts, the unit operations to get to the Encapso product, **they're all operable and really have been operable since later March**.  The part that just happens to be taking longer and to be specific, Rob, **it has to do with just getting some conveyance equipment installed**, is the final oil extraction units.  **I wouldn't say it has anything to do with complexity**.*

62.    Finally, Wolfson repeatedly stated that the power and steam issues, which were, according to Defendants, the sole cause of the delays, were temporary and easily remedied:

**Analyst**: Hi.  I just had a couple of quick questions, one on Moema.  You said some of the delays related to a new cogen facility, and you do not expect[ that] to be a long-term issue.  … **Would there be maybe some intermediate term risk related to that, that maybe this ramp takes a bit longer?**  Thanks.

**Wolfson**: Bunge's been a phenomenal partner to Solazyme, and I should say, is a phenomenal partner to Solazyme.  **I wouldn't read much into this** other than the intermittency of steam and power, it's been something that has been really a recent issue.  What I would say about Bunge is that they're operating many facilities, including many cogen facilities very successfully all around the world.  **I think between Solazyme and Bunge, we don't have concerns about the reliability of steam and power in the longer term**.

63.    Wolfson's prepared remarks contained these same false statements that "**we don't see reliable availability of power and steam as a long-term issue….**  [W]e still see production of our first commercial products at Moema happening this quarter and **limited, if any, impact on the ultimate scale-up timeline of Moema**.  This kind of unexpected **hiccup** is why we've clearly defined the first phase of plant start-up to be about establishing consistent commercial operations."

### b.    Knowledgeable Confidential Witnesses Contradict Defendants' Statements

64.    These statements were not only false but highly misleading because they failed to disclose the fundamental problems with the production process at the Moema Facility that were

well-known within Solazyme.  Further, according to each of the Confidential Witnesses, the power and steam issues were not the most significant contributor to the delays at Moema.

65.   CW1 stated that if the power and steam issues had not occurred, the Moema Facility still would not have been on schedule with its ramp up to commercial production levels by May 5, 2014 because the Company was so far behind its production targets at that time, and plagued by so many other problems, that the amount of oil production that would have been gained by resolving the utility issue, while material, would not by itself have been sufficient to make up the difference.  CW1 confirms that the other significant issue that caused delays at the Moema Facility during the entire Class Period was the poor quality of the oil being produced that rendered it unsalable.   For example, throughout the Class Period the extracted oil had a predominantly black or red color, and was of a thinner viscosity than expected.  CW1 also confirms that throughout the Class Period the "cake" that was produced during the fermentation stage was constantly clogging the press that was used to extract the oil, and as a result, the cake would start burning inside the press.  As a result, the machines would have to be shut down and cleaned, which greatly slowed down the process, in addition to losing the existing batch of oil that was being processed.  The process was operating on brand new machines, so this was not a problem involving broken machinery that needed to be, or could be, fixed.  CW1's account is corroborated by the Company's own belated admission on November 5, 2014 that it had not achieved "consistent processing."

66.   CW2 was aware of the power and steam problems because they were regularly discussed in the Solazyme-Bunge office, but stated that these utility problems did not have a significant effect on the oil production output because commercial production was not ongoing at any point during the Class Period.  Instead, the Company's efforts during the Class Period were focused on troubleshooting and trying to fix problems with the production process, and that was inconsistent with commercial production operations.

67.   CW3 stated regarding Wolfson's May 5, 2014 response to an analyst question that the Company "believe[d] that had [Solazyme] had consistent power and steam, we would've produced first commercial product by now," that CW3 and other colleagues at

Solazyme believed at the time of this statement that the steam and power issues were intentionally being exaggerated, and that the main issue was rather to do with the consistent manufacturing problems that existed in conjunction with the power and steam issues.

68.     Defendants' statements omitted material adverse information that rendered their statements misleading.  Defendants specifically denied that delays were related to processing or technology and told investors not to "read much into" the limited problems they did disclose with respect to power and steam.  At the time of Defendants' statements, the truth was that (i) even without those problems Solazyme was far behind production targets and (ii) the real problems were the poor quality of the oil being produced making it unsalable and the manufacturing defects at the Moema Facility.

### c.     Defendants' Misrepresentations were Material to the Market

69.     Solazyme's strategy of deflecting concerns over the mounting delays at the Moema Facility by blaming them on allegedly short-term utility problems worked.  Analysts remained upbeat on the progress at Moema, citing management's explanations.

