UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SOLAZYME, INC., et al.,<br><br>Defendants. | Case No. 15-cv-02938-HSG<br><br>**ORDER GRANTING MOTION TO DISMISS AND GRANTING REQUEST FOR JUDICIAL NOTICE**<br><br>Re: Dkt. Nos. 93, 95 |

This is a consolidated putative securities class action brought against Defendant Solazyme, Inc. ("Solazyme"), Jonathan S. Wolfson, Solazyme's Chief Executive Officer during the class period, and Tyler W. Painter, Solazyme's Chief Financial Officer (collectively, "Defendants"), pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

On December 29, 2016, the Court granted motions to dismiss brought by Defendants and by Goldman, Sachs & Company and Morgan Stanley & Company, LLC. Dkt. No. 88. Plaintiffs filed an Amended Consolidated Complaint on February 15, 2017. Dkt. No. 91 ("SAC"). Pending before the Court is Defendants' motion to dismiss the SAC.[1] Dkt. No. 93. For the following reasons, the Court **GRANTS** Defendants' motion to dismiss.[2]

---

[1] This action was stayed between August 7, 2017 and January 26, 2018 due to a bankruptcy proceeding involving TerraVia Holdings, Inc., Solazyme Brazil LLC, and Solazyme Manufacturing 1, LLC. *See* Dkt. Nos. 102, 107.

[2] Defendants have requested that the Court consider documents incorporated by reference in the Complaint and take judicial notice of certain documents attached as exhibits to the Declaration of Mark R.S. Foster. Dkt. No. 95. The Court **GRANTS** the request for consideration of documents incorporated by reference in the Complaint. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.") The Court also **GRANTS** the request for judicial notice of SEC filings, *see Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC

## I. LEGAL STANDARD

### A. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### B. Heightened Pleading Standards

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use

---

filings subject to judicial notice); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (same), and of press releases and other investor communications showing that the "market was aware of information[,]" *see Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 980-81 & n.18 (9th Cir. 1999); *see also Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (taking judicial notice of press releases); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 979-80 (N.D. Cal. 2010) (taking judicial notice of slide presentations to analysts). Defendants request that the judicially-noticeable materials containing their representations be considered to the extent they "show what information was disclosed to the market," Dkt. No. 99 at 5, and the Court agrees these materials are appropriately considered for that purpose.

or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . . " 15 U.S.C. § 78j(b). Under this section, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "To prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

At the pleading stage, a complaint alleging claims under section 10(b) and Rule 10b-5 must not only meet the requirements of Rule 8, but must satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). With respect to forward-looking statements, "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) (quoting *Cutera*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112–13 (9th Cir. 2010)).

The Court considers each pleading requirement in turn.

3

## II. FALSITY

### A. February 26, 2014 Statements

On February 26, 2014, Solazyme issued a press release and hosted a conference call for investors and analysts. SAC ¶ 42. During that call, Wolfson noted that Solazyme had "neared completion of the 100,000 metric ton Moema plant," that Solazyme was "making strong and steady progress at Moema," and was "deep into the commissioning process," that "[i]nfrastructure and upstream which together comprise a substantial percentage of the plant, [were] both currently online and everything [was] functioning as expected," and that "[a]t Moema, commissioning [was] well underway, a significant [portion] of the plant [was] already online," and that Solazyme was "getting close to producing our first commercially salable product." SAC ¶ 43. The press release also stated that Solazyme was "deep into commissioning in Brazil as we complete the first-of-its-kind 100,000 MT Solazyme Bunge Renewable Oils (SB Oils) facility at Moema." SAC ¶ 44.

Wolfson also made several forward-looking statements on the February 26 conference call, including that Solazyme planned a "12 to 18-month time line to reach nameplate capacity at both Clinton and Moema," and that the "clock [would] start soon at Moema with initial fermentation operations just getting under way." SAC ¶ 43. Wolfson stated his belief that "the progress at Moema and its current schedule leaves us in good shape to bring full production online" in the spring, and that Solazyme was "on track to reach full nameplate capacity in the back half of 2015." *Id*.