70.     For example, Morgan Stanley's research update on May 6, 2014 was titled "Moema COD Close at Hand; Long-term Value Still Intact,"[6] stating that "[a]lthough Moema did not reach COD in April as expected, the delay was due to power supply issues from a nearby co-gen plant rather than fundamental technology or process problems."

71.     Credit Suisse's May 6, 2014 update, titled "Significant Commercialization Progress Albeit Slight Delay in Brazil," was similarly positive, and cited management's power and steam access justification to support its conclusion that "the delay is relatively minor and par for the course with plant startups."  Jefferies also concluded on May 7, 2014, after Solazyme management's explanations, that the Company was "on track," and maintained its Buy rating.

---

[6] "COD" in this context stands for "Cash On Delivery," which is industry short-hand for the shipment of commercial products.

4. **May 29, 2014**

    a. **Defendants' Misrepresentations**

72.     Later that same month, on May 29, 2014, Solazyme followed up its quarterly investor reporting with a short but significant announcement. The Company issued a special press release in which the Company falsely represented that it had "***successfully produced its first commercially salable products on full-scale production lines***" at the Moema Facility, and stating that "***production [was] underway***," which was described as "an important milestone for this joint venture."

    b. **Knowledgeable Confidential Witnesses Contradict Defendants' Statements**

73.     According to the confidential witnesses, these May 29, 2014 statements were false when made. CW1, who was working at Solazyme-Bunge at the time the March statements were made, stated that the plant was not close to achieving commercial viability at ***any*** point during 2014, including all of May 2014. CW1 stated that the statement that Solazyme's Moema Facility had "successfully produced its first commercially salable products on full-scale production lines" was false as of May 29, 2014, because the Company was never able to produce commercially salable oil at the Moema Facility at any point during 2014.

74.     CW2 also confirmed that commercial oil production never truly got underway at the Moema Facility at any time during the Class Period. Instead, the Company's efforts during the Class Period were focused on troubleshooting and trying to fix problems with the production process, and that process was inconsistent with commercial production operations.

75.     CW3 also disagreed with the statement that production on "full-scale production lines" was underway by May 29, 2014 at the Moema Facility, because only four of the six presses at the Moema Facility were ever commissioned during all of 2014, and the Company generally was not able to run more than two presses at a time during that period because the presses would become clogged in a very short period of time. Therefore, the statement that the Company was using "full-scale production lines" was at best misleading in light of the omission of that information.

### c.   Defendants' Misrepresentations were Material to the Market

76.   Analysts reacted very positively to this announcement, including in a special company update issued by analysts at Morgan Stanley on May 30, 2014 titled "Moema COD Significantly Derisks Story," which explained that "[t]he company announced Thursday that the Moema Facility is operational, having manufactured oils" and other products.  Based on the Company's announcement that production was underway, the analyst concluded:

> ***An operational Moema facility allows the market to refocus on Solazyme's valuable technology platform and robust strong growth prospects*** rather than handicapping the startup of the Brazilian plant. ***We expect the Clinton and Moema facilities to reach nearly 25% of their 120k MT total capacity by the end of 2014.***

### 5.   July – August 2014

### a.   Defendants' Misrepresentations

77.   All through the summer of 2014, Defendants continued to falsely represent to investors that everything was on track at the Moema Facility, which it continued to boast as a large-scale manufacturing facility.  In fact, Defendants by this point were often focusing investors even ***beyond*** the 100,000 metric-ton nameplate capacity, and pointing to "***significant expansion potential***" for the plant.

78.   On July 30, 2014, Solazyme hosted a conference call for investors and analysts to discuss the Company's results of operations for the second quarter of 2014.  As part of his prepared remarks, CEO Wolfson referred to the Moema Facility variously as a "***large-scale manufacturing facilit[y]***" or "***100,000 metric ton Moema facility***."

79.   On the same call, Wolfson continued on, stating in part:

> [W]e've made substantial progress commissioning the plant and are ***in the final stages.  All equipment through the finishing process is now installed and commissioning is nearing completion***.

80.   CFO Painter similarly misled investors by claiming that "***[w]e continue to expect the ramp to nameplate at both facilities to be a 12- to 18-month process*** that starts slowly and accelerates in the later stages."

81.     Significantly, during a question-and-answer session that followed, Defendant Wolfson falsely told investors that Solazyme had "***produced both oil and Encapso using full-scale production lines*** and ***we've shipped initial volumes of commercial products***" from the Moema Facility.