The complaint alleges that the Moema plant "was not close to achieving commercial viability at *any* point during 2014," and that "commercial oil production never truly got underway at the Moema Facility during any point in the Class Period." SAC ¶ 46, 54. The complaint further alleges that "there was no reasonable basis to conclude that the Moema Facility would achieve nameplate capacity of 100,000 MT in 12 to 18 months." SAC ¶ 46.

Plaintiffs have failed to adequately allege any misrepresentation as to any of these statements.[3] Taking these allegations in the light most favorable to Plaintiffs, the SAC does not

---

[3] Plaintiffs do not address several of Solazyme's statements, including those regarding the "12 to 18-month time line," in their opposition brief, thereby abandoning those statements as possible bases for their claim. *See Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197, 1210 and n.7

4

sufficiently plead falsity at the time the statements were made. A plant that was not close to achieving commercial viability in 2014 could still be "near completion." *See* SAC ¶ 43. Likewise, Solazyme could still have made "strong and steady progress," been "deep into the commissioning process," and infrastructure and upstream could still have been "online" and "functioning as expected" without being "close to achieving commercial viability" at Moema. SAC ¶¶ 43–44; *see Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (holding that statements must be "capable of objective verification" to be misleading).

The forward-looking statements that Moema was "in good shape to bring full production online" in the spring, and was "on track to reach full nameplate capacity in the back half of 2015" are also not contradicted by the allegation that Moema was not close to achieving commercial viability in 2014. With respect to Solazyme's plans to achieve nameplate capacity within 12 to 18 months, the assertion that there was no "reasonable basis" to conclude that such a timeline was possible does not allege that the plan to do so did not exist at the time. *See* SAC ¶¶ 43, 46. Moreover, Plaintiffs fail to allege actual knowledge that Wolfson knew these forward-looking statements to be false at the time they were made. *See* SAC ¶¶ 104–109; *see also Employers Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004) ("[I]f the challenged statement is forward-looking, the plaintiffs must have alleged facts that would create a strong inference that the defendants made the forecasts with actual knowledge . . . that the statement[s were] false or misleading at the time made.") (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002)) (internal quotation marks omitted).

B. **March 14, 2014 Statements**

i. **Alleged Misstatements**

On March 14, 2014, Solazyme filed its 2013 Form 10-K with the SEC. SAC ¶ 51. In it, Defendants stated that their "process is compatible with commercial-scale, widely-available

---

(N.D. Cal. 2013) (finding failure to respond to arguments in opposition brief constituted waiver, and collecting cases finding same).

fermentation and oil recovery equipment," that the "commercial scale achieved at ADM's Clinton Facility is comparable to the fermentation equipment at the Solazyme Bunge Renewable Oils facility in Brazil," that "the commissioning of the facility at Moema [was] underway," and that Solazyme was "now expanding into large-scale, high-volume commercial production." *Id.*

Solazyme also made the forward-looking statements that they were "targeting the production of commercially salable product by the end of the first quarter of 2014," and that the "production facility [was] expected to have a name plate capacity of 100,000 [metric tons] of oil per year." *Id.*

Plaintiffs again rely on the allegations that Moema was "not close to achieving commercial viability at *any* point during 2014," and that there was "no reasonable basis to conclude that the Moema Facility would achieve nameplate capacity of 100,000 metric tons in 12 to 18 months" to show falsity of the March 14 statements. SAC ¶ 53.

Plaintiffs again have failed to adequately allege any misrepresentation. The Solazyme statements are not contradicted by the allegations of Plaintiffs' confidential witnesses ("CW"). Several of these statements are similar or identical in substance to those provided during the February 26 call, and falsity is insufficiently pled for the reasons described above. Additionally, that Moema was "not close to achieving commercial viability" does not contradict statements about the compatibility of its process with "fermentation and oil recovery equipment," or about comparisons with other oil facilities. *See* SAC ¶¶ 51, 53.