82.     Defendants continued to make similar false statements to analysts and investors at two investment conferences held on August 11-12, 2014.  For instance, CFO Painter boasted of the Moema Facility that it was a "100,000 metric ton purpose built plant in Sao Paolo state in Brazil, this was with our partner, Bunge … again, ***it is [a] 100,000 metric ton plant*** at their largest sugar mill in Brazil which is [at] Moema."  Painter continued to insist during these conferences that the Moema Facility was operating according to its originally conceived schedule:

> What we have talked about is that for each of these facilities our production ramp is a 12- to 18-month cycle.  So as we are bringing in, finalizing the commissioning of the plant, ***the introduction of commercial production at the plant starts that 12- to 18-month cycle.*** … [I]n the third phase, we reach toward what we call nameplate capacity.  ***So that means you are running at a run rate of producing 100,000 metric tons a year when you hit that nameplate capacity***.

83.     Solazyme's SVP of Corporate Development also attended the investor conference and told investors "[w]e just began commercial production out of [the Moema] facility.  It's based in Sao Paulo state and ***that's for 100,000 metric tons of production volume***."

**b.     Knowledgeable Confidential Witnesses Contradict Defendants' Statements**

84.     Each of these July and August 2014 statements concerning the eventual capacity of the Moema Facility was false when made.  Moreover, each of these statements was highly misleading and gave analysts and investors an impression of progress at the Moema Facility that was wildly inaccurate because Defendants failed to simultaneously disclose the fundamental problems that they were facing at the plant.

85.     CW1, who was working at Solazyme-Bunge at the time the July and August statements were made, stated that the plant was not close to achieving commercial viability at ***any*** point during 2014, including all of July and August 2014.  Moreover, with respect to

Defendants' statements regarding the viability of the Moema Facility's 100,000 metric ton production capacity, CW1 stated that given the production problems plaguing the Moema Facility during July and August 2014 and throughout the rest of that year, there was no reasonable basis to conclude that the Moema Facility would achieve nameplate capacity of 100,000 metric tons in 12 to 18 months.

86.     Regarding the statement that Solazyme had "shipped initial volumes of commercial products," CW1, who as Controller was responsible for maintaining an inventory of oil produced at the Moema Facility at the time that statement was made, stated that no commercial products were *ever* shipped to customers during 2014 using oil produced at the Moema Facility, and it was therefore not possible for this statement to have been true on July 30, 2014 when it was made.

87.     CW3 also disagreed with the statement that production on "full-scale production lines" was underway during this time at the Moema Facility, because only four of the six presses at the Moema Facility were ever commissioned during all of 2014, and the Company generally was not able to run more than 2 presses at a time during that period because the presses would become clogged in a very short period of time.  Therefore, the statement that the Company was using "full-scale production lines" was at best misleading in light of the omission of that information.

88.     The accounts of the confidential witnesses is further corroborated by Defendants' own statements made *five months later* when the Company described fixes it was only just then implementing.  Specifically, CEO Wolfson told investors during an analyst call on February 26, 2015 that "in December [2014, five months after stating that Solazyme had "produced both oil and Encapso using full-scale production lines"], we made significant progress at the facility and some of the highlights from that include periods of fully integrated plant operations from sugar input all the way to final crude oil.  This validated the plant's capability for integrated operations and was a major technical milestone for the Moema facility."  Wolfson further stated that "[a] big goal on getting Moema to operate on a fully integrated basis in December was to give us the opportunity to see the plant in action …."  This representation stands in stark contrast to the

1  earlier statements made by Wolfson that commercial production was already underway in July

2  of 2014.

3            c.      **Defendants' Misrepresentations were Material to the Market**

4            89.      Once again, analyst reactions to the statements Solazyme made in July and

5  August of 2014 concerning the progress at the Moema Facility were overwhelmingly positive.

6  Morgan Stanley's research update on July 31, 2014 stated that "[t]he production ramp is

7  underway and apparently on track" and maintained its "Overweight" (Buy) rating as a result.

8            90.      Credit Suisse reported the same day that "[t]he company continues to make

9  commercial progress with Moema coming online in Q2 and now ramping up," noting that

10  "Solazyme has started initial runs & shipments from the 100k MT Moema facility."  Based on

11  the Company's representations, Cowen & Co. also reported on July 31, 2014 that its "Base

12  Case" scenario was that "Moema reaches nameplate by mid-15, ramps to 300K MT by Y.E.

13  2016," and issued a follow-up update on August 12, 2014 after the investor conference that it

14  believed there was an "attractive entry point into Solazyme at current levels, ahead of an

15  inflection as full-scale productions begins to ramp up."