Plaintiffs likewise do not allege that the forward-looking statement that Solazyme was "targeting the production of commercially salable product by the end of the first quarter of 2014" is false, as the SAC does not address Solazyme's plans or target dates at all.

### ii. Alleged Omissions

Plaintiffs contend that Defendants omitted material facts in their February 26 and March 14 statements, which created a false impression of the state of the Moema facility. Dkt. No. 96 at 8. Plaintiffs contend that the specific issues at Moema manifested in poor oil quality and oil byproducts that were "constantly clogging the press that was used to extract the oil," and that by omitting these details, Defendants affirmatively created a false impression. *Id.*; SAC ¶ 65; *see*

6

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.").

This allegation simply is not presented in the complaint. Defendants' alleged omissions are only discussed with reference to the May 5, 2014 statements (addressed below). *See* SAC ¶ 65 (containing only a nonspecific reference to conditions "throughout the Class Period," in a section discussing only the May 5 statements). Thus, Plaintiffs have failed to "identify[] the statements at issue and set[] forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).

### C. May 5, 2014 Statements

#### i. Alleged Misstatements

On May 5, 2014, Solazyme hosted another conference call for investors. SAC ¶ 57–58. During the call, Wolfson attributed delays at the Moema facility to "intermittent power and steam availability resulting from the start up of a new cogen facility at the adjoining Moema sugar mill," and stated that, "[s]team and power aside, we are progressing closer to completion of the plant." SAC ¶ 58. When pressed about the cause of the delays, Wolfson stated that "[i]t hasn't been anything other than construction to commissioning," and that the "delays have nothing to do with the process," and were not related to Solazyme's technology. SAC ¶ 59. Wolfson continued to state his belief that the only reason for the delays was the interruption of steam and power to the facility. SAC ¶ 60. Wolfson also noted that he didn't "have concerns about the reliability of steam and power in the longer term." SAC ¶ 62. Regarding the extraction and refinement process, Wolfson stated that he wouldn't say that the process itself was "more complicated" than he originally thought, and that the parts involved in the unit operations were "all operable and really have been operable since later March." SAC ¶ 61. He noted that the "part that just happens to be taking longer and to be specific . . . it has to do with just getting some conveyance equipment installed, is the final oil extraction units. I wouldn't say it has anything to do with complexity." SAC ¶ 61.

Wolfson additionally made several forward-looking statements in connection with the May 5 press release and conference call. Wolfson stated that Solazyme expected "to manufacture commercial product at the Moema facility in the second quarter," and that he did not "see reliable availability of power and steam as a long-term issue," and that he envisioned the production of commercial products at Moema would happen that quarter. SAC ¶¶ 57, 63.

Plaintiffs allege that these statements were misleading because, according to a confidential witness, even "if the power and steam issues had not occurred, the Moema Facility still would not have been on schedule with its ramp up to commercial production levels by May 5, 2014 because the Company was so far behind its production targets at that time, and plagued by so many other problems," which included the "poor quality of the oil being produced." SAC ¶ 65. Plaintiffs also allege another confidential witness's opinion that "these utility problems did not have a significant effect on the oil production output because commercial production was not ongoing at any point during the Class Period." SAC ¶ 66. Plaintiffs allege that at the time of the May 5, 2014 statements, a confidential witness "and other colleagues at Solazyme believed . . . that the steam and power issues were intentionally being exaggerated, and that the main issue was rather to do with the consistent manufacturing problems that existed in conjunction with the power and steam issues." SAC ¶ 67.

Again, Plaintiffs fail to plead facts sufficient to allege that Wolfson's statements were inaccurate at the time he made them. Plaintiffs rely on the opinions of their confidential witnesses, who believed that the power and steam issues "did not have a significant effect on the oil production output," and were "intentionally being exaggerated." SAC ¶¶ 66–67. These opinions, formed with the benefit of hindsight, do not establish that Wolfson, or anyone making statements on behalf of Solazyme, shared the confidential witnesses' opinions on May 5, 2014. *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 801–02 (9th Cir. 2017) (noting that, with respect to opinion statements, "when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue.").