16  **E.      The Truth About the Moema Facility Is Partially Revealed to the Public**

17            91.      After the close of the trading session on November 5, 2014, Solazyme made a

18  dramatic announcement in its earnings press release and in a subsequent conference call with

19  investors and analysts that same day.  Specifically, the Company announced for the first time

20  during the investor call:

21            *[Solazyme will] narrow our production focus to smaller volumes*
              of higher value products at both Moema and Clinton/Galva. We
22            will be prioritizing cash management and product margin over a
              rapid capacity ramp. *We therefore, no longer plan to produce a*
23            *nameplate capacity within 12 to 18 months.* This decision will
              cause us to deprioritize near term production in some product areas
24            where we're seeing significant and growing demand, but are not
              yet economically attractive given early cost structure and
25            commodity pricing trends.

26            92.      The Company explained the decision by stating, among other things, that

27  "*[o]perational challenges at Moema are causing a slower than anticipated descent down the*

28  *manufacturing cost curve.*"

93.     Solazyme's Chief Technology Officer then disclosed a substantial list of the problems impeding progress at the Moema Facility:

> ***Power and steam consistency continues to be an issue***.  The fix[es] implemented over the spring and summer have led to improvements resulting in periods of reliability.  So these have continued to be interest bearers with setbacks as well.  To be clear, ***the work that has been done up to now, including a significant focus on backup systems is a partial fix***.
>
> \*        \*        \*
>
> ***[T]here is continued work to do on the downstream operations to allow them to run continuously and then in integrated fashion***.  Specifically, we are focusing on some correctable ***issues with the conveyance system***.

94.     Next, despite previously and emphatically having told investors that "the delays have nothing to do with process," Defendants did an about-face on the November 5th call, and stated that it was "also ***working to achieve consistent processing with the process***, the timing of which is taking longer than we expected."  Finally, the Company further disclosed that "***not all of the downstream is working yet efficiently, continuously or on an integrated basis***."

95.     On October 9, 2014, less than a month prior to these revelations, Solazyme issued a press release concerning the forthcoming release of the Company's third quarter 2014 financial results and notifying investors about the upcoming November 5 call, but failed to disclose any information about the problems at the Moema Facility.

**F.     The Market Reacts to Solazyme's Revelations**

96.     In reaction to these disclosures of the truth concerning Solazyme's inability to produce oil on a large commercial basis at the Moema Facility, Solazyme's stock price declined $4.35 per share, or 58.08%, to close at $3.14 per share following the next trading session on November 6, 2014.

97.     Defendants' false statements and omissions during the Class Period, as set forth in ¶¶ 42-95, caused the Company's common stock to trade at artificially inflated prices during the Class Period.  However, when the conditions described above were revealed to the market on November 5, 2014, the prices of the Company's securities fell significantly.  On November 6, 2014, Solazyme's stock price fell by $11.56 per share—or 78.64%—from its Class Period-high

1  closing price of $14.70 per share (on March 12, 2014), as evidenced in the following chart:

**Solazyme vs. NASDAQ**



98.     As shown above, the artificially-inflated market value of the Company's common stock during the Class Period was the direct result of Defendants' misrepresentations concerning the progress at the Moema Facility because those statements were closely followed by industry analysts who perceived the Moema Facility to be the cornerstone of Solazyme's perceived commercial success.

99.     Similarly, the dramatic crash in the value of Solazyme's securities that immediately followed the Company's November 5, 2014 revelations concerning the inability of the Moema Facility to achieve large-scale commercial capacity was a direct result of the market's acceptance of the reality that had been hidden from investors during the Class Period.

100.    For example, just prior to the November 5 announcement, investment column The Motley Fool "suggested management use the third-quarter earnings conference call as an *opportunity to begin rebuilding investor trust by being honest about the seemingly obvious*

*issues*."   Shortly after the November 5 revelations the column's assessment was that "*management seized the opportunity, but there won't be much celebrating after investors digest and interpret the sobering admissions made during the call*."   The column ended with the following conclusion:

> *I would feel very uncomfortable buying Solazyme shares until the company can demonstrate or disclose more information that removes any doubt that fermentation processes, the core technology, are potentially the/a culprit for the swift change in commercialization strategy*.