8

### ii. Alleged Omissions

Plaintiffs contend that, by omitting the problems unrelated to the power and steam issues, Wolfson affirmatively created a false impression of the state of the Moema facility. *See* Dkt. No. 96 at 9–10. "No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Brody*, 280 F.3d at 1006. Wolfson's statements taken as a whole, including his acknowledgment that "back end separation at Moema was taking a little bit longer than expected," do not present an affirmatively-created false impression. SAC ¶ 61. None of the hypothetically-alleged omissions contradict the statements regarding the Moema facility, nor would their addition have materially altered the impression created by the statement that "the commissioning of the facility at Moema [was] underway." SAC ¶ 51; *see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (noting no "rule of completeness for securities disclosures"). And finally, Plaintiffs have not sufficiently alleged that Wolfson had actual knowledge of the allegedly omitted facts prior to the May 5 statements. *See* SAC ¶¶ 64–68, 104–109.

### D. May 29, 2014, July, and August Statements

On May 29, 2014, Solazyme issued a special press release, stating that it had "successfully produced its first commercially salable products on full-scale production lines" at Moema, and that "production [was] underway." SAC ¶ 72. On July 30, 2014, Solazyme hosted a conference call to discuss company operations in the second quarter of 2014. SAC ¶ 78. During a question and answer session following the call, Wolfson stated that Solazyme had "produced both oil and Encapso using full-scale production lines and [] shipped initial volumes of commercial products" from Moema. SAC ¶ 81. On August 11 or 12, 2014, Solazyme's Senior Vice President ("SVP") of Corporate Development stated during an investor conference that Solazyme "just began commercial production out of [Moema]." SAC ¶ 82–83.

On the July 30 call, Wolfson referred to Moema as a "large-scale manufacturing facilit[y]," and a "100,000 metric ton . . . facility." SAC ¶ 78. He noted that commissioning of Moema was "in the final stages," and that all "equipment through the finishing process [was] now installed." SAC ¶ 79. Painter stated that Solazyme continued "to expect the ramp to nameplate at both

facilities to be a 12- to 18-month process that starts slowly and accelerates in the later stages." SAC ¶ 80.

Plaintiffs allege, based on the statements of three confidential witnesses, that Solazyme "was never able to produce commercially salable oil at the Moema Facility at any point during 2014," and that "commercial oil production never truly got underway at the Moema Facility at any time during the Class Period." SAC ¶¶ 73–74, 86.

Plaintiffs again allege that, because Moema was "not close to achieving commercial viability," and because there was no "reasonable basis to conclude that the Moema Facility would achieve nameplate capacity of 100,000 metric tons in 12 to 18 months," these statements were false when made. SAC ¶ 85. For the same reasons discussed with respect to the February 26 and March 14 statements, these allegations do not sufficiently plead falsity.

However, making all reasonable inferences in Plaintiffs' favor, the statements that Solazyme "successfully produced its first commercially salable products," "produced . . . oil," and "just began commercial production" at Moema on or before August 12, 2014 are inconsistent with the allegation that Solazyme "was never able to produce commercially salable oil" during 2014. SAC ¶¶ 72–73, 81, 83. Defendants do not argue otherwise. *See* Dkt. No. 93 at 14–15. Rather, Defendants contend that the underlying allegations of Plaintiffs' confidential witnesses are unreliable because CW1 did not have personal knowledge of the salable oil produced by Solazyme in 2014, and because CW1's job description implies that salable oil was produced in 2014 because CW1 was tasked with "maintaining an inventory of oil produced a the Moema Facility." *See id.*; SAC ¶ 39.