101.   Other analysts expressed similar views.   The day after the November 5, 2014 investor call, Morgan Stanley issued an update stating that it was "reviewing our long-term view of the company *in light of new disclosure of delays and incremental costs associated with ramping the company's commercial facilities*."   The update further stated:

> Management disclosed that the two major commercial facilities (particularly the Brazilian Moema facility) are experiencing significant delays and higher unit costs than expected. Although some of the issues are attributable to lower than expected power reliability, *others relate to more fundamental challenges integrating downstream production steps*. *The company had provided an update less than a month ago (on October 9th) that did not include disclosure about potential delays in the production ramp, so we believe that the announcement was largely unexpected by the market*.

102.   Morgan Stanley concluded that "[a]s a result of the new disclosure, we are in the process of reviewing our long-term assumptions relating to growth and earnings power of the business, as well as our OW rating and valuation on the stock."   Days later following their review, on November 10, 2014 Morgan Stanley downgraded Solazyme's stock, stating that "*[N]ewly disclosed delays in the ramps of both Moema and Clinton / Galva facilities highlight risks associated with the company's growth and force us to reduce our long-term forecasts considerably*."   Morgan Stanley also noted:

> Management announced Wednesday that they are experiencing delays bringing online their Bunge and Clinton / Galva facilities. *Although the company says that the core fermentation process seems to be working*, they are running into *problems integrating the downstream finishing steps of the production process*. Management has identified some possible improvements, but *the measures do not fully solve more fundamental problems leading to higher than expected production costs*, in our view.

> ***Management has not yet identified a full fix for the problem***, let
> alone characterized the cost or timing of resolving the problem.

103.    In other words, analysts saw right through the Company's attempt to frame its 180 degree U-turn as a strategic "adjustment."  Analysts also saw Defendants' statements for what they were – an admission that the problems at the Moema Facility were far worse than the Company had previously disclosed, and that in fact, the Moema Facility was not in its current trajectory ever going to be, a 100,000 metric ton facility.  This fact was already well known at Solazyme throughout the Class Period, but on November 5, 2014, the market learned this for the first time as well, and reacted as one would expect on such news.

**G.    Defendants Were Fully Aware of the Condition of the Moema Facility and Knowingly Made Each Misrepresentation with Scienter**

104.    Defendants acted with scienter in that they knew, or recklessly disregarded, that the misrepresentations they issued or disseminated in the name of the Company, or in their own name during the Class Period, were materially false and misleading at the time they were made; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

105.    Defendants, including the Individual Defendants Wolfson and Painter, had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time because of their direct involvement with and oversight of the Moema Facility project.  The Moema Facility was the central cornerstone of the Company's ambitions to become a large-scale commercial manufacturer and distributor of oil products.  Discussion concerning the progress at the Moema Facility dominated the calls that Wolfson and Painter held each quarter with investors during the Class Period.

106.    CW1 stated that Solazyme's management team in the United States, including CEO Wolfson and CFO Painter, were kept regularly apprised of the state of the progress at the Moema Facility throughout the entire Class Period, including with respect to the nature and extent of the problems with the manufacturing process, the power and steam issues, the oil

quality and the production capacity.  CW1 stated that such updates were provided during weekly conference calls between the corporate U.S. headquarters and the Sao Paolo office that oversaw the Moema operations in which CW1 often participated, and which also included CFO Painter and sometimes CEO Wolfson.  According to CW1, these weekly updates began in February of 2014 and continued all through the rest of the year and beyond.  Plant commissioning and production issues were typically included and received the most attention during the weekly calls, along with technical issues.  CW1 also stated that Solazyme-Bunge CFO Erico Lopes ("Lopes"), and Solazyme-Bunge Managing Director Walfredo Linhares ("Linhares") spoke regularly with Defendant Painter by phone in addition to the weekly conference calls to provide further updates.  CW1 also stated that members of Solazyme's management team, including Wolfson and Painter, traveled to Brazil at least three times during the Class Period to visit the Moema Facility and discuss the problems with the production process and the associated delays.  The first of these visits occurred in April or May of 2014, the second was in June 2014, and a third was in September 2014.