A few cases, including two cited by Defendants, appear to address the adequacy of allegations regarding a confidential witness's basis for knowing certain facts under the falsity prong. *See Lomingkit v. Apollo Educ. Grp. Inc.*, No. CV-16-00689-PHX-JAT, 2017 WL 633148 at *12 (D. Ariz. Feb. 16, 2017), and *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009). However, most cases address this issue when considering the second prong regarding the adequacy of scienter allegations. *See Zucco Partners*, 552 F.3d at 995 (discussing PSLRA pleading requirements where "confidential witnesses[' statements]. . . are introduced to establish

10

scienter"); *In re Quality Sys.*, 865 F.3d at 1144–45 (analyzing basis for confidential witnesses' knowledge under scienter prong, citing *In re Daou Sys. Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) and *Zucco Partners,* 552 F.3d at 995); *Browning v. Amyris, Inc.*, No. 13-CV-02209-WHO, 2014 WL 1285175, at *17–18 (N.D. Cal. Mar. 24, 2014) (same, citing *Zucco Partners*).

The Court will follow the approach of the majority of cases. Accordingly, for present purposes, the Court will consider whether, even assuming it were to find falsity adequately pled as to these three statements regarding the production of commercially salable oil at Moema, the Plaintiffs have met their further burden of pleading scienter as to those statements. *See Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 742–49 (9th Cir. 2008) (declining to decide "close[] question" regarding adequacy of falsity allegations, because scienter was inadequately pled).

## III. SCIENTER

A complaint adequately pleads scienter "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Zucco Partners*, 552 F.3d at 991 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007)) (internal quotation marks omitted; emphasis in original). The Court must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions. *Tellabs*, 551 U.S. at 322. The inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991 (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014–1015 (9th Cir. 2005)) (internal quotation marks omitted).

### A. **Confidential Witness Statements**

Because Plaintiffs' complaint relies on statements from confidential witnesses, it must "pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient

11

particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995 (internal citations and quotation marks omitted).

Plaintiffs have not adequately pled scienter in the SAC. CW1, a "controller for Solazyme-Bunge in Sao Paolo, Brazil for the entire duration of 2014," is described as having responsibilities that included "maintaining an inventory of oil produced at the Moema Facility and overseeing the accounting records concerning the value of that inventory." SAC ¶ 39. CW2, "a Senior Administrator working in the Sao Paolo office during the entire Class Period," is described as being "responsible for all financial and administrative reporting systems with respect to the Moema Facility," including "all information stored in Solazyme-Bunge's systems concerning product inventory (*i.e.* oil production), customer orders, sales of oil, and vendor relations." SAC ¶ 40.

CW2 alleges that "Solazyme's management, including the Individual Defendants Wolfson and Painter, were kept fully apprised of the status of the Moema Facility and its inability to produce commercial-grade oil." SAC ¶ 107. CW2 states "that Wolfson visited the Moema Facility approximately three times per year during the relevant period, and that the Solazyme-Bunge's CEO Hildo Henz . . . and CFO Lopes travelled to the United States to meet with the Individual Defendants in order to provide them with updates concerning the progress of the Moema Facility." *Id.* CW2 additionally states that "Henz and Lopes had frequent conference calls with Solazyme's management to discuss the problems at the Moema Facility." *Id*.

Further, CW1 alleges that "Solazyme's management team in the United States, including CEO Wolfson and CFO Painter, were kept regularly apprised of the state of the progress at the Moema Facility throughout the entire Class Period, including with respect to the nature and extent of the problems with the manufacturing process, the power and steam issues, the oil quality and the production capacity." SAC ¶ 106. CW1 also states "that such updates were provided during weekly conference calls between the corporate U.S. headquarters and the Sao Paolo office that oversaw the Moema operations in which CW1 often participated, and which also included CFO

12

1 Painter and sometimes CEO Wolfson," and that "these weekly updates began in February of 2014
2 and continued all through the rest of the year and beyond." *Id.*

The SAC does not "provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report." *Zucco Partners*, 552 F.3d at 995. The SAC lacks supporting facts sufficient to establish the basis for CW1's central assertion that "the Company was never able to produce commercially salable oil at the Moema Facility at any point during 2014." SAC ¶ 73. General allegations regarding CW1's receipt of unspecified hearsay "updates" regarding "production process issues at the Moema Facility during the Class Period," SAC ¶ 39, are not sufficient without further factual detail. *See Amyris*, 2014 WL 1285175 at *17–18 (scienter inadequately pled where complaint failed to provide an adequate basis for CW's beliefs, which were "otherwise conclusory," and where allegations were unaccompanied by detailed facts of a "corroborative nature").