107.   CW2 confirmed that Solazyme's management, including the Individual Defendants Wolfson and Painter, were kept fully apprised of the status of the Moema Facility and its inability to produce commercial-grade oil because the progress at the Moema Facility was very important to the overall success of the Company.  CW2 stated that Wolfson visited the Moema Facility approximately three times per year during the relevant period, and that the Solazyme-Bunge's CEO Hildo Henz ("Henz") and CFO Lopes travelled to the United States to meet with the Individual Defendants in order to provide them with updates concerning the progress of the Moema Facility.  CW2 also stated that Henz and Lopes had frequent conference calls with Solazyme's management to discuss the problems at the Moema Facility.

108.   CW3 also confirmed that there were regular conference calls in which CW3 participated together with senior personnel from Moema, including Solazyme-Bunge's CEO Henz and Solazyme-Bunge Managing Director Linhares, and senior management from Solazyme's headquarters in San Francisco.  CW3 participated directly in these calls on occasion throughout the Class Period in order to discuss and provide assistance with regard to the

1  manufacturing problems at the Moema Facility. CW3 recalled that steam, power, and ongoing

2  manufacturing problems were discussed during these regular conference calls.

3          109.    Additional circumstances during the Class Period provide further evidence of

4  Defendants' scienter with respect to their statements about the Company's supposed flagship

5  facility at Moema.  First, many officers and directors inside the Company sold huge amounts of

6  their Solazyme stock during the Class Period.  Defendant Wolfson alone sold more than 423,000

7  of his shares during the Class Period, and Defendant Painter sold more than 97,000 shares

8  during the Class Period.  Second, several sudden and largely unexplained high-level departures

9  also occurred towards the end of the Class Period, including the resignations of President and

10  Director David Cole, and the Chair of the Company's Audit Committee – Ann Mather – which

11  were simultaneously announced on October 9, 2014.

12  **H.**    **Presumption of Reliance**

13          110.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-

14  the-market doctrine in that, among other things:

15            (a)    Defendants made public misrepresentations or failed to disclose material

16                facts during the Class Period;

17            (b)    the omissions and misrepresentations were material;

18            (c)    the Company's securities traded in efficient markets;

19            (d)    the misrepresentations alleged would tend to induce a reasonable investor

20                to misjudge the value of the Company's securities; and

21            (e)    Plaintiffs and other members of the Class purchased Solazyme securities

22                between the time Defendants misrepresented or failed to disclose material

23                facts and the time the true facts were disclosed, without knowledge of the

24                misrepresented or omitted facts.

25          111.    At all relevant times, the markets for Solazyme securities were efficient for the

26  following reasons, among others:

27            (a)    as a regulated issuer, Solazyme filed periodic public reports with the

28                SEC;

(b) Solazyme regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c) Solazyme securities were actively traded in an efficient market, including the NASDAQ, where the Company's common stock trades under the ticker symbol "SZYM."

112. As a result of the foregoing, the markets for Solazyme securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the respective prices of Solazyme securities.   Under these circumstances, all purchasers of Solazyme securities during the Class Period suffered similar injury through their purchases of Solazyme securities at artificially inflated prices and the presumption of reliance applies.

113. Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiffs and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**I.** **Additional Loss Causation Allegations**

114. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Solazyme's stock, and operated as a fraud or deceit on Class Period purchasers of the Company's securities by misrepresenting the state of the construction progress, development, and production capacity for the Moema Facility and the prospects and outlook for Solazyme, and including misrepresenting the fact that it had sold commercial-grade oil produced at the Moema Facility and telling investors that there were no issues relating to the production process.

115.    Later, as the Company's prior false statements, misrepresentations, and fraudulent conduct were disclosed to the market, the prices of Solazyme's stock fell as the prior artificial inflation dissipated from the market prices of the stock.  As a result of their purchases of the Company's securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**J.    Inapplicability of Statutory Safe Harbor and Bespeaks Caution Doctrine**

116.    Neither Defendants' "Safe Harbor" warnings accompanying their forward-looking statements ("FLS") issued during the Class Period, nor the bespeaks caution doctrine can shield those statements from liability because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Solazyme who knew that the FLS was false.

117.    For example, the Company's standard FLS warning given prior to statements made during the quarterly investor/analyst conference calls stated that:

> some of the comments constitute forward-looking statements that reflect management's current views and estimates of future events and economic circumstances, industry conditions, company plans, performance, and financial results. Statements are based on many assumptions and factors, including the completion and ramping up of production facilities, the availability and pricing of raw materials and equipment, operating efficiencies, new product development, market conditions, product sales, access to capital, and actions of governments, partners, and customers. Any changes in such assumptions or factors can produce significantly different results.