In addition, neither CW1 nor CW2 identifies a time when Wolfson or the SVP of Corporate Development was informed that the Moema facility was unable to begin commercial oil production before they made the challenged statements. The confidential witnesses refer generally to "conference calls" and "updates" given to senior management, but fail to identify any call, meeting or other type of communication (1) participated in by both the confidential witness and Wolfson or the SVP of Corporate Development, (2) prior to the May 29, 2014, July, and/or August statements, and (3) disclosing information contradicted by those statements. *See Police Ret. Sys.*, 759 F.3d at 1063 (confidential witness statements lacked foundation because they did not "detail the actual contents of the reports the executives purportedly referenced or had access to," and witnesses "lack[ed] firsthand knowledge regarding what the individual defendants knew or did not know about Intuitive's financial health"); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002) (complaint failed to allege "contemporaneous facts in sufficient detail and in a manner that would create a strong inference that the alleged adverse facts were known at the time of the challenged statements"); *In re Rackable Sys., Inc. Sec. Litig.*, No. C 09-0222 CW, 2010 WL 3447857, at *9 (N.D. Cal. Aug. 27, 2010) (citing *In re Vantive Corp.* in rejecting confidential witnesses' "vague assertions" about financial conditions as inadequate to support an inference of

13

scienter).

Nor does the SAC allege that the confidential witnesses shared the purportedly contradictory information with the Defendants before they made the challenged statements. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (allegation of access to disputed information was inadequately particularized where plaintiff failed to allege that defendants personally accessed information, or that witnesses disclosed the purportedly contradictory information to defendants); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) (explaining that "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud").

### B. Defendants' Admissions

Plaintiffs also contend that later statements made by Wolfson indicate his knowledge in May, July, and August that Solazyme had not produced commercial oil at Moema. Dkt. No. 96 at 20–21. Wolfson stated on February 26, 2015 that "in December [2014], we made significant progress at [Moema] and some of the highlights from that include periods of fully integrated plant operations from sugar input all the way to final crude oil. This validated the plant's capability for integrated operations and was a major technical milestone for the Moema facility." SAC ¶ 88. He went on to state that a "big goal on getting Moema to operate on a fully integrated basis in December [2014] was to give us the opportunity to see the plant in action." *Id.*

"A later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003). These statements neither directly contradict nor are inconsistent with Wolfson's earlier statement that Solazyme had "produced both oil and Encapso using full-scale production lines and [] shipped initial volumes of commercial products" from Moema, and are thus insufficient to allege scienter. SAC ¶ 81. The production of crude oil at Moema in December does not foreclose oil production prior to December.

14

### C. Core Operations and Small Size

Plaintiffs contend that the allegations of misrepresentation relate to the "core operations" of Solazyme, and that, taken together with Solazyme's small size, this factor raises a strong inference of scienter. Dkt. No. 96 at 22–25.

"The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys.*, 759 F.3d at 1062 (internal quotation marks omitted). "Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id*.

Plaintiffs allege that Moema was "the central cornerstone" of Solazyme's market strategy, and as a result, Defendants were kept apprised of facts related to its operations. Dkt. No. 96 at 22–23. Plaintiff also alleges that because Solazyme had 266 full-time employees at the end of 2014, it is more likely that its officers were aware of the alleged misrepresentations. SAC ¶ 22; Dkt. No. 96 at 24–25.