118.    However, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

119.    Indeed, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  For example, Solazyme did not caution investors that it had never sold any

1   oil produced at the Moema Facility during the Class Period, or that the factory was incapable of

2   making commercially salable oil.

3       120.   Moreover, to the extent that certain misrepresentations alleged herein could be

4   construed as "forward-looking," these statements lacked a reasonable basis given the

5   information that was known to Defendants at the time those statements were made.   Any

6   warnings provided by Defendants were insufficient to adequately warn investors of the true

7   risks the Company faced.

8                           **CLASS ACTION ALLEGATIONS**

9       121.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

10   Rules of Civil Procedure on behalf of all persons and entities that purchased or otherwise

11   acquired Solazyme common stock during the Class Period and were damaged thereby.

12   Excluded from the Class are Defendants and their families, directors and officers of Solazyme

13   and their families, and affiliates.

14       122.   The members of the Class are so numerous that joinder of all members is

15   impracticable.   The disposition of their claims in a class action will provide substantial benefits

16   to the parties and the Court.   As of October 30, 2015, Solazyme had 80,539,001 shares of

17   common stock outstanding, owned by thousands of persons.

18       123.   There is a well-defined community of interest in the questions of law and fact

19   involved in this action.   Questions of law and fact common to the members of the Class that

20   predominate over questions that may affect individual Class members include:

21           (a)   whether the Exchange Act was violated by Defendants;

22           (b)   whether Defendants omitted and/or misrepresented material facts;

23           (c)   whether Defendants' statements omitted material facts necessary in order

24               to make the statements made, in light of the circumstances under which

25               they were made, not misleading;

26           (d)   whether Defendants knew or recklessly disregarded that their statements

27               were false and misleading;

28           (e)   whether the price of the Company's stock was artificially inflated; and

1              (f)     the extent of damage sustained by Class members and the appropriate

2             measure of damages.

3     124.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class

4 sustained damages from Defendants' wrongful conduct.

5     125.    Plaintiffs will adequately protect the interests of the Class and have retained

6 counsel experienced in class action securities litigation.  Plaintiffs have no interests that conflict

7 with those of the Class.

8     126.    A class action is superior to other available methods for the fair and efficient

9 adjudication of this controversy.

10 **ADDITIONAL CONTROL PERSON ALLEGATIONS**

11     127.    By virtue of the Individual Defendants' positions of management and control

12 within the Company as CEO and CFO, they had access to undisclosed adverse information

13 about Solazyme, its operations, financial condition, and internal controls. The Individual

14 Defendants ascertained such information through Solazyme's internal corporate documents,

15 conversations, and connections with each other and with corporate officers, employees,

16 attendance at Board of Directors' meetings, including committees thereof, and through reports

17 and other information provided to them in connection with their roles and duties as Solazyme's

18 two highest ranking officers.  This includes weekly meetings and/or conference calls regarding

19 problems with the manufacturing process, the power and steam issues, the oil quality and

20 production capacity as well as regular visits they made to the Moema Facility personally to

21 inspect the progress and condition of the facility.

22     128.    The Individual Defendants participated in the drafting, preparation, and/or

23 approval of the various public, shareholder and investor reports and other communications

24 complained of herein and knew, or recklessly disregarded, that there were material

25 misstatements and omissions contained therein. Because of their executive positions with

26 Solazyme, each of the Individual Defendants had access to the adverse undisclosed information

27 about the true production capability at the Moema Facility as particularized herein and knew (or

28

1  recklessly disregarded) that these adverse facts rendered the positive representations made by or

2  about the Moema Facility, or adopted by the Company, materially false and misleading.

3      129.   The Individual Defendants, because of their positions of control and authority as

4  officers or directors of the Company, were able to and did control the content of the various SEC

5  filings, press releases and other public statements pertaining to the Company during the Class

6  Period.  Each of the Individual Defendants was provided with copies of the documents alleged

7  herein to be misleading before or shortly after their issuance and had the ability and opportunity

8  to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual

9  Defendants is responsible for the accuracy of the public reports and releases detailed herein and

10  is therefore primarily liable for the representations contained therein.

11      130.   As executive officers and controlling persons of a publicly-held company whose

12  common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the

13  NASDAQ, and governed by the provisions of the federal securities laws, the Individual

14  Defendants each had a duty to promptly disseminate accurate and truthful information with

15  respect to the Company's operations, financial condition, and internal controls, and to correct

16  any previously issued statements that had become materially misleading or untrue, so that the

17  market price of the Company's publicly-traded securities would be based upon truthful and

18  accurate information. The Individual Defendants' material misrepresentations and omissions

19  during the Class Period violated these specific requirements and obligations.