Plaintiffs have not sufficiently alleged that the misrepresentations regarding operations at Moema related to the core operations of Solazyme such that "it would be absurd to suggest that management was without knowledge of the matter." *Police Ret. Sys.*, 759 F.3d at 1062. As discussed above with respect to the confidential witness statements, Plaintiffs have not alleged specific involvement of the Defendants in the details of the purported misrepresentations, and claims regarding the size of the company do not remedy this defect. As a result, Plaintiffs' core operations theory does not raise a strong inference of scienter.

### D. Stock Sales

Plaintiffs contend that the sale of Solazyme stock by Wolfson and Painter during the class period is also indicative of scienter. "Suspicious" stock sales "only give rise to an inference of scienter when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information . . . Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and

(3) whether the sales were consistent with the insider's trading history." *Metzler*, 540 F.3d at 1066–67 (internal citations and quotation marks omitted). "For individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a meaningful trading history for purposes of comparison to the stock sales within the class period." *Zucco Partners*, 552 F.3d at 1005 (internal quotation marks omitted).

Plaintiffs allege that Wolfson and Painter sold over 423,000 and over 97,000 shares of Solazyme stock during the class period, respectively. SAC ¶ 109. The SAC contains no allegations regarding the trading history or the timing of the sales. Plaintiffs have therefore failed to adequately plead scienter based on these sales.

### E. **Management Departures**

Plaintiffs additionally note that "several sudden and largely unexplained high-level departures" took place at Solazyme near the end of the class period. SAC. ¶ 109. These departures included President and Director David Cole and the Chair of Solazyme's Audit Committee, Ann Mather. *Id.*

The Ninth Circuit has recognized that "resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter." *Zucco Partners*, 552 F.3d at 1002. However, "a plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one. Mere conclusory allegations that a financial manager resigns or retires during the class period . . . without more, cannot support a strong inference of scienter." *Id*.

Here, Plaintiff alleges nothing beyond the fact of the departures of David Cole and Ann Mather on October 9, 2014. These departures, without further context, do not support a strong inference of scienter.

### F. **SOX Certifications**

Plaintiffs contend that the certifications in Solazyme's SEC filings that the filings did "not contain any untrue statement of material fact" support a strong inference of scienter. Dkt. No. 96 at 23–24; SAC ¶¶ 52, 57 n.5. The SAC does not allege that the May 29, 2014, July, and August statements for which falsity has been adequately pled were accompanied by any such

certifications, and so the certifications alleged do not support an inference of scienter as to those statements. Moreover, the Ninth Circuit has recognized that "[b]oilerplate language in . . . required certifications under Sarbanes-Oxley section 302(a) . . . add[s] nothing substantial to the scienter calculus." *Zucco Partners*, 552 F.3d at 1003-04.

### G. Holistic Evaluation

Finding that none of these factors individually supports a strong inference of scienter, the Court next conducts a holistic review of the allegations to determine whether the combination of allegations raises such an inference. *See id.* at 992. Here, as many of the allegations do not support a finding of scienter at all, the combination of the above allegations also fails to raise a strong inference of scienter. As a result, the Court finds that Plaintiffs have failed to adequately plead scienter with respect to the May 29, July, and August, 2014 statements regarding the production of commercially salable oil at Moema.

## IV. CONTROL-PERSON LIABILITY

Plaintiffs also allege Section 20(a) claims against the Individual Defendants and Solazyme on a "control person" theory of liability. SAC ¶¶ 127–130, 136–137. Because the Court finds that Plaintiffs have not adequately pled a primary violation of Section 10(b) and Rule 10b-5, Defendants' motion to dismiss Plaintiffs' Section 20(a) claims is **GRANTED**.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss **WITH LEAVE TO AMEND** only as to the May 29, 2014, July, and August statements. The motion is granted **WITHOUT LEAVE TO AMEND** as to all other statements, based on Plaintiffs' failure to adequately plead those claims following the Court's prior grant of leave to amend, and their abandonment of several statements not addressed in their opposition brief. Any amended complaint must be filed within 28 days of the date of this order.

**IT IS SO ORDERED.**

Dated: 6/26/2018

HAYWOOD S. GILLIAM, JR.
United States District Judge

17