## CAUSES OF ACTION

### COUNT I
#### For Violation of Section 10(b) of the Exchange Act
#### and SEC Rule l0b-5 Against All Defendants

23      131.   Plaintiffs repeat, incorporate, and reallege paragraphs 26 through 130 by

24  reference.

25      132.   During the Class Period, Defendants disseminated or approved the false

26  statements specified above, which they knew or recklessly disregarded were misleading in that

27  they contained misrepresentations and failed to disclose material facts necessary in order to

28  make the statements made, in light of the circumstances under which they were made, not

1    misleading.

2        133.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that

3    they:

4            (a)    employed devices, schemes, and artifices to defraud;

5            (b)    made untrue statements of material facts or omitted to state material facts

6                   necessary in order to make the statements made, in light of the

7                   circumstances under which they were made, not misleading; and/or

8            (c)    engaged in acts, practices, and a course of business that operated as a

9                   fraud or deceit upon Plaintiffs and others similarly situated in connection

10                  with their purchases of Solazyme securities during the Class Period.

11       134.   Plaintiffs and other members of the Class have suffered damages in that, in

12   reliance on the integrity of the market, they paid artificially inflated prices for Solazyme

13   securities.   Plaintiffs and other members of the Class would not have purchased Solazyme

14   securities at the prices they paid, or at all, if they had been aware that the market prices had been

15   artificially and falsely inflated by Defendants' misleading statements.

16       135.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

17   the other members of the Class suffered damages in connection with their purchases of

18   Solazyme securities during the Class Period.

19                                   **COUNT II**
                          **For Violation of Section 20(a) of the Exchange Act**
20                            **Against the Individual Defendants**

21       136.   Plaintiffs repeat, incorporate, and reallege paragraphs 26 through 130 by

22   reference.

23       137.   The Individual Defendants acted as controlling persons of Solazyme within the

24   meaning of Section 20(a) of the Exchange Act.   By virtue of their power to control public

25   statements about Solazyme, the Individual Defendants had the power and ability to control the

26   actions of Solazyme and its employees.   By reason of such conduct, the Individual Defendants

27   are liable pursuant to Section 20(a) of the Exchange Act.

28

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.      Awarding Plaintiffs and the members of the Class damages and interest;

C.      Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

1

## JURY DEMAND

2          Plaintiffs demand a trial by jury.

3

4     DATED:  February 15, 2017                    Respectfully submitted,

5
                                                    _/s/ Joel H. Bernstein_____
6                                                   Joel H. Bernstein (*pro hac vice*)
                                                    Mark S. Arisohn (*pro hac vice*)
7                                                   Corban S. Rhodes (*pro hac vice*)
                                                    **LABATON SUCHAROW LLP**
8                                                   140 Broadway
                                                    New York, New York  10005
9                                                   Telephone: (212) 907-0700
                                                    Facsimile: (212) 818-0477
10                                                  jbernstein@labaton.com
                                                    marisohn@labaton.com
11                                                  crhodes@labaton.com

12                                                  *Co-Lead Counsel for Plaintiffs and the Putative*
                                                    *Class*
13
                                                    Ex Kano S. Sams II (Bar No. 192936)
14                                                  **GLANCY PRONGAY & MURRAY LLP**
                                                    1925 Century Park East
15                                                  Suite 2100
                                                    Los Angeles, California 90067
16                                                  Telephone: 310-201-9150
                                                    Facsimile: 310-432-1495
17                                                  esams@glancylaw.com

18                                                  *Co-Lead Counsel for Plaintiffs and the Putative*
                                                    *Class*
19
                                                    Shawn A. Williams (Bar No. 213113)
20                                                  Willow E. Radcliffe (Bar No. 200087)
                                                    Matthew S. Melamed (Bar No. 260272)
21                                                  **ROBBINS GELLER RUDMAN**
                                                       **& DOWD LLP**
22                                                  Post Montgomery Center
                                                    One Montgomery Street, Suite 1800
23                                                  San Francisco, CA 94104
                                                    Telephone: (415) 288-4545
24                                                  Facsimile:  (415) 288-4534
                                                    shawnw@rgrdlaw.com
25                                                  willowr@rgrdlaw.com
                                                    mmelamed@rgrdlaw.com
26
                                                    *Liaison Counsel*
27

